**REDACTED**

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MASSACHUSETTS

3    No. 1:09-cr-10166-MLW-ALL

4

5

6    THE UNITED STATES OF AMERICA

7    vs.

8

9    SALVATORE F. DiMASI, ET AL

10

11    * * * * * * * *

12

13    For Hearing Before:
     Chief Judge Mark L. Wolf

14

15    Pretrial Conference

16

17

18    United States District Court
     District of Massachusetts (Boston.)
     One Courthouse Way
19    Boston, Massachusetts 02210
     Wednesday, June 17, 2009

20

21    * * * * * * *

22

23    REPORTER: RICHARD H. ROMANOW, RPR
     Official Court Reporter
24    United States District Court
     One Courthouse Way, Room 5200, Boston, MA 02210
25    bulldog@richromanow.com



2

                        A P P E A R A N C E S


S. THEODORE MERRITT, ESQ.
ANTHONY E. FULLER, ESQ.
    United States Attorney's Office
    John Joseph Moakley Federal Courthouse
    1 Courthouse Way, Suite 9200
    Boston, Massachusetts 02210
    (617) 748-3123
    Email: Theodore.merritt@usdoj.gov
           Anthony.fuller@usdoj.gov
    For the United States of America


THOMAS R. KILEY, ESQ.
WILLIAM J. CINTOLO, ESQ.
    Cosgrove, Eisenberg & Kiley, P.C.
    One International Place, Suite 1820
    Boston, Massachusetts 02110
    (617) 439-7775
    Email: Trkiley159aol.com
    For Salvatore F. DiMasi


ROBERT M. GOLDSTEIN, ESQ.
    20 Park Plaza, Suite 1000
    Boston, Massachusetts 02116
    (617) 742-9015
    Email: Rmg@goldstein-lawfirm.com
    For Joseph P. Lally, Jr.


THOMAS DRECHSLER, ESQ.
    Finneran, Byrne & Drechsler
    50 Redfield Street, Suite 201
    Boston, Massachusetts 02122
    (617) 265-3900
    Email: Tdrechsler@fbdlegal.com
    For Richard W. McDonough


MARTIN G. WEINBERG, ESQ.
    20 Park Plaza, Suite 1000
    Boston, Massachusetts 02116
    (617) 227-3700
    Email: Owlmcb@att.net
    For Richard D. Vitale

```
 1                P R O C E E D I N G S
 2                (Begins, 11:00 a.m.)
 3                THE CLERK:  United States versus Salvatore
 4      DiMasi, et al., Criminal Number 09-10166.  The Court is
 5      in session.  Please be seated.
 6                THE COURT:  Good morning.  Would counsel
 7      please identify themselves for the Court and for the
 8      record.
 9                MR. MERRITT:  Good morning, your Honor.
10      Theodore Merritt on behalf of the government.
11                MR. FULLER:  Anthony Fuller on behalf of the
12      government, as well, your Honor.
13                MR. GOLDSTEIN:  Good morning, your Honor.
14      Robert Goldstein on behalf of Joseph Lally, who is
15      present in court.
16                MR. WEINBERG:  Good morning, your Honor.
17      Martin Weinberg for Richard Vitale, who is sitting to my
18      right.
19                MR. KILEY:  Good morning, your Honor.  Thomas
20      R. Kiley.  Mr. DiMasi, to my left.  And Mr. Cintolo is
21      with us both.
22                MR. DRECHSLER:  Good morning, your Honor.  Tom
23      Drechsler for Mr. McDonough, who is here in court.
24                THE COURT:  Okay.
25            As you know, this case was randomly assigned to
```

4

1   me.  Magistrate Judge Collings is, at least for the time

2   being, handling the early phases, including discovery.

3   However, there are several issues that I wanted to

4   discuss at the outset with counsel and the parties.

5          I think before discussing what the case is about,

6   it's prudent and appropriate to tell you certain things

7   and give you a chance to ask me any questions, express

8   any concerns you might immediately have.  I'll give the

9   parties an opportunity to respond after today.  However,

10  I think, these are matters that counsel should discuss

11  with their clients.

12         I feel comfortable that I'm not biased or

13  prejudiced in any way and my recusal, based on the

14  individual matters I'll describe to you, that those

15  matters, cumulatively, in my present view, certainly

16  wouldn't require my recusal under Section 455(b)(1) of

17  Title 28, nor, at the moment, do I believe that a

18  reasonable person would question my impartiality based

19  on the matters I'll describe to you.  So -- if I had

20  come to that conclusion, I would disqualify myself under

21  Section 455(a).  But I do want to consider any questions

22  or concerns that you may have today, but particularly

23  after today.

24         There are three things that I want to describe and

25  then ask you, within reason, whether you'd like to ask

1    me anything else.

2         First, I believe I've met Mr. DiMasi once. We sat

3    together at a Boston Bar Association luncheon in

4    connection with its annual meeting several years ago.

5    It's possible we've encountered each other at some other

6    time, but that's the one time I remember meeting

7    Mr. DiMasi. We were seated at a table of about 10

8    people. We were not seated next to each other, as I

9    recall.

10        But would anybody like to ask me any questions

11   about that?

12            MR. KILEY:  Did he behave himself, your

13   Honor?

14            THE COURT:  I don't remember anything

15   memorable.

16        Okay. Second, the Deputy Clerk assigned to me is

17   Dennis O'Leary. Mr. O'Leary is married to another

18   employee of the court, Eugenia O'Leary. Mr. O'Leary

19   advised me that his wife, Eugenia's aunt, told Eugenia

20   that she worked for one of the defendants. And we're

21   going to have a closed session where I'm going to give

22   you, in the greater detail, the names -- or the name.

23   But as this is a matter that occurred before the grand

24   jury, at least until I consult the government, I don't

25   want to discuss it on the public record. Well, let me

6

1    take a step back.

2        Dennis O'Leary told me that his wife's aunt told

3    his wife that she worked for one of the defendants

4    identified and that she had been called to testify

5    before the grand jury.  Because grand jury matters are

6    secret, unless it's necessary to make them public in

7    connection with a court proceeding, generally, as I

8    said, and I'm not saying the name right now, but we'll

9    go back in the lobby and I'll tell you later and they'll

10   be a transcript and perhaps it will be made part of the

11   public record.

12       In any event, Mr. O'Leary told me that he and his

13   wife, Eugenia, have not discussed his wife's aunt's

14   grand jury testimony or the case with the aunt.  They

15   were just told that she testified.  And Mr. O'Leary

16   thinks that the prosecutors may have been told about

17   this connection.

18       Mr. O'Leary is not here today.  If necessary or

19   appropriate, I could exclude him from all participation

20   in the case.  It would be somewhat disruptive, but not

21   impossible to deal with.  However, I thought I should

22   promptly bring that to your attention.

23       Are there questions you'd like to ask me about

24   that?  Is this something that -- does the government

25   know what I'm talking about?

1          MR. FULLER:  I believe so, your Honor.

2          THE COURT:  Okay.  All right.  Well, I will,

3     as I said, give you the name of the aunt and the

4     defendant for whom she worked, when we go back, and

5     perhaps it will soon be made part of the public record.

6     But I want to hear from counsel on that.

7          And then the third and last thing that I thought I

8     should tell you is the following.  Since 1986, I've been

9     the chair of a program called the John William Ward

10    Public Service Fellowship for Boston Latin School

11    students.  It is a program that gets summer jobs with

12    public officials in the Commonwealth to encourage them

13    to become engaged citizens and public leaders.  They

14    work for the Governor, the Mayor, some of them work in

15    the State Legislature, although none work for Speaker

16    DiMasi.  As I recall, the Ward Fellows worked in the

17    Attorney General Bellotti's office in the early years of

18    the program when Mr. Kiley was the First Assistant.

19          As a judge I cannot be involved in any fundraising

20    and I'm not involved in any fundraising for this

21    program.  It doesn't need or have much money.  But the

22    limited fundraising that is done is done by now the

23    former fellows and other leaders of the program.  Every

24    year, and sometimes periodically, I see financial

25    statements and they show who made contributions to the

 1    program.  And one of the former fellows, who is now a

 2    young lawyer and a leader of the program, whose name I

 3    can tell you, if you think it's important, but if the

 4    name is not important, I won't mention it, has a mother

 5    who is employed by the Vitale Catarino accounting firm.

 6    The accounting firm has a foundation.  And I don't think

 7    this is anything that the government knows anything

 8    about.  I'm looking at Mr. Fuller looking at

 9    Mr. Merritt.

10         In 2006 and 2007, this young man's mother applied

11    to the foundation, which apparently considers

12    applications or requests from employees of the firm, for

13    a contribution to the Boston Latin School Association

14    for the Ward Fellows Program.  $500 contributions were

15    made by the foundation in 2006 and 2007.

16         I would have seen that.  I don't have any memory

17    of having seen it, but the name of the firm wouldn't

18    have meant anything or the name of the foundation

19    wouldn't have meant anything to me at that time.

20         On about December 21st of last year, 2008, there

21    was a reunion of the Ward Fellows and this young lawyer

22    asked me if his mother should not ask the foundation for

23    a contribution again, for 2008, because Mr. Vitale's

24    name had been in the newspaper as being under

25    investigation, a Federal investigation, I think, and I

1   didn't tell him that she couldn't ask again, for several

2   reasons.

3       One is that I know the young man's mother and I

4   know that she takes pride in being able to generate

5   support for a program that meant a lot to her son.  I

6   was told that the foundation was separate from the firm

7   and I understood from the young lawyer and/or from the

8   media -- and I checked again, that it was in the May

9   17th, 2008 Boston Globe, and that Mr. Vitale was retired

10  from his firm.  The money wasn't being given to me,

11  certainly.  Mr. Vitale was only reportedly under

12  investigation.  There was no Federal charge or case.

13  And I didn't know the case would get assigned to me, if

14  there was a case.

15      So as far as I knew, Mr. Vitale didn't have any

16  role in the foundation, at the end of that party, in a

17  conversation that probably took a minute or two, at the

18  most, and I said that it would be okay if his mother

19  wanted -- well, I wasn't telling him not to do it.  I'm

20  not generally involved in these things and I didn't seek

21  to veto it.

22      I've checked the records.  On December 23rd, 2008,

23  a $500 contribution was made by the Vitale Catarino

24  Foundation through the Boston Latin School Association

25  for the Ward Fellows Program.  As I said, I can give you

1    the name of the young lawyer and his mother, if you'd

2    like.

3        But would anybody like to ask me any questions

4    about that?

5            MR. FULLER:  No, your Honor.

6            THE COURT:  Is there anything else, within

7    reason, you'd like to ask me about that might relate to

8    the propriety of my participation?

9            (Silence.)

10            THE COURT:  All right.  And does anybody have

11    any immediate concerns?  You shouldn't be timid about

12    expressing them.

13            (Silence.)

14            THE COURT:  I'll issue a written order on

15    this.  But I am directing that defendants' counsel speak

16    to the defendants, discuss all of this, see whether they

17    have any concerns or objections.  But essentially the

18    relevant questions are whether you think a reasonable

19    person could question my impartiality if that person

20    knew what I've described?  And if a reasonable person,

21    in the circumstances, would question my impartiality, if

22    I shouldn't participate in the case?  And that's a

23    ground for recusal that could be waived under Section

24    455(e) so the order will ask whether, in any event, you

25    waive any argument or objection under Section 455(a).

1   And the government will have to consider this and tell

2   me its position, too.

3       I can't completely delegate the decision regarding

4   recusal to the parties. I have a duty to protect

5   against forum shopping, as the First Circuit discussed

6   in *In re Allied Signal*, 891 F. 2nd 967 at 970, and as I

7   later discussed in *Salemme*, 164 F. Supp. 2nd 86.

8   However, I will consider the parties' views very

9   seriously, as I did in the *Sawyer* case in about 1994.

10  There's a September 2, 1994 order in *Sawyer*. And I

11  certainly am not going to take offense or be affected as

12  we go ahead, if anybody raises a question, expresses a

13  concern, or makes an objection that doesn't ultimately

14  prove to be persuasive. However, as I said, I think

15  it's very important to deal with these matters at the

16  beginning of any case and hopefully put them to rest.

17       Would it be reasonable for me essentially to ask

18  you to make filings on this issue, say, by Friday?

19           MR. KILEY:  Yes.

20           MR. FULLER:  That's fine, your Honor.

21           THE COURT:  Okay.  And does anybody have any

22  concern or objection to my proceeding today?

23           MR. WEINBERG:  No, your Honor.

24           MR. KILEY:  No.

25           MR. DRECHSLER:  Can I ask one procedural

1    question, Judge?  If we have no position, there's no

2    objection or anything, must we file something?

3                THE COURT:  Yes.

4                MR. DRECHSLER:  Okay.

5                THE COURT:  You're going to tell me -- it's

6    going to be in writing.  You're going to tell me that

7    either you have an objection and explain it or you're

8    going to tell me that there is no objection and you're

9    going to tell me whether you also -- your clients waive

10   any Section 455(a) ground for recusal as is permitted

11   under Section 455(e).  Okay?

12               MR. DRECHSLER:  Thank you, your Honor.

13               THE COURT:  All right.

14        I've read the indictment in the case and certain

15   other filings, but it's always my practice, when I see

16   counsel and the parties in a criminal case for the first

17   time, to ask for an overview and essentially what you

18   think I ought to know to have a fuller flavor of it as

19   we begin to proceed.  So I'll hear from the government

20   and then if there's anything the defendants would like

21   to tell me, I'm interested in that, too.

22               MR. MERRITT:  Well, your Honor, I think -- as

23   the Court has read the indictment, it pretty much lays

24   out a fairly good and factual detail of what the

25   allegations are.  Obviously I'm sure there will be some

```
 1    legal filings concerning the honest services theory, but
 2    apart from that, the government thinks it's a fairly
 3    straightforward case.
 4               THE COURT:  Famous last words, in my
 5    experience.
 6          But actually that is helpful.  The theory of the
 7    case is a conspiracy to deprive the public of the honest
 8    services of a public official?
 9               MR. MERRITT:  Correct, and the scheme itself.
10               THE COURT:  Well, a mail fraud, a wire fraud,
11    but the -- well, what are the leading cases on that
12    theory now?  I haven't looked at it in about 25 years.
13               MR. MERRITT:  Well, most recently in the First
14    Circuit there is the *Potter* case, *United States vs.*
15    *Potter*.  That was cited.  And *United States vs.*
16    *Urciuoli,* if I'm pronouncing that correctly.  And, of
17    course, the leading cases still go back to *Sawyer* and
18    *Woodward*.
19               THE COURT:  Okay.
20               (Pause.)
21               THE COURT:  And this will evolve.  But do you
22    have a sense of about how long you think it would take
23    the government to put its case in?
24               MR. MERRITT:  I would suggest about three
25    weeks, your Honor.
```

1          THE COURT:  I know that Magistrate Judge

2    Collings has talked to you about discovery.  We'll get

3    to that shortly.  But -- well, all right.

4          Anything else you think I ought to know or have in

5    mind?

6          MR. MERRITT:  I don't think so, your Honor.

7          MR. WEINBERG:  Your Honor, we think, in

8    contrast to the government, that this is an unorthodox

9    and even extraordinary expansion of a statute that is at

10   the core of the Supreme Court's scrutiny.  Within the

11   past half a year, Justice Scalia, in dissenting from a

12   denial of certiorari of a case named *U.S. vs. Sorich*,

13   S-O-R-I-C-H, expressed extreme concern about the lack of

14   boundaries in 1346, which was Congress's 1988, I

15   believe, response to the Supreme Court decision in

16   *McNally* that talked about the absence of any contours or

17   structure in honest services jurisprudence.  Justice

18   Scalia identified a split in circuits and a search for

19   boundaries and, in fact, cited to the *Urciuoli* case,

20   which is U-R-C-I-U-O-L-I, a First Circuit decision by

21   then Chief Judge Boudin.

22         THE COURT:  Out of Rhode Island?

23         MR. WEINBERG:  Out of Rhode Island, your

24   Honor.  And it's a case I'm familiar with.  I

25   represented Mr. Urciuoli and he's back on *Urciuoli II*,

1    which is again before the Court of Appeals.  But then

2    Chief Justice Boudin talked about a need for and a

3    search for a principle narrowing an expansive statute.

4         Justice Scalia talked about 28 words that had

5    generated, in the years since *McNally*, a search for

6    boundaries and the Ninth Circuit, in a case called

7    *Kincaid*, K-I-N-C-A-I-D, articulated four different

8    theories by which different circuits tried to cabin in

9    the boundarilessness of the 28 words of 1346.  In the

10   *Black* case, of course, the Supreme Court, you know,

11   focused on a split in circuits --

12            THE COURT:  I'm sorry.  In which case?

13            MR. WEINBERG:  *Black's* case, which was the

14   portion of 1346 that did not relate to honest services,

15   vis -- vis public officials, but instead related to

16   honest services regarding private parties,

17   employer/employee.  To compound, the traditional

18   theories are not delineated in this indictment, which

19   are quid pro quo bribery and concealed conflict of

20   interest.  Those are the two in addition to the *Sawyer*

21   theory, which added a third theory of some pattern of

22   gratuities that caused a deviation from honest

23   services.

24         You know, we, at least, would contend that this

25   case, and the charges in the indictment, do not provide

1    clear notice, at least to Mr. Vitale, as well as his

2    co-defendants, as to just what the theory of criminality

3    is except that it clearly impacts -- and this is where

4    --

5              THE COURT:  You're saying the indictment

6    doesn't provide clear notice?

7              MR. WEINBERG:  Exactly, your Honor.  Except

8    that we believe that central to the litigation in this

9    case will be whether or not these defendants, all four

10   of them, conformed their conduct to state law?  *Sawyer*

11   says you don't need to violate a state law to qualify

12   for Federal prosecution, although two other circuits,

13   the Fifth in *Brumley* and the Third Circuit say you do.

14        But our defenses in this case will go beyond that

15   set of criteria.  We will be contending to the Court

16   that it is because the defendants conformed their

17   conduct to carefully architected state legal

18   requirements, that they are entitled to the legal

19   protection of that conformity.  And that if it's the

20   honest services of the state citizens that's being

21   allegedly betrayed by the defendants, that if the state

22   citizens elect legislators that enact a law that they

23   conform with, that they should be protected and indeed

24   immunized from Federal prosecution.

25        And to make things even one step, you know, more

1    interesting, *Urciuoli II* will address that exact matter

2    before the Court of Appeals sometime in the late fall.

3    He was -- he requested and was denied a theory of

4    defense instruction about conforming to state law.

5    Judge Lisi denied the instruction.  The jury convicted

6    him.  Judge Lisi denied him bail pending appeal.  The

7    First Circuit just reversed that portion of her

8    decision.

9         And the central issue of *Urciuoli II*, which again

10   has not been briefed, but will be presented to the Court

11   of Appeals in the upcoming months, will be whether or

12   not a theory of defense is viable to a 1346 prosecution

13   based on a Federal prosecution when the defense is "I

14   conformed with state law, so how could I betray the

15   citizens of the state?"

16        So that's a kind of overview of what we think is

17   an expansion of 1346 beyond its traditional theories.

18   Beyond *Sawyer*.  And, you know, we believe that the Court

19   will need to address this defense.  That Mr. Vitale, for

20   instance, did not register as a lobbyist because he fit

21   within an exemption under the state lobbying laws which

22   presumes you're not required to register if you don't

23   work 50 hours in any reporting period.  I know that

24   Mr. Kiley will inform the Court that it is part of

25   Mr. DiMasi's potential defense is his conformity to

1    state law and that this will be a central and common
2    theme that the defense will bring.
3         THE COURT:  I mean, this is the kind of
4    preview of coming attractions I was hoping to get.  It
5    seems to me, conceptually, at a very abstract level,
6    something might not violate state law, but could violate
7    Federal law.  Here it's the mail fraud and the wire
8    fraud statutes.
9         But do the arguments you make go to whether --
10   well, the state of mind requirements of the mail fraud
11   and wire fraud statutes, for example, intent to
12   defraud?
13        MR. WEINBERG:  I think they go to two
14   different elements, one is the state of mind and whether
15   or not somebody that believed they were conforming to
16   state law could have the necessary criminal intent to
17   cause deviation of honest services?  But I also think it
18   goes to the very essence of criminal scheme.  And
19   whether or not 1346 can be expanded so far from its
20   heartland, which is quid pro quo bribery, the *Seigelman*
21   case, an exchange of money for a job, to encompass the
22   kind of conduct that the government is attempting to
23   prosecute in this case?
24        THE COURT:  I think you said, at the outset,
25   that you challenge whether the indictment gives fair

1    notice?

2            MR. WEINBERG:  Yes, your Honor.  It does not

3    charge quid pro quo bribery, it does not charge a

4    *Sawyer*-type pattern of gratuities designed to cause

5    deviation, and it does not charge a concealment of a

6    conflict of interest.  And therefore we, at least on

7    behalf of Mr. Vitale, I am without notice,

8    constitutionally-required notice, as to what the 1346

9    theory is.  Remember, 1346 is an unusually vague

10    criminal statute.

11            THE COURT:  Well, let me just ask you one

12    question.  You said the indictment doesn't give you

13    notice.

14            MR. WEINBERG:  Yes, your Honor.

15            THE COURT:  Do you anticipate complaining that

16    the statute doesn't give you notice?

17            MR. WEINBERG:  Yes, your Honor.  And the

18    statute as applied in this case provides us with no

19    notice.

20            THE COURT:  Well, at some point I'll ask you

21    whether there's any important First Circuit case after

22    *Anselem* on whether a statute gives adequate notice?

23        Okay.  Thank you.  Mr. Kiley, is there anything I

24    should know from your client's perspective?

25            MR. KILEY:  What Mr. Weinberg represented, I

1    think, speaks for all of us.  We do think that this case

2    will present a very involved set of circumstances for

3    you to evaluate the way state law and Federal law come

4    together in defining the honest services duty that an

5    individual owes.  And we will indeed be arguing to you

6    ultimately that all of the Speaker's -- that all of the

7    Speaker's actions were expressly authorized by law and

8    permitted by law and that there's been no violation of

9    the statute.

10         In terms of the overview that you want, the

11    case law that you want, I think Mr. Weinberg,

12    Mr. Merritt have given it all to you.  The one

13    nonprecedential matter that I would suggest to you, when

14    you're looking at the First Circuit cases, the *Urciuoli*

15    line of cases, the cases that come out of Rhode Island,

16    are very enlightening because they -- because the

17    actions of the Court, the District Judge, the Presiding

18    Judge Lisi in Rhode Island, built on the most recent

19    Federal precedents and in the trial of Messrs. Cramer

20    and Ortiz, at the trial court level, following the

21    return of all of the First Circuit precedents up to the

22    *Urciuoli II* matter, the role that state law plays was a

23    central part of the instructions and I think you're

24    going to have to pay attention to that, your Honor.

25              THE COURT:  Do you anticipate -- and you're

1    not wedded to your answer on this.  But do you

2    anticipate raising these issues on a motion to dismiss

3    the indictment or is it more likely that I'd be dealing

4    with this during trial?

5         MR. KILEY:  It's a certainty you'll be dealing

6    with it at trial if you don't dispose of it with motions

7    to dismiss.  There may be dispositive motions.

8         THE COURT:  All right.  I think -- I'm sorry.

9    Go ahead.

10         MR. KILEY:  Again, your Honor, Mr. Weinberg

11    laid it out, from the defense perspective, perfectly.

12         THE COURT:  Well, assuming, as I do for

13    present purposes, that I continue in the case, I will be

14    interested, in some fashion, addressing these issues

15    before we get to trial, even if it's only in the context

16    of anticipating what proper jury instructions would be.

17         MR. KILEY:  Well, the spirit is really just to

18    inform you what you will be dealing with.

19         THE COURT:  Right.  And the fact that you told

20    me today communicates that you're not waiting until a

21    jury is impaneled and hoping anybody will be surprised

22    by this.  We'll deal with it.

23         All right.  Mr. Goldstein?  Mr. Drechsler?

24         MR. GOLDSTEIN:  There's one issue that may

25    apply only to Mr. Lally, I'm not sure, and it's that

1    Mr. Lally has expressed a strong interest to me, as his

2    lawyer, to secure as speedy a trial as possible in this

3    case.  And I don't know what time frame encapsulates "as

4    possible."  We're in the very nascent stages in terms of

5    discovery production.

6            THE COURT:  I'd say I'm with Mr. Lally and I'd

7    like to see this case proceed with all deliberate

8    speed.  We're going to get to talking about discovery in

9    a moment.  There does have to be complete discovery and

10   there does have to -- you know, the issues that are

11   raised have to be dealt with.  But it would be my goal,

12   you know, to give this high priority to assure that you

13   all have enough time to do what needs to be done

14   thoughtfully and thoroughly and not have it progress in

15   any artificially fast pace, but it would be regarded as

16   a priority matter.

17           MR. GOLDSTEIN:  And that's what Mr. Lally is

18   interested in.  What I would just add, Judge, is that

19   one of the primary motivating factors behind that

20   request is Mr. Lally has, in essence, become

21   unemployable in his chosen field as a result of the

22   intense coverage the investigation received by the

23   Globe.  It's practically impossible for Mr. Lally to

24   secure employment.  Every time he gets close to a

25   prospect, the prospect vanishes when likely these

1    companies perform, you know, what is today routine, in

2    terms of Google and other kinds of background searches.

3    And I know the Court has conducted -- had conducted some

4    inquiry regarding the possibility that material had been

5    improperly leaked to various newspaper outlets with

6    regard to the government's investigation, and that

7    certainly didn't help. But even without that, you know,

8    Mr. Lally's ability to continue on this path is somewhat

9    jeopardized the longer that this case progresses. And

10   so on his behalf -- and I know it's an impossible

11   question to answer today, not knowing the scope of

12   discovery, but I did want to put it on the record.

13         THE COURT: That's useful. You know, it

14   elicits my -- my frame of mind. This should be regarded

15   as a priority matter to proceed with -- what the Supreme

16   Court said in *Brown*, is "all deliberate speed." Nothing

17   artificially quickly. Everything needs to be done

18   thoroughly and thoughtfully. But as quickly as

19   reasonably possible.

20         MR. GOLDSTEIN: Thank you, your Honor.

21         THE COURT: Mr. Drechsler.

22         MR. DRECHSLER: I really have nothing to add,

23   Judge, to what's already -- I echo the thoughts of my

24   brother counsel in this regard, other than I -- you

25   know, until I -- like the Court says, until I've seen

1    the discovery, I have no position to take regarding the

2    schedule beyond that.

3         THE COURT:  Well, that actually moves into

4    what I had coming up next on my agenda.

5         Again, at the outset, I want to remind all of you

6    of certain obligations that you have.  We have Local

7    Rule 83.2(a) which describes the parameters of

8    permissible statements by attorneys in criminal cases.

9    I read the news accounts.

10        The defendants have expressed some concern for

11   pretrial publicity in various ways.  I actually --

12   things have changed in the last 25 years.  There didn't

13   use to be press conferences at the time of an

14   indictment, there was a little press release, but now

15   there are press conferences.  I've read the news

16   reports, some of them the day after the indictment in

17   this case.  I didn't perceive anything reported that was

18   inconsistent with Rule 83.2(a) from the government, but

19   I do point you to the rule.  You want to keep it in

20   mind.  And it imposes obligations on defense lawyers as

21   well as on prosecutors.

22        It's also important, as you know, to be sure that

23   the restrictions relating to grand jury secrecy imposed

24   by Federal Rule of Criminal Procedure 6(e) are observed.

25        The next local Rule, 83.2(b), gives the Court the

```
 1    authority to impose special restrictions in highly
 2    publicized cases.  That, hopefully, will not prove to be
 3    necessary or appropriate in this case.  But that
 4    authority is there.  It's inevitable in a case like this
 5    that there's going to be publicity and in other highly
 6    publicized cases, in my experience and in the experience
 7    of my colleagues, it's been possible to pick a fair
 8    jury, but that's always a concern.  You know, it's a
 9    concern that's already been expressed in various ways in
10    the short time this case has been pending.  It's
11    something important for everybody to remain sensitive
12    to.
13         But at this point, is there anything anybody would
14    like to say about this issue?
15              (Silence.)
16              THE COURT:  All right.
17         Then, as I do the first time in every criminal
18    case -- the first time I see the parties in any criminal
19    case, I want to point you to the requirements of Rule 16
20    of the Federal Rules of Criminal Procedure and
21    particularly the local rules of the District Court
22    regarding discovery.  The local rules provide for
23    automatic discovery of material exculpatory
24    information.  That's Rule 116.2.  That material
25    exculpatory information has to be obtained from all
```

1    agencies involved in the investigation of the case.

2    That's Rule 116.8.  Notes must be preserved.  That's

3    local Rule 116.9.  And there's a continuing duty to

4    supplement the disclosure.

5        You know, if information is developed in the

6    course of the case that didn't exist when the earlier

7    disclosure was made, there's a duty to promptly

8    supplement it.  The local rules just codify obligations

9    imposed by the Constitution.  But despite all kinds of

10   efforts, there have been problems.  Nobody wants any

11   problems in this case.

12       So hopefully -- and I asked Magistrate Judge

13   Collings to say this to you when he saw you as well.  I

14   can see this is not going to be entirely

15   straightforward, that there's some legal issues, but

16   every effort needs to be made to assure there's no

17   reasonable basis for a complaint that the defendants or

18   the government didn't get what they or it was entitled

19   to, because there are reciprocal obligations imposed on

20   the defendants under Rule 116.1(d) and under Federal

21   Rule of Criminal Procedure 16.  So the rules should be

22   helpful to you.  Use them as a road map.

23       Now, I see, in the file, that the government filed

24   motions for lis pendens and also for preliminary

25   restraint on certain assets.  They were filed June 2nd

1    and 3rd.  To my knowledge, no oppositions have yet been

2    filed.  They'd be due around now.

3            MR. GOLDSTEIN:  Any opposition to the lis

4    pendens were due yesterday.  There'll be no opposition

5    from Mr. Lally with regard to that.  As relates to the

6    government's proposed order restraining Mr. Lally's

7    ability in terms of his property, which is 4 Oliver

8    Swain Road, you know, we have conducted research

9    regarding the propriety of the Government's order.  I

10   think today we'll mail you the filings.  And we're

11   reserving our right to later contest the order, if

12   necessary.  But there will be no opposition as of today.

13           THE COURT:  Okay.

14           MR. KILEY:  There is no intention to oppose

15   the lis pendens on the part of Mr. DiMasi.

16           THE COURT:  And what about the preliminary --

17           MR. KILEY:  There is not.

18           THE COURT:  Okay.  Mr. Weinberg, are you

19   subject to those motions?

20           MR. WEINBERG:  I am not, Judge.

21           MR. DRECHSLER:  We are not, Judge.

22           THE COURT:  All right.  So if I understand

23   this correctly -- and a lis pendens ordinarily just is

24   automatic.  It just shows there's a dispute about the

25   title.  The restraining order, as I understand it, I can

1    enter it without prejudice to the parties moving for

2    reconsideration.  Is that right?

3            MR. GOLDSTEIN:  Yes, Judge.  There were issues

4    legally regarding the scope of the restraining order

5    requested by the government.  I've spoken to Mr. Lally.

6    He can live by the terms presently as they exist and if

7    it comes an issue at a later point in time, I'll notify

8    the Court.

9            THE COURT:  All right.  So the government

10   would like me to enter the post-indictment restraining

11   order in the form attached, is that correct?

12           MR. MERRITT:  Yes, your Honor.

13           THE COURT:  Okay.  I plan to do that.

14           (Pause.)

15           THE COURT:  Now, unless somebody has something

16   else, that completes what I hoped to discuss in this

17   public session.  I am planning to see all of you back in

18   the lobby in a session that will, at least temporarily,

19   be closed to the public.  I'll give you the name of

20   Mrs. O'Leary's aunt.  I'll also discuss with you a

21   matter that is, at present, under seal.  It relates in

22   part to an issue that may implicate the attorney-client

23   privilege.  Such issues may justify the sealing of

24   documents and the closure of proceedings, as the First

25   Circuit said in *Sidel v. Putnam*, 147 F. 3rd 7 at 9.  It

1    also relates, to some degree, with a grand jury matter

2    that possibly should not be made public.

3         As the parties know, I have some questions with

4    regard to whether sealing and closing the proceedings to

5    the public are justified.  But it's not only prudent, I

6    find it's necessary to discuss those questions in a

7    closed proceeding.  A transcript will be made of that

8    proceeding.  That transcript can be unsealed fully or in

9    redacted form if some redactions are appropriate.

10        Therefore, and unless some member of the public

11   wants to be heard on that, we will recess and reconvene

12   in the lobby.

13        Okay.  The Court is in recess.

14             (Recess, 11:45 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1          (In the lobby, 11:50 a.m.)

2          THE COURT:  All right.  Okay.  We've

3    reassembled in the lobby.  We have everybody except

4    Mr. Cintolo.  I don't have either my Docket Clerk or my

5    Deputy Clerk.

6          (Mr. Cintolo enters.)

7          THE COURT:  And I've just been handed a June

8    16th, 2009 filing that the government made under seal.

9    I haven't seen it before a few minutes ago.  I assume it

10   was filed yesterday?

11         MR. MERRITT:  Yes, your Honor.

12         THE COURT:  Well, it didn't come to my

13   attention.  Once I clarify who is going to be serving as

14   my Deputy Clerk on this, I think, particularly if it's

15   an urgent matter, if it's going to come in the day

16   before the hearing, you should call or at least e-mail

17   to let me know it's on the way.

18         I've just read it quickly.  This goes to whether

19   this hearing ought to be sealed --

20         MR. MERRITT:  Yes, your Honor.

21         THE COURT:  -- and closed to the public and

22   the papers still sealed, which is what the government

23   originally asked for?  And I don't suggest, actually,

24   improperly.  I think when these kind of issues are

25   raised, it's prudent to probably err on the side of

1  requesting confidentiality and we can discuss the

2  question, which in the process we're engaged in here.

3      I think I'll come back, at the end, to whether the

4  -- I don't know if I can decide whether the proceedings

5  should be open or the transcript should be promptly made

6  available until I know what we're going to be talking

7  about.  So let's set some ground rules for proceeding.

8      And I think the government may want to read --

9  reread the redacted version that was given to me.  You

10 can't rely exclusively on word processing.  You took the

11 attorney's last name out everywhere, but you left his

12 first name in the first time it came up.  So go through

13 it again with human eyes.  Sometimes the electronics can

14 be challenging.

15     You know, on the other hand, here, you know, we're

16 not talking about wiretap information or information

17 that's not likely to become public at some point, as far

18 as I can tell.  So you know I have concerns about

19 closing this.

20     But, here, I told you I would tell you the name of

21 Mrs. O'Leary's aunt.  That's  redacted      .  I'm told

22            redacted        .

23     So when you -- well, I'll put in my order that you

24 ought to let me know, you know, whether you think I

25 should essentially take Mr. O'Leary off the case.

1    I feel, myself, comfortable that when I tell him

2    "Don't discuss this with your wife and neither of you

3    can discuss it with her aunt," that he would follow that

4    instruction.  But, you know, if you think it's necessary

5    or prudent that I just replace him, for the purposes of

6    this case, then I expect I will do that.

7    But now that you know who this is, that it's

8    redacted    , is there anything else you would like to ask

9    or tell me?

10    MR. MERRITT:  Well, I don't know if the Court

11    knows the answer to this question, but how close a

12    relationship is it between Mr. O'Leary's wife and her

13    aunt?

14    THE COURT:  I don't know the answer.  In fact,

15    neither of them are here, neither Mr. O'Leary nor

16    Mrs. O'Leary are here this week, but I can talk to them

17    on the telephone.  She doesn't work in my session.

18    You know, there will be matters coming in under

19    seal.  On the other hand -- well, I'll ask.  But maybe

20    you ought to proceed on the assumption, you know, that

21    it's reasonably close.  And I haven't talked directly to

22    Mrs. O'Leary about this, so I have hearsay about the

23    original conversation.  But I just think it's important

24    that as many as these issues as possible, if they exist,

25    you know, be surfaced, so that they can be considered at

1    the outset and that they be dealt with and that we can

2    proceed.

3          All right.  But this doesn't have to be a final

4    answer, as I said, I can give you a couple of days to

5    respond on these.

6          But do you have a concern about Mr. O'Leary

7    continuing at this point?

8             MR. MERRITT:  Not at this point, your Honor.

9             THE COURT:  All right.  All right.  Well, you

10    go back and think about it, talk to your colleagues,

11    talk to your clients, and you'll let me know.

12          All right.  And then essentially just to preserve

13    their privacy, if it's possible, I didn't tell you the

14    name of the young lawyer or her mother, because they

15    have nothing to do with the case, the young man who is

16    the alumnus of the Ward Fellows program.

17          Does anybody feel you should have that name?

18             MR. MERRITT:  No, your Honor.

19             MR. KILEY:  I don't even want the name.

20             THE COURT:  Okay.  Okay.  All right.  What do

21    you feel is going to need to be done to develop and

22    fully brief this -- well, actually, let me take a step

23    back.

24          (Pause.)

25             THE COURT:  All right.  What I'm interested

1   in, with regard to this motion to disqualify, is

2   developing a briefing schedule and getting a sense of

3   what's going to be necessary to resolve this.

4        And this is up to Mr. DiMasi, but as his lawyers

5   may have told him, at some point I'm going to ask you,

6   pursuant to the Supreme Court decision in *Wheat*, you

7   know, a set of questions, you know, about if you want

8   Mr. Kiley and Mr. Cintolo to continue to represent you

9   and if you recognize that there are these issues and

10  these risks, which I'll spell out.  It may be desirable

11  -- but this is up to you, to get some independent legal

12  advice.  In other words, not from Mr. Kiley, not from

13  Mr. Cintolo or from anybody sitting around the table, as

14  to whether you should proceed with them as your lawyers

15  or not.

16        As I said, that's up to you.  I'm not ordering

17  it.  But I have two concerns that I have in every case.

18  One, I want the proceedings to be fair to everybody and

19  to have everybody energetically and effectively

20  represented, and then, if it turns out there's a

21  conviction, I want it to be final.  I don't want to be

22  in the situation where a convicted defendant can come

23  back and have a colorable claim that, you know, "My

24  lawyer was restricted improperly in his ability to

25  represent me because of something."

1        So it will probably be August before we have this

2    hearing, but you've got a right to consult somebody else

3    on these issues, and while they are sealed materials

4    now, I'll put it in my order that you would be permitted

5    to, you know, consult another lawyer and that wouldn't

6    be a violation of my order, unless somebody has a

7    different thought on that.

8            MR. FULLER:  No.

9            THE COURT:  The government has no objection to

10    that?

11            MR. FULLER:  No, your Honor.

12            THE COURT:  Okay.  So that's up to you.

13        All right.  You know, what's going to be necessary

14    to develop the factual record and complete the briefing

15    on the issue -- the issues raised by the motion for

16    disqualification?  I saw there was a footnote, maybe in

17    the file that Mr. Weinberg and Mr. Goldstein made,

18    telling me something I anticipated, that you made the

19    request for the full grand jury transcript?

20            MR. KILEY:  I did, your Honor.  The motion to

21    disqualify was previewed and delivered to us at the time

22    of arraignment, on the 8th, and literally immediately, I

23    think by letter of the 9th, I requested the full

24    transcript and other 3500 material and the government

25    has responded and has provided me -- and I think it's a

1   footnote in their next-to-last submission, which

2   indicated that they provided an additional document,

3   it's an interview report.  It is a significant interview

4   report, in my mind, because it indicates that what

5       P.A.      told the interviewer, at the time, was that

6   I was not his lawyer.  I was not then -- at least then

7   representing him.  You don't have that before you, I

8   think, in any additional form.  And otherwise declining

9   to provide the balance of the transcript.

10      Obviously I would like the balance of the

11  transcript.  But they've made the decision not to do

12  that.

13          THE COURT:  Do you intend to ask me to order

14  them to give it to you?

15          MR. KILEY:  Well, again, I haven't thought

16  that through.

17          THE COURT:  All right.

18          MR. KILEY:  There is something I very much

19  intended to do and have refrained from doing because of

20  the impoundment and sealing order, and that's

21  communicating any further with -- that I have not

22  communicated since this issue was raised, with

23      P.A.    ,     P.A.'s      current counsel, and

24      P.A.'s    former counsel, redacted     .

25          THE COURT:  Who's his current counsel?

1          MR. KILEY:    redacted    .  And my intention

2    would be to give you a factual record, which I expect

3    would tell you --

4          THE COURT:  Right.  Well, as soon as I read

5    the motion, I said to my law clerk that they're going to

6    ask for the full grand jury transcript and all the 3500

7    materials that they ordinarily wouldn't be entitled to

8    get this early.  I didn't say I was going to give it,

9    but I just said that this is going to be an issue.  And

10   I'd have to get a request and I'll have to deal with it,

11   but what do those materials relate to, both whether

12   there was an attorney-client relationship at all and

13   whether there are any statements that might be made at

14   trial that you would be a potential witness on?

15         MR. KILEY:  I suppose both.  Certainly when I

16   ask for the grand jury transcript, I envision that it is

17   going to contain more material than about his

18   communications with me.  But what I do think the record

19   is going to show is that I never represented  P.A.

20   in connection with this Federal investigation and that

21   all of my communications with him, with respect to this

22   inquiry, were in the presence of his then counsel.  And

23   I think that is going to be the case.

24         THE COURT:  The grand jury testimony, the

25   little excerpt I had, seemed to indicate that, at least

1    the first time he met with you, he didn't have another

2    lawyer?

3          MR. KILEY:  Correct, and that's what I sought

4    to distinguish, your Honor.  The Federal investigation

5    comes toward the tag end of it, after more than a year

6    of other activity, and I think what the grand jury

7    snippet suggests is that he, um, was seeking counsel

8    through Mr. DiMasi first, who directed him to

9    Mr. Egbert, with respect to what his duties were with

10   respect to the Secretary of State's Office, and that, I

11   think, is the matter that is laid out in the snippets as

12   with regard to counsel.  And I expect that's what the

13   record would be and my position would be, that I never

14   represented him in this matter and indeed I never opened

15   the file, I never did an engagement letter, you know, I

16   never took a penny from    P.A.    , and all of that

17   will be in it.

18         THE COURT:  That -- and this is just off the

19   top of my head, and you'll address it, but, you know,

20   the government cites cases that are consistent with my

21   understanding, you know, that if somebody consults you

22   even if it doesn't mature into a retained agreement, you

23   know, that that might be a privileged communication.

24   What I couldn't tell from the excerpt attached is when

25       P.A.      learned that you were representing

1    Mr. DiMasi. Did he know it from Day 1, as far as you're

2    concerned, or did he learn it later?

3              MR. KILEY: Um, again, more than Day 1, I

4    represented Mr. DiMasi, who was his law colleague, for

5    -- on and off for more than a decade. So from Day 1

6    certainly.

7              THE COURT: Because, analytically, with regard

8    to the government's argument that, you know, Mr. Kiley

9    might be in a position to use confidential information

10   of    P.A.       on behalf of Mr. DiMasi saying, say,

11   cross-examining     P.A.     , you know, one of the

12   questions I would have is that if he had no reasonable

13   expectation of confidentiality from Mr. DiMasi, he might

14   have it, you know, with regard to the world generally

15   and what's the impact of that on the analysis? You

16   don't need to answer it. Well, okay. Go ahead. Go

17   ahead.

18             MR. FULLER: Well, I don't know, from the

19   record that we provided, that Mr. DiMasi was present

20   during that first meeting when   P.A.       met with

21   Mr. Kiley.

22             THE COURT: And I assume he wasn't, but --

23             MR. FULLER: And so I don't understand that he

24   could expect Mr. DiMasi to have any knowledge of what he

25   told Mr. Kiley. So that --

```
 1              THE COURT:  Oh, I think this is their joint
 2    defense-type point.
 3              MR. FULLER:  Well, right, your Honor.
 4              THE COURT:  And this is just questions.
 5    You've had a lot more time to think about it.  If --
 6    let's say Mr. Kiley was representing both of them, but
 7      P.A.      knew that Mr. Kiley was also representing
 8    his traditional client.  Then, um, the question I would
 9    have is, is information  P.A.       gave Mr. Kiley
10    confidential information that Mr. Kiley can't use to
11    cross-examine    P.A.    ?  Did he sort of assume that
12    risk that the defendant here, if they ever split, would
13    use that information against him through his lawyer?
14              MR. FULLER:  I think certainly it would have
15    to depend on the terms of any common defense.  I don't
16    know that there was one here, certainly in writing.  But
17    at the end of the day, your Honor, the confidentiality
18    issue is really not what's driving our motion.
19              THE COURT:  What is?
20              MR. FULLER:  Well, it's certainly the
21    appearance of the conflict that a key government witness
22    sought counsel from the defendant's attorney and was
23    told to tell the truth, which by virtue of that advice,
24    seems to run counter to the interests of that
25    defendant.  Because as laid out in the indictment and in
```

1    our motion, that testimony, if truthful, is inculpatory
2    of the defendant.  So that's one thing.  Because the
3    advice given was essentially, um, about a key issue in
4    this prosecution, namely this entire relationship
5    between  P.A.   and Cognos and the payments and
6    Mr. Kiley was privy or heard this witness describe it to
7    him, we believe, in a consistent fashion as to what he
8    will say at trial, again it's in our motion, that
9    Mr. Kiley is a witness to his prior consistent
10   statement.  And that really, I think, separates -- to
11   use a term Mr. Weinberg uses, it separates this from the
12   heartland of these other cases.  I don't know, of the
13   cases we cite, there's really not a situation where the
14   attorney-client relationship came about in the context
15   of advice on the central issue that was to be tried in
16   the criminal case.  It's usually in the context of
17   representing a co-defendant who may have information
18   that may or may not inculpate another defendant and the
19   courts are looking at it respectively not knowing what
20   that witness may say, but there could be a conflict.
21   Here we have a definitive conflict before us that
22   actually makes the attorney a witness.
23            THE COURT:  Well, how is he a witness?
24            MR. FULLER:  Well, he's a possible witness.
25            THE COURT:  Well, that may be.  I mean, I'm

1   telling you this just so you can better prepare to

2   address it.  There are a couple of things that come to

3   my mind, as you say.  To the extent that Mr. Kiley,

4   arguably, shouldn't have been representing both of them,

5   um, under the ethics rules, I don't know how that -- you

6   know, whether that should be a basis for prompt

7   disqualification or just something that should be dealt

8   with if the Board of Bar Overseers is sufficiently

9   interested in it.  In other words, you say there's an

10  appearance of --

11             MR. FULLER:  Well, I'm not suggesting that he

12  represented him in the sense of -- as Mr. Kiley said, he

13  didn't represent him for the purposes of the Federal

14  investigation, however, he did give advice about the

15  grand jury --

16             THE COURT:  Yeah, and I don't think that

17  distinction is dispositive.  You know, this was public

18  and, I mean, and we had this at the outset of the *Flemmi*

19  case where I think Mr. Egbert represented Mr. Flemmi and

20  also previously represented one of the bookmakers, as I

21  vaguely recall, Crantz, and the argument was that

22  Mr. Egbert would be able to cross-examine Crantz, on

23  behalf of Flemmi, relying on confidential information he

24  received from Crantz.  And that -- do I remember this

25  right?

1          MR. WEINBERG:  I think that there was also the

2     parallel component -- there were two parallel components

3     to this case, one being the depth of Mr. Egbert's

4     relationship with -- and the corollary, the depth of

5     Flemmi's need to continue that relationship, which I

6     think parallels the depth of the DiMasi/Kiley

7     relationship, the complexity of this case, and really

8     the irreplaceability of Tom Kiley to Sal DiMasi, as I

9     think it was argued to you, the irreplaceability of

10    Egbert to Flemmi.  And second, the fact that the

11    Government regularly elicits from their cooperating

12    witnesses, then Crantz, now  P.A.    , the very content of

13    the communications between Kiley/ P.A.     , Egbert/Crantz

14    and so there isn't that traditional risk that secret

15    conversations unknown to the government, known to the

16    lawyer, would give the lawyer an unfair advantage.

17         THE COURT:  Yeah, and I haven't had time to do

18    more than read what you filed, but, you know, these are

19    some of the questions and it may influence the scope of

20    the appropriate discovery.  But, you know, 1, was there

21    an attorney relationship?  My present sense is that that

22    doesn't turn on whether it was with regard to a Federal

23    investigation or not.  2, did  P.A.        give Mr. Kiley

24    information that he expected would be confidential for

25    Mr. DiMasi or did he understand it would be shared?  3,

1    if he did give Mr. Kiley information that was

2    privileged, with regard to Mr. DiMasi, has that been

3    waived by the testimony of the grand jury?  Which I

4    think you may address in this filing I just read.  I

5    mean, I think the answer to that is probably "Yes."

6            And so then, um -- so if there was a relationship

7    but it wasn't supposed to be -- the information wasn't

8    supposed to be confidential to Mr. DiMasi and it's been

9    waived anyway, then what's the problem -- well, what's

10   the basis for the disqualification?

11           MR. FULLER:  Well, it may not come to pass,

12   but, your Honor, the real issue would then become, in

13   order to vigorously represent Mr. DiMasi, if P.A.

14   is testifying as laid out in the motion, there's going

15   to have to be a cross-examination that's going to attack

16   his credibility to some degree.  And if the lawyer doing

17   that witnessed the prior consistent statement and he's

18   the only one who did --

19           THE COURT:  Do we know whether Mr. Kiley was

20   the only one who spoke -- you know, who was with

21      P.A.       when they spoke?

22           MR. FULLER:  Well, I think, based on the

23   record we submitted, that Mr. Kiley was the only one

24   present.  If there's a way to have Mr. Kiley stay in the

25   case and not have that happen?  But I don't know that

1    there is because he -- I'm sorry?

2              MR. MERRITT:  And argue it, too.  He has to

3    get up and argue it.

4              MR. FULLER:  Yeah.  I mean, that's the issue

5    that the Court is aware, the lawyer is the advocate, not

6    someone testifying to a fact.  So it becomes --

7              THE COURT:  And these are things, you know,

8    that we're going to have to -- if Mr. DiMasi continues

9    to want Mr. Kiley and Mr. Cintolo to represent him,

10   these are things I'm going to have to review with them.

11   But -- and again, it's a right thing to raise at the

12   beginning of the case before going to trial.  I don't

13   criticize you're raising it, I sort of commend you

14   surfacing it now, because the argument that it, you

15   know, disrupts an important relationship gets stronger

16   as you get toward trial.

17             But the other question is, you know, how real is

18   this risk that Mr. Kiley is going to be a witness?  And

19   this is part of the reason I -- and if what  P.A.

20   has told the government is consistent with what he told

21   Mr. Kiley, not a prior inconsistent statement, um, well,

22   or Mr. Kiley doesn't have any prior inconsistent

23   statements that he can testify to, how would he be a

24   witness?

25             MR. FULLER:  I'm sorry?

1          THE COURT:  Yeah, I mean I think your theory

2     is that if  P.A.    testifies in a way that's

3     inconsistent with what he told Mr. Kiley, Mr. Kiley is a

4     potential witness.

5          MR. FULLER:  What I'm saying is, if he -- in

6     his grand jury snippet that we included, he says, in

7     that sense, "I told Mr. Kiley the same thing that I've

8     told the grand jury," we have essentially included a lot

9     of that in the indictment and it inculpates, obviously,

10    Mr. DiMasi.  So if  P.A.      testifies consistently

11    with that, which we expect he will, I don't understand

12    how to vigorously defend Mr. DiMasi.  He will not be

13    attacked -- his credibility won't be attacked on what

14    was said.  If that doesn't happen --

15         THE COURT:  Well, as I say, he'll attack his

16    credibility and then you would want to call Mr. Kiley as

17    a witness?

18         MR. FULLER:  That may be what happens, your

19    Honor.

20         THE COURT:  Well, because it was a prior

21    consistent statement?  Why was it -- and then I would

22    ask you -- and this isn't an answer, it's a question,

23    but was it before there was a motive to fabricate?

24         MR. FULLER:  It was after -- it was before the

25    grand jury subpoena and before he was contacted by the

1   Federal authorities,

2           MR. KILEY:  I think the record will be to the

3   opposite effect on that.  I think the record will be

4   that the conversation at the time in the Secretary of

5   State's Office is before subpoenas and Federal

6   involvement.  But I think the record will be, at the

7   time of the -- the tell-the-truth allegation -- perish

8   the thought that that's truly what I said, but if I

9   undoubtedly did --

10          THE COURT:  But before you perish the

11  thought.

12          MR. KILEY:  -- I think the record is going to

13  be -- which takes me full circle what I envision doing,

14  is dealing with redacted   , who was his lawyer, who was

15  present at the time, it would be part of what I would

16  develop, and at that point in time they were there --

17  when redacted    came over, it was at the time of the

18  Federal investigation when, um, the question to tell the

19  truth arose -- represented by another, who was present.

20  I did not have any private communication with

21    P.A.      at all, in that time period, and that's what

22  the record, I'm sure, will show, which would properly

23  put me in --

24          MR. FULLER:  Your Honor, I don't know that

25  that would satisfy --

```
 1              THE COURT:  Hold on one second.  I may have
 2       asked you this before.  If I did, I apologize.
 3           Does the government have any objection to my
 4       modifying the sealing order to permit the consultation
 5       with counsel for  P.A.         and, if they permit, with
 6           P.A.    ?
 7              MR. FULLER:  With counsel?  If you consult
 8       with -- I'm sorry?
 9              THE COURT:  No, no, I'm going to modify the
10       sealing orders, the sealing orders to permit -- I mean,
11       essentially what I have in mind is issuing a protective
12       order with regard to any discovery relating to this
13       where all of the people working on this case can have
14       the information, they can use it for the purpose of this
15       case, and no other, and I would clarify whether that
16       includes going out and interviewing witnesses.  But I
17       want to see whether you have any concern about that?
18              MR. MERRITT:  If they want to develop a
19       factual record, they don't have to be shown these
20       documents.
21              THE COURT:  Well, no, he wants to go and talk
22       to him.  Right now it's not just the documents that are
23       under seal, but the information in the documents that
24       are under seal.  Well, let me finish, because I don't
25       want any confusion about this.
```

1          Part of the reason I have a concern about closing

2     the public proceedings is generally it's a public right

3     to know, cases like *Standard Financial Management*, a

4     civil case, and that's my case I was referring to.  But

5     my general orientation is to try and make things public,

6     if they can properly be made public.  But another reason

7     is, um, that if I put it under seal, I don't expect to

8     read the information in the newspaper.  And if I don't

9     have confidence that it's going to remain confidential,

10    I'll just unseal it, so I don't have to spend my time

11    and energy doing a leak investigation.  So, I mean,

12    that's part of it.  So I just want everyone to

13    understand that it's not just the documents that are

14    under seal, it's the information that's impounded.

15          MR. FULLER:  I think to facilitate the Court's

16    consideration of the motion, to the extent    redacted

17    has to be contacted, that should be fine.

18          THE COURT:  I think redacted    is in there.

19          MR. FULLER: redacted      is the current attorney

20    for --

21          MR. KILEY:  Well, my view is if I wanted to

22    develop a factual record, I have to deal with his

23    present counsel, his former counsel, and perhaps

24    P.A.        .

25          THE COURT:  Right.  I mean, this is factual.

1    I mean, I assume there's going to be -- you know,

2    there's a possibility there's going to be an evidentiary

3    hearing, there's a possibility that    P.A.    is going

4    to testify in connection with this motion.  But there

5    may be a factual dispute as to what occurred.  And I

6    think Mr. Kiley has been telling me that redacted    was

7    present for at least the meetings after the first one?

8                MR. KILEY:  I think that's what's in this, the

9    interview with -- um, on the Federal investigation is

10   what I'm telling you, your Honor, not the Secretary of

11   State matter.

12               THE COURT:  I'm sorry.  Say that again?

13               MR. KILEY:  What I want you to understand is

14   I'm representing to you that what I think the record

15   will show is that from the point in time of the Federal

16   investigation forward, or any knowledge with respect to

17   that,    P.A.    had counsel, it was first   redacted

18      .  I never met with him without   redacted    present

19   in that time period.  As opposed to a year earlier, or

20   whatever it was, when he visited the Secretary of

21   State's Office.

22               THE COURT:  All right.  But I'm going to

23   issue -- I have to see what the discovery is, but I'm

24   going to issue some order that's going to permit all of

25   you to use the documents and information in connection

1    with the litigation.  And this is a sensitive issue.

2    But is there anybody other than  P.A. , redacted  and

3      redacted    you think you would need to share this

4    information with?

5              MR. KILEY:  Not on this discrete issue, no.

6              THE COURT:  I mean, on the motion to

7    disqualify.

8              MR. KILEY:  Well, what they're suggesting is

9    is that there may be facts within it, this notion that

10   there might be a witness, a basis of prior inconsistent

11   statements.  I don't know what the statements are that

12   were made --

13             THE COURT:  Well, that's why I thought you had

14   asked me for all of the grand jury transcripts?

15             MR. KILEY:  Well, I probably will.

16             THE COURT:  Okay.

17             MR. FULLER:  Our position will be that that

18   will be unnecessary and Mr. Kiley will oppose the

19   motion.  Obviously the Court will have that information.

20             THE COURT:  No, but I -- I mean, I would

21   perhaps review it in camera, but I don't understand the

22   implications of everything.  In other words, this is

23   what I anticipated.  I'm not sure you did.  And this

24   isn't a ruling, but it's -- it's just kind of embedded

25   in the issue.  You say -- you, the government, say that

1    Mr. Kiley should be disqualified because he may have

2    personal information about statements    P.A.    made

3    that are inconsistent with what he said to the grand

4    jury or were in an interview.  But for Mr. Kiley, you

5    know, to take a position on whether he has personal

6    information about prior inconsistent statements, he's

7    going to argue to me, and I'm not suggesting to him

8    anything that --

9            MR. KILEY:  You're not.

10           THE COURT:  -- that he has to know what the

11   statements were.  And if there's something important in

12   the grand jury that he thinks, you know, Mr. DiMasi

13   would need him to be a witness for, I would expect him

14   to get out of the case.  If on the other hand he comes

15   in and argues, "I've read the whole grand jury

16   transcript and it's entirely consistent with what

17   P.A.    called me," "told me," then, 1, he'll argue

18   "There's no need for Mr. DiMasi to call me as a witness,

19   and if the government wants to call me as a witness, you

20   ought to exclude that under Rule 403," because, you

21   know, he probably told other people this, too, like

22   redacted, or somebody.

23           MR. FULLER:  Well, the Government's position

24   is that Mr. Kiley can assess that -- granted the entire

25   transcript is not incorporated in the indictment, but

1    the key allegations that are -- certainly the ones that

2    are incriminating, and there may be others, but to

3    Mr. DiMasi are there. Mr. Kiley can sit here today and

4    tell the Court or factfinder if that information was

5    consistent or inconsistent without seeing the

6    transcript. So given that there is a possibility he

7    could be a witness, then why run the risk of producing

8    the entire transcript especially when the Court would

9    have the opportunity to review it? I think Mr. Kiley

10   would end up probably being a witness in a motion -- in

11   this evidentiary hearing, should there be one. You

12   know, and that poses another thought, whether or not

13   there needs to be standby counsel to conduct that

14   hearing. You know, there's unfortunately a lot of

15   lawyers here.

16        But on the main point about the access to the

17   transcript, there's enough information in the indictment

18   about what    P.A.        said that I think Mr. Kiley would

19   be able to know whether or not it was consistent with

20   what the witness told him.

21             MR. KILEY: One other fact that I want to make

22   sure that we put on the record in this conference, which

23   is not reflected in the government's pleadings, is that

24        P.A.      , at least through the Government, is not

25   seeking my disqualification or asserting any kind of

1    privilege or confidentiality.  A very important

2    consideration, your Honor.

3            MR. WEINBERG:  I think one other factor that

4    was raised by Mr. Goldstein --

5            THE COURT:  Well, hold on just one second.

6            (Pause.)

7            THE COURT:  I don't know that.  In other

8    words, this is a motion under seal.  I don't know what

9    P.A.'s    position is in connection with that.  And

10   I think the government probably knows this, but it's

11   just important to be sensitive to these things.  It

12   wouldn't be proper for the government to, under the

13   ethical rules, to discourage    P.A.    from talking to

14   Mr. Kiley, if he wanted to -- and he's probably got a

15   lawyer and we would probably have to go through his

16   lawyer, I haven't looked at this, but, you know, the

17   witnesses are equally available to anybody and he can

18   talk to the government, if he wants, he can talk to the

19   defendant, if he wants.  But there are cases that point

20   out the impropriety of the government instructing or

21   encouraging the witness not to talk to the defense.  Go

22   ahead.

23           MR. KILEY:  Just the -- I think the government

24   makes the representation, in Footnote 10 in their

25   original submission to you, with respect to the current

```
 1    intentions, as they understand it, of    P.A.    .  I
 2    have not made that --
 3                THE COURT:  What does it say his intentions
 4    are?
 5                MR. FULLER:  Footnote 4, your Honor.  I'm
 6    sorry.
 7                MR. KILEY:  I think 1 is the original 4 now?
 8                MR. FULLER:  Page 4.  "Counsel for    P.A.    has
 9    advised that while    P.A.    believes" --
10                THE COURT:  Not too fast.  He's got to write
11    this down.
12                MR. FULLER:  I forgot we had a reporter here.
13    "Counsel for    P.A.    has advised that while    P.A.
14    believes he had an attorney-client relationship with
15    Attorneys Kiley and Cintolo, he does not seek
16    disqualification from this matter."  That's in the
17    footnote.
18                THE COURT:  Oh, okay.  All right.  Well, did
19    somebody else want to be heard on this?
20                MR. WEINBERG:  Just briefly.  We've worked
21    together towards trying to get common grounds for
22    discovery.  We've worked with Mr. Fuller and we're
23    working on two different levels, one to try to agree to
24    a protective order that your Honor will consider fair.
25    Second, to receive electronic discovery, which we expect
```

1  in huge volumes, in a format that's user friendly and

2  searchable.  And Mr. Fuller and I are working towards

3  that end.

4      But what interfaces with the disqualification

5  issue is I think all parties will tell you that this is

6  an enormous case in terms of the magnitude of the grand

7  jury, the magnitude of the expected documents, the

8  complexity.  It's interfaced with state law where

9  Mr. Kiley is a preeminent authority of great value to

10  all members of this defense, small defense community.

11  He's not fungible.  He's not replaceable, particularly

12  in a case where there's some hope for a speedy trial.

13  In contrast to some expectation, we're going to be

14  getting a huge electronic volume of discovery and I hope

15  your Honor considers his value not only to Mr. DiMasi,

16  but to the administration of justice in terms of a

17  speedy trial.

18      THE COURT:  I don't know that that's a

19  cognizable consideration.  But -- here, with regard to a

20  possible protective order, take a look at *Salemme*, 978

21  F. Supp. 386 at 390.  This is the sort of format for a

22  protective order that I would probably enter.  I was

23  thinking of doing it now.  But how --

24      MR. MERRITT:  May I ask a procedural question,

25  your Honor?

```
 1                THE COURT:  Yes.
 2                MR. MERRITT:  Is the Court rescinding the
 3      order of reference?  Is the Court going to be handling
 4      discovery matters?
 5                THE COURT:  I may be.  I probably will be,
 6      unless you -- well, I'm going on vacation in July.  I
 7      think everybody knows that.  Are you, too?
 8                MR. MERRITT:  Yeah.
 9                THE COURT:  Good.  Make your plans for next
10      July, too, and maybe we'll try the case a year from
11      September, if not earlier, which would be great from my
12      perspective.  I mean, I'm with Mr. Goldstein, you know,
13      I want this to go.
14                But, you know, I'm -- I probably will take the
15      case.  And I haven't decided when, but -- well, that's
16      part of the reason I wanted to see you, because I
17      don't -- I don't want any appeals.  It's a waste of time
18      to have things done twice.  And I might as well, you
19      know, have a feel for all of this, about what you're
20      talking about, not to have somebody tell me, "Well,
21      we've discussed that with the Magistrate Judge."  But,
22      you know -- that's probably what's coming.
23                So basically what do you propose as a way of
24      proceeding?  Do you propose to litigate any discovery
25      issues?  Do you want a modification of the impoundment
```

1    orders so you can do some investigation?  When do you

2    propose to respond to the government's filings?

3             MR. KILEY:  Um, I would anticipate first

4    seeking all of the grand jury -- if this issue of me as

5    a potential witness on an inconsistent statement is

6    real, I will press -- I will file a motion.  If I may

7    have until -- is Monday too soon to get the grand jury?

8             THE COURT:  And you can say, "No," but next

9    Tuesday is my last day in the office until August.  So

10   what do you want to do?

11            MR. KILEY:  Just for the transcript, I want to

12   get --

13            MR. CINTOLO:  If it's just for the

14   transcript.  We've got a brief in the Ninth Circuit to

15   do.

16            MR. KILEY:  I do know that.

17            THE COURT:  Well, we might as well talk about

18   this.  If you want to file something, you should file it

19   simultaneously maybe while I'm on vacation.  But the

20   point is that I think the government is not going to

21   agree to give you the transcript.  At least they didn't

22   come in here intending to give them to you and normally

23   there are good reasons for not wanting to give them.  On

24   the other hand, you need to understand that Mr. -- well,

25   that Mr. Kiley is going to argue, "How can we make a

1  properly-informed decision as to whether I have any

2  information inconsistent with what    P.A.    told the

3  government if I don't see everything he told the

4  government?"

5      MR. GOLDSTEIN: Could I have one more point,

6  your Honor?

7      THE COURT: Well, in -- then, you know, and

8  then you'll explain to me, as you began to explain it to

9  me, why he doesn't need it for these purposes or why I

10  should look at it. The problem is that I don't know the

11  case except for essentially what I read in the

12  indictment and what you told me, and I don't know what

13  P.A. told Mr. Kiley. He's the one who would know

14  whether it's inconsistent or not. If they got it, it

15  would be subject to some kind of protective order

16  similar to what you'll see in *Salemme*, which limits the

17  use.

18      MR. KILEY: My first step would be that. I

19  would envision that within two weeks after securing the

20  transcripts, I would -- and I'm assuming that I'm going

21  to be able to communicate with    redacted

22  and, if permissible,    P.A.    , if permitted by

23    redacted    , to develop the factual record and do a

24  submission again two weeks after I get the grand jury.

25      THE COURT: All right. And I assume the

1    government would want some time to respond to that?

2            MR. FULLER:  Yes, your Honor.

3            THE COURT:  Is there any hope that you could

4    agree on the discovery, I mean, if you talk further sort

5    of reflecting on this discussion?

6            MR. FULLER:  On the transcript?

7            THE COURT:  Yes.

8            MR. FULLER:  I don't think so.

9            MR. MERRITT:  I mean, granted Mr. Kiley wants

10   to proffer to us what    P.A.     told him and then we

11   can go in that direction.

12           MR. KILEY:  I'm not in a position to do that.

13           THE COURT:  Okay.  Well, it sounds like -- so

14   when do you propose to make your motion?

15           MR. KILEY:  I proposed Monday until Bill

16   kicked me under the table --

17           MR. CINTOLO:  Wednesday?  Next Wednesday?

18           THE COURT:  Okay.  This may not be great from

19   Mr. Goldstein's perspective, but it obviously is not

20   going to get resolved before I go away.  So next

21   Wednesday?

22           MR. CINTOLO:  Still in June?

23           THE COURT:  I'm not going to leave -- next

24   Tuesday is my last day in the courthouse until August,

25   which is why I gave you Friday.

1        MR. CINTOLO:  Well then, Monday.  I'll do it

2    Monday.  That's okay.

3        THE COURT:  No, no, I've got plenty to do.

4    I'm going to be doing the *Sampson* death penalty habeas

5    on Monday.  I'm not going to be sitting there waiting

6    for your motion.  Because the government is going to

7    have to have time to respond to it anyway.  You want to

8    read their motion and respond to it.

9        About how much time do you think you want to

10    respond to it?

11        MR. FULLER:  Two weeks is customary.

12        THE COURT:  All right.  Can I have Dennis's

13    calendar, please.

14        MR. FULLER:  Oh, on the transcript?

15        MR. KILEY:  This is just on the transcript.

16        MR. FULLER:  Oh, probably -- I hate to cut my

17    own time, but that says a week, so --

18        THE COURT:  Well, he's going on vacation, so a

19    week is fine with him.

20        MR. FULLER:  Okay, two weeks.  Sorry, your

21    Honor.

22        THE COURT:  All right.  The defendant's motion

23    for discovery, because you may be talking about more

24    than the transcript.  Well, first of all, I'm going to

25    order that you confer on this before you file.  You've

1  got to let some of this sink in a bit and maybe you can

2  reach some resolution.  Look at my protective order.

3  Look at the -- you know, what they're requesting.

4           Is it just the grand jury transcript or is it

5  going to be more than the grand jury transcript?

6           MR. KILEY:  We ask for the statements, the

7  3500 material, but it's just -- it's limited to  P.A.  .

8           THE COURT:  All right.  So defendants are

9  going to file that motion on Wednesday -- if I'm going

10 to give them two weeks, Mr. Cintolo, do you want a

11 little more time?  Do you want till the end of next

12 week?

13          MR. CINTOLO:  That would be fine.

14          THE COURT:  Here, I'm going to give you until

15 the 29th.  And I'm ordering that you confer before you

16 file anything, because, you know, the government never

17 wants to give this up a year in advance.  But as soon as

18 I read the motion, I knew that this was going to be the

19 issue.  Because, at a minimum, the issue of Mr. Kiley as

20 a witness relates to -- there may be another way to deal

21 with it, but it relates to what did  P.A.    say?

22 Because there's a -- well, you know, if the government

23 -- you know, you may be able to evade it, if you want to

24 do this, but then it concerns me, if not full

25 disclosure, because then Mr. DiMasi has to know what

1    kind of risk he's assuming.  But if you say, you know,

2    "We're concerned only that Mr. Kiley would be a witness

3    on A, B, C, and D and, you know, we've given him A, B,

4    C, and D," but that might not cut through it because --

5                    MR. FULLER:  I would probably think Mr. Kiley

6    is going to want all of it.  So we'll confer, your

7    Honor, absolutely.

8                    THE COURT:  Yeah, reflect on it.  Because it

9    really is just inherent in the issue the way you posed

10   it and it strikes me as the right way to pose it.

11   That's one of the issues, is he a necessary witness?

12                   MR. FULLER:  Well, that isn't the only issue.

13   I don't want to suggest that --

14                   THE COURT:  Yeah, I say it's one of the

15   issues.

16                   MR. FULLER:  Yes.

17                   THE COURT:  And it might be the dispositive

18   issue.  So --

19                   MR. CINTOLO:  That's under seal, correct, your

20   Honor, to file it under seal?

21                   THE COURT:  Yeah, I'll give you an order

22   because -- well, every time you file something under

23   seal, also under seal is -- well, we're going to come

24   back to this, as to whether I'm going to open all of

25   this.  You've got to file -- and I'll tell you, in my

1    order, either publicly or also under seal, a redacted

2    copy, so when all of this -- this is all going to get

3    unsealed, at this point, but probably with redactions,

4    which you all will have to make carefully, including to

5    this transcript. But I'll give you something in writing

6    on how to file.

7        All right. And so if that's filed on June 29th,

8    Mr. Fuller wants two weeks to respond on discovery, so

9    that would take us to the 13th. But you've got the 4th

10   of July in there. Do you want until the 15th?

11                MR. FULLER: (Silence.)

12                THE COURT: To respond to discovery?

13                MR. FULLER: That's fine, your Honor.

14                THE COURT: You can do it sooner, if you want,

15   but you wanted the two weeks. I want you to get a

16   little vacation, too.

17                MR. FULLER: I have a trial starting the 13th,

18   so that's not going to matter to me.

19                THE COURT: All right. So do you want me to

20   give you the 10th?

21                (Laughter.)

22                MR. FULLER: The 15th is fine, your Honor.

23                THE COURT: Okay, the 15th. If there's any

24   reply that's going to be filed, it will be the 22nd.

25   I'll get this and perhaps decide it before I come back.

1    But once I determine what the discovery is, I'm going to

2    give Mr. Kiley two weeks after that to file his

3    opposition and then I'll give the government one week to

4    reply, and I expect I'll schedule a hearing, which I

5    would aim to conduct in August.

6            MR. CINTOLO:  In the interim -- I know you're

7    going to address this, but will we be allowed to contact

8            redacted                ?

9            THE COURT:  Yes, I think with some

10   restrictions.  Well, the short answer is "Yes," you're

11   going to have to get a written order.  But the -- but if

12   the government doesn't object to it.  But I think it's

13   probably necessary.

14           MR. DRECHSLER:  Your Honor, I do plan on

15   taking some time off in August.

16           THE COURT:  I was just going to ask you that.

17   When will that be?

18           MR. DRECHSLER:  Well, I haven't finally

19   determined that.  But I would say this, I was going to

20   ask, anyway, that if a hearing is conducted solely on

21   the issue of disqualification, I'm privately retained,

22   my client and I are trying to conserve resources, and so

23   if the hearing is solely going to be on that issue,

24   whether evidentiary or nonevidentiary, that I be excused

25   from that day and I wouldn't interfere with the Court's

1    schedule on that.

2         THE COURT:  Any time I schedule a hearing, if

3    it's on an issue that doesn't involve one of your

4    clients and you prefer not to be there, you can just

5    file something and say that you've consulted your client

6    and, you know, he and you request that you be excused.

7         MR. DRECHSLER:  I haven't determined yet, but

8    I'm going to be taking a couple of weeks off in August,

9    but not consecutively, probably the 3rd and then the

10   last week before Labor Day.  But I haven't confirmed

11   that.

12        THE COURT:  Well, until I get the briefing,

13   you know, it's conceivable that we'll be doing that

14   right after Labor Day, hopefully before.

15        Now, I think I have two options, at this point,

16   with regard to opening these proceedings.  I want to

17   read what the government filed more closely, but now the

18   government is advocating that this be open and the

19   documents be unsealed.  Is that correct?

20        MR. MERRITT:  Yes, your Honor.

21        THE COURT:  And do the defendants still oppose

22   that?

23        MR. KILEY:  Well, I never thought it was our

24   motion, I thought it was the Government's, and I -- your

25   Honor, my view is that the wisest course, because there

1    are allegations that may not pan out with respect to

2    privilege, that the wisest course is to keep sealed,

3    until you're ready to make findings with respect to

4    privilege, when you are ready to make those findings, I

5    heard the Court loud and clear that at some point this

6    matter is going to be public.

7              THE COURT:  It is, and I really want it to be

8    public when, after hearing you, I decide it's going to

9    be public and not read it in the newspaper, but you've

10   been really good on that so far.  You know, you share

11   this interest.

12        My inclination is not to unseal anything now, um,

13   but to revisit this when I have the defendant's response

14   and maybe the government's reply on the merits, to

15   basically revisit this in August.  You should order the

16   transcript and the parties should review it and make any

17   necessary redactions.  If you want     P.A.'s     name

18   out, you'll have to give me a redacted copy.

19        I'm willing to -- you know, because if this -- if

20   I order disclosure of the grand jury transcripts, which

21   is probably the next issue I'm going to have to decide,

22   you know, the government might have a different view on

23   how much of this ought to be public.  It seems to be a

24   very fluid situation.

25        But does the government want to be heard further

1    on that?

2             MR. MERRITT:  Well, your Honor, I'm sort of

3    handling the --

4             THE COURT:  Well, that's fine.

5             MR. MERRITT:  I don't think -- well, our

6    position is, at this point, that the Court has enough

7    for it to make the determination that there aren't

8    countervailing considerations that have been proffered

9    by the defendants that would rebut the presumption of

10   openness.  Both parties agree essentially, although no

11   one has come out directly and said it, but that if there

12   was an attorney-client privilege, it has been waived by

13       P.A.      in talking to the government.  So that is

14   just kind of a specter of attorney-client privilege.  I

15   don't think that's a real issue for the Court to find

16   that there's a reason to keep this in these closed

17   proceedings.  And, well, the Court can read our thing,

18   but this is the kind of proceeding that is and should be

19   open to the public.

20            THE COURT:  I know, that's what I told you

21   initially.

22            MR. MERRITT:  Well, we agree with the Court,

23   but --

24            THE COURT:  No, I --

25            MR. WEINBERG:  I think there will be a

1    countervailing factor that probably isn't yet directly

2    on the table.  As I go back to the *Flemmi* case, I quite

3    frankly can't remember, because I did some of the

4    representation with Mr. Egbert, whether we filed a brief

5    that was based on *U.S. vs. Cunningham,* the Second

6    Circuit case of 472 Fd. 2nd or not?  And I know one of

7    the key variables will be, for Mr. Kiley, to disclose to

8    the Court the full extent of his prior relationship with

9    Mr. DiMasi and the extent to which counsel of choice and

10   his replaceability or irreplaceability is at stake.  And

11   therefore there will be, I think, matters Mr. Kiley will

12   want to present to the Court about the historic

13   attorney-client privilege that he would not want to be

14   disclosed to the public.

15            THE COURT:  But that's not inconsistent with

16   unsealing the documents that exist to date.  People --

17   you know, the public would know that there's an issue

18   that the government is seeking to disqualify

19   Mr. DiMasi's attorney, but you could file a motion to

20   submit something particular under seal.  The question is

21   whether the whole thing is secret, which is what I felt

22   uncomfortable with to begin with.

23            Well, I'm going to do the following, because you

24   need to get to work on this.  I ordered the Government

25   to file redacted versions of this submission, which it's

1    going to correct by Friday.  But all parties should file

2    redacted versions of their submissions in case I decide

3    to unseal something before I go.  I'm ordering that you

4    order the transcript, which may take a while to prepare

5    because we're doing a lot of things, and you're going to

6    have to review this transcript and propose redactions.

7    I'll put it in an order and I'll give you one week to

8    propose redactions.

9         The government and the defendant, you should

10   confer.  Whoever is serving as -- if I decide to unseal

11   this, um, before I go, I'll ask whoever is working as my

12   Deputy Clerk in the matter to give you a heads-up.   I

13   mean, you'll get the order or I'll issue the order and

14   the redacted versions will be put on the public record

15   the next day or something like that.

16        But the basic principle is that there's a

17   presumption of public access, that's in part to hold the

18   prosecutor -- you know, so the public can hold the

19   prosecutors accountable and so that the public can hold

20   me accountable as the judge.  And in this case, you

21   know, we're not talking about unlitigated Title IIIs,

22   there's not a question of whether, you know, if you had

23   a wiretap, and two people were discussing killing

24   somebody and there was a question about whether that was

25   going to be excluded, in evidence, whether it was going

1    to be suppressed, that could be unfairly prejudicial if

2    it was publicized and never got into evidence.  But it

3    sounds to me like what's in the government's submission,

4    you know, is going to be        P.A.      -- or, you know,

5    some statements by       P.A.      based on his personal

6    knowledge, if they're relevant then they would come into

7    evidence.  So there's not that kind of risk of unfair

8    prejudice that we would be dealing with if we were

9    dealing with an unlitigated Title III.

10         And I think it's your position, Mr. Kiley, that

11    this was never intended to be confidential for

12    Mr. DiMasi and it was never -- and, you know, and it

13    wouldn't be improper for you to make it public in cross-

14    examining    P.A.    .

15              MR. KILEY:  That's right.  The government's

16    motion to disqualify me is predicated in part on the

17    notion that I possess confidential or privileged

18    information.  I don't believe I do.  But if I do -- but

19    if I do, then information pertaining to these

20    proceedings, under *Sidel*, is precisely the kind of thing

21    that can override the presumption for that, but just for

22    that.

23              MR. WEINBERG:  Could I just raise one other

24    issue to support that?  The courtroom was packed with

25    media today.  If your Honor was to unseal this prior to,

1  rather than after making the decision to hopefully

2  retain Mr. Kiley as counsel, there's going to be far

3  more predictable publicity and publicity that may

4  somewhere, in some juror's mind, have the potential for

5  discrediting all defense counsel.  The government is

6  moving on ethical and legal grounds to disqualify one of

7  us.  If, again, the publicity was unsealed, there would

8  be no prejudice to the media, they can integrate it with

9  your Honor's ultimate decision --

10          THE COURT:  All right.  Here's what I've got

11  to do to be fair.  Here goes my vacation again.  You've

12  got to have a chance to respond to what the government

13  just filed.  I mean, I'm the one who raised the issue.

14  I think -- I'm uncomfortable with doing all of this

15  secretly.  I mean, I had eight hearings that were closed

16  when we were talking about whether I would order the FBI

17  to disclose if Whitey Bulger and Stevie Flemmi were

18  informants, because if that information got out,

19  somebody could get killed.  And if I wasn't going to

20  order it, I mean -- I mean, that that's what was at the

21  heart of the case.  But this isn't the same situation.

22  I don't think they cited my June 6th *Salemme* decision

23  where I discussed some of this, including *Amadeo*, which

24  I noticed was in your papers.

25          But I don't, at the moment, see waiting until the

1    end to do a decision on this motion and then unsealing

2    it.  I think I'm likely to unseal it before then.

3    Having said that, I do think there are legitimate

4    competing interests.  I'd like to be somewhat surgical

5    in deciding what gets unsealed.  There are things that I

6    think that the government is not going to want out.  If

7    I order the grand jury transcripts be disclosed, I don't

8    think the defendants should just be able to just dump

9    them all on the public record.  And I'll have a

10   protective order.  And I don't think they would do

11   that.

12           But, Mr. Weinberg, do you want an opportunity to

13   respond to what the government filed yesterday?

14           MR. WEINBERG:  Yes, your Honor.

15           THE COURT:  Why don't you take until a week

16   from Monday.

17           MR. WEINBERG:  Thank you, sir.

18           THE COURT:  It's a little less than the

19   traditional 14 days, but the 14 days probably falls on

20   the 4th of July.

21           MR. KILEY:  If you had asked me, I would have

22   been saying, yes, your Honor, too.

23           THE COURT:  Well, you want it, too?  Yeah, you

24   all can.

25           MR. KILEY:  Of course.  Of course.

1          THE COURT:  But, you know, I'm the one who

2    raised the question.  You know, now the government's

3    come around to my perspective, which I think is

4    consistent with the instructions they generally have

5    from the Attorney General that you're supposed to have

6    open proceedings.  But, you know -- and again, this is

7    another thing you all should be talking about.  I mean,

8    maybe you -- I mean, you can always move to file things

9    under seal and I'm likely to let you file them under

10   seal, at least temporarily, until I can read them and

11   hear if there's a dispute and consider the public

12   interest, same as I did with the original motion.

13        So I suppose there's -- you know, there's reason

14   to be careful.  Arguably attorney-client relationships

15   are involved.  But, you know, I'm disinclined to keep

16   all of this out of public view until it's resolved.

17   And, you know, if you talk to each other and you can

18   suggest some parameters that you agree on, I may agree,

19   too.  Or I may not, since initially you all agreed that

20   they should all be closed and then I didn't have the

21   concern.

22          (Pause.)

23          THE COURT:  All right.  Hopefully you've been

24   taking notes.  I'll get you a written order.  I'll

25   probably get you two written orders, one that relates to

1    what happened in open court and one that relates to

2    what's happening here.  But I'm not quite sure when

3    you'll get the written order as to what occurred here.

4    So keep your notes.

5              (Pause.)

6              THE COURT:  I had a couple of other

7    questions.

8         Okay.  All of this discussion has been about

9    Mr. Kiley meeting with     P.A.     .  Is there a possible

10   disqualification concerning Mr. Cintolo flowing from the

11   fact that they're partners?

12             MR. FULLER:  We're not sure.  Again, it would

13   be the knowledge of the attorney whether or not he met

14   with Mr. Cintolo is --

15             THE COURT:  Well, I'll help you out.

16        Have you had any of the meetings with

17        P.A.    ?

18             MR. CINTOLO:  Yes.

19             THE COURT:  How many?

20             MR. CINTOLO:  Two.  The ones with redacted.

21             MR. FULLER:  And we know he is a partner.

22             THE COURT:  Oh, I know.  But you just found --

23             MR. FULLER:  Yes, we suspected as much, but

24   thank you, your Honor.

25             THE COURT:  Well, you should ask him.  He

1    might have even told you.

2          MR. WEINBERG:  Yes.  May Mr. Vitale be excused

3    to go to the men's room?

4          THE COURT:  Yes.  There's actually one right

5    back there.  But we're almost finished.

6          (Mr. Vitale leaves.)

7          THE COURT:  All right.  And, Mr. DiMasi, at

8    some point, um, I'm going to ask you a series of

9    questions as to whether you understand all of this and

10    you understand the arguments, the arguable risks to

11    you.  As I said earlier, I'm not ordering you to go to

12    yet another lawyer to get independent advice, but I'll

13    probably ask you whether you did, because my

14    responsibility, you know, is to the fairness of the

15    proceedings and to be sure that, you know, you're

16    comfortable, that you're being effectively and

17    energetically represented by somebody who has no

18    competing interest, not by somebody who says, you know,

19    "I could be a witness, but I'm a lawyer, so I won't be a

20    witness, even though I could help as a witness type of

21    thing."  So I want to encourage you to think all of

22    these things through.

23        I'm not saying don't talk to Mr. Kiley and

24    Mr. Cintolo about it, but it may be in your interest to

25    talk to somebody else about it.  I may well ask you

1    that. But, you know, once I ask you, unless something

2    unforeseen comes up, as far as I'm concerned, you're

3    going to have to live with the answer.

4        So, you know, sometimes we see this. You know,

5    somebody is happy with their lawyer and then they get

6    convicted and they say, "I wasn't effectively

7    represented." I would like to do this one time and in a

8    way that's fair to everybody and the decisions are made

9    on an informed basis and there's no reason to reopen

10    it. All right?

11        Is there anything else we ought to discuss?

12    Okay. Rest up.

13            MR. WEINBERG: Thank you, your Honor.

14            MR. KILEY: Thank you, your Honor.

15            (Ends, 1:15 p.m.)

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4

5        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

6   do hereby certify that the foregoing record is a true

7   and accurate transcription of my stenographic notes,

8   before Chief Judge Mark L. Wolf, on Wednesday, June 17,

9   2009, to the best of my skill and ability.

10

11

12

13

14

15   RICHARD H. ROMANOW

16

17

18

19

20

21

22

23

24

25
```