IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Crim. No. 09-CR-10166-MLW |
| | : | |
| SALVATORE F. DIMASI, | : | |
| JOSEPH P. LALLY, Jr., | : | |
| RICHARD W. McDONOUGH, | : | |
| and | : | |
| RICHARD D. VITALE | : | |
| Defendants | : | |

## UNITED STATES' TRIAL BRIEF

The United States, by and through the undersigned Assistant United States Attorneys, hereby submits this trial brief, outlining the case and the legal elements of the crimes charged, and identifying particular evidentiary issues that may arise.

## I.   Introduction.

Defendants Salvatore DiMasi ("DiMasi"), Richard McDonough ("McDonough"), Joseph Lally ("Lally"), and Richard Vitale ("Vitale") (collectively, the "Defendants") are charged with conspiracy to commit honest services wire and mail fraud and to violate the Hobbs Act, in violation of 18 U.S.C. § 371; and honest services wire and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1346.  DiMasi is also charged with extortion under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951.  Finally, Lally is charged with money laundering, in violation of 18 U.S.C. § 1957.  The indictment also contains forfeiture allegations.

In sum, the Defendants arranged to have bribes disguised as lawyer referral fees paid to DiMasi and kickbacks paid to Vitale and McDonough in return for DiMasi's agreement to perform official acts as the Speaker of the House that would assist the interests of Lally and Cognos ULC ("Cognos") in securing two multi-million dollar software sales contracts from agencies of the Commonwealth of Massachusetts.

## II.   Summary of Anticipated Evidence.

### A.   The Defendants.

During the relevant time period of the conspiracy, DiMasi was the Speaker of the House of Representatives in Massachusetts. In this leadership position DiMasi wielded substantial power over the legislative process, including shaping and influencing the passage of bills that ultimately funded executive agencies and their activities. During his time in the legislature, DiMasi was also a practicing lawyer. However, after he was elected Speaker in September 2004, income from his law practice declined significantly because he ceased appearing in court for clients and instead relied primarily on fees for referring cases to other attorneys, including Steven Topazio with whom DiMasi was associated since the late 1980s.

McDonough was a long-time close friend of DiMasi and a well-known lobbyist on Beacon Hill working as the entity known as McDonough Associates. At the time in question, McDonough was paid

by Cognos a $25,000 monthly fee for his services.

Lally was a Cognos sales executive who started the State and Local Government sales group at Cognos. Lally's responsibilities included the engagement and payment of lobbyists in the New England region. Lally left Cognos in February 2006 to start his own Cognos "reseller" business, known as Montvale Solutions, LLC ("Montvale").

Vitale was a founding member of the accounting firm Vitale Caturano & Co. ("VCC"). As DiMasi's accountant, financial advisor, and close personal friend, Vitale was well-informed of DiMasi's financial picture. Vitale also owned a real estate investment fund called Washington North Realty Corp. ("Washington North"), which borrowed and loaned money to private investors, mostly friends of Vitale, in various real estate development projects.

**B.   Funding for Cognos Software.**

Cognos was a publicly traded Canadian software corporation with offices in Burlington, Massachusetts. Among its specialty products was business intelligence and performance management software, which would help businesses or government agencies gather and track data on a historical perspective and enable forward projections. In 2005 and 2006, Lally and Cognos wanted to sell software licenses and related services worth $5.2 million to the Department of Education ("DOE") of the Commonwealth of Massachusetts for an Education Data Warehouse and Reporting System ("EDW"). To fund this purchase by DOE, it was necessary for the

Massachusetts legislature to appropriate the money in its Fiscal Year 2007 budget. As described below, DiMasi caused the budget amendment funding the EDW and earmarking $4.5 million for software licenses to be introduced and enacted in the House Budget.

Later, in 2006 and 2007, when Cognos wanted to sell software licenses and related services worth $15 million to the Department of Administration and Finance ("A&F") and its Information Techonology Division ("ITD") of the Commonwealth of Massachusetts for a statewide performance management ("PM") system, DiMasi ensured that the funding would be there again by insisting that emergency legislation authorizing the Commonwealth to issue general obligation bonds include the $15 million for procurement of performance management software.  After the bond bill was passed and Cognos was selected as the winning vendor, DiMasi and the other defendants leveraged his power as Speaker to pressure A&F to execute the contract thereby funding Lally's profits and kickbacks to McDonough and Vitale.

DiMasi performed these and other official actions that advanced the interests of Lally and Cognos after bribe monies were funneled to him through Lally's hiring of Steven Topazio.

**C.   Setting Up Payments from Cognos to DiMasi.**

DiMasi first hired Steven Topazio ("Topazio") to practice law with him in 1987.  By the early 1990s, Topazio no longer acted as DiMasi's employee, but shared billing proceeds with DiMasi for

4

matters that DiMasi brought to the practice on which Topazio worked.  Professionally, Topazio looked up to DiMasi as a mentor. After DiMasi became Speaker in September 2004, he continued to refer business to Topazio in return for a share of the billing proceeds.  But, as noted above, DiMasi's income from the law practice decreased significantly, while his debts increased considerably.

DiMasi, McDonough and Lally devised a plan to use the unwitting Topazio as a conduit for bribe payments.  In or about December 2004, DiMasi called Topazio and told him that "Dickie" McDonough would be calling to set up a meeting about a new client. McDonough and Lally, who was introduced as an executive for Cognos, eventually met with Topazio, and McDonough told Topazio that they needed to hire local counsel to review contracts for the merchandising of Cognos' software.  Topazio, who handled primarily personal injury and criminal litigation, told McDonough and Lally that he was not sure he was qualified to do the work.  McDonough assured Topazio that they would provide examples of the contracts to help him.  Lally told Topazio that he would be paid a $5,000 per month flat fee for six months.  Topazio later called DiMasi and told him about the meeting and the retainer.  DiMasi sounded excited, remarking, "it's about time we got business like this."

Thereafter, Topazio entered into three six-month consulting agreements with Cognos.  Instead of reviewing contracts, the

consulting agreements stated that Topazio was to assist Cognos with its government strategy in Massachusetts and other New England states.  Topazio was confused by the terms when he received the first contract and called Lally, who told Topazio it was a standard form and suggested it was "take it or leave it."  Topazio then called DiMasi to tell him what had happened, and DiMasi told Topazio to sign the contract.

Despite the fact that no work came from Cognos, Topazio sent monthly invoices to Lally's attention.  After he received the first Cognos check in April 2005, Topazio told DiMasi about the payment, and DiMasi told Topazio that he wanted $4,000 out of the $5,000. Although DiMasi's requested share of the Cognos payment was higher than their usual fee sharing arrangements, Topazio agreed.

During the rest of 2005, Topazio consistently paid DiMasi $4,000 out of the $5,000 he received each month.  When the first contract was up for renewal, DiMasi told Topazio to contact McDonough about getting it renewed.  At various points, Topazio told DiMasi that he had not been given any work from Cognos. DiMasi told him not to worry, as long as Topazio remained ready and able to perform.

### D.    Lally Forms Montvale Solutions.

Lally left Cognos in February 2006 to start Montvale with an acquaintance, Bruce Major ("Major").  Before leaving, Lally negotiated a reselling arrangement with Cognos, allowing Montvale

to act as a Cognos sales agent in certain transactions, including the DOE contract and the ITD contract. Lally negotiated a fee to Montvale of 20% of the license fee on any sale he closed.

When Lally left Cognos, sales representative Christopher Quinter ("Quinter") took over many of Lally's responsibilities, including oversight of the lobbying budget for the East region. Before leaving Cognos in February 2006, Lally told Quinter never to cancel a "lobbyist" named Topazio, who was a "friend to Sal."

   **E.   The $4.5 Million DOE Earmark.**

In the summer of 2005, DOE had a pilot project for several vendors to test the EDW concept. DOE was interested in the EDW because it would help keep track of student performance across the state and allow DOE to assess education components including students, schools and curriculum. By October, DOE had determined that Cognos had the best product for the job and that the total cost would approach $5.5 million. There was a supplementary budget going through the Statehouse in the fall of 2005, which DOE hoped would include funding for the EDW.

In October 2005, DiMasi expressed an interest in the EDW to DOE officials and other legislators. DOE Commissioner David Driscoll ("Driscoll") sent the following email to DOE colleagues October 16, 2005, shortly after speaking to DiMasi about the EDW:

> The Speaker was very interested in our bid for the Data Warehouse. Now his interest was making sure we do not pick a bidder that he does not have confidence in. But nonetheless had Lida Harkins call me twice. We are close to awarding the

contract to Cognos, which he is okay with, and I believe could get his support for a six million supp when the next one is considered ... around Feb.  I think we are too late now.

While the supplementary budget did not include funding for the EDW, DiMasi's involvement in the EDW initiative continued into the Spring of 2006.  After Cognos had been selected by DOE as the vendor for the EDW, on April 12, 2006, DiMasi's legal counsel, Daniel Toscano ("Toscano"), drafted a specific budget amendment for $5.2 million for DOE, requiring not less than $4.5 million to be spent on the statewide software license (from which Lally would derive his 20% commission), not less than $500,000 to be spent on hardware, and not less than $500,000 to be spent on professional services.  By directing (or "earmarking") the amounts of funds be spent on the specific items, the proposed legislation would thus restrict DOE's ability to spend the funds.  Toscano also drafted a separate budget amendment increasing DOE's operating budget to $2.5 million from $768,000.  For both amendments, Toscano listed Representative Robert Coughlin ("Coughlin") as the sponsor.  On the same day, Toscano emailed each document in separate emails to McDonough, who forwarded the documents to Lally.

DiMasi and his staff then used Rep. Coughlin as a conduit to introduce the proposed amendments.  Toscano asked Rep. Coughlin to sponsor an amendment to help provide new technology for DOE. Unaware of the specific purpose of the technology, Coughlin agreed to be the sponsor, but Toscano took care of filing the amendments.

The two Coughlin amendments were introduced on April 24, 2006.

The amendments were then considered by the House Ways and Means Committee ("HW&M"), where DiMasi made his interest in the EDW known. In fact, notes taken at the time by HW&M's Chief of Staff, James Eisenberg ("Eisenberg"), reflect that the EDW budget amendment was something DiMasi wanted. The EDW amendment passed through the House and was ultimately consolidated in HW&M as part of the budget that passed; the $2.5 million increase for the DOE budget was not adopted in the House.

The failure of the $2.5 million budget increase was a concern to DOE officials. The funds had been requested to help pay for the implementation and maintenance of the new EDW software; if $4.5 million out of the $5.2 million allocation was earmarked for the license, then DOE would not have the funds to implement and maintain the software. Commissioner Driscoll wrote to DiMasi on June 9, 2006 asking for the earmark to be removed allowing DOE to spend the funds as it saw fit, as opposed to having to spend $4.5 million on the EDW license. Driscoll's letter made its way to Lally, who sent it to Quinter, stating "we will be having a coming to Jesus meeting on Monday with the Commissioner." Driscoll later met with DiMasi and asked either that the earmark be removed or that DOE get more money, but neither happened.

DiMasi refused to remove the $4.5 million earmark for the software licenses as requested by DOE, thus ensuring that Lally's

commission, which would fund kickbacks to McDonough and Vitale, would be 20% of the $4.5 million.  Instead, the $500,000 earmark for professional services was removed.  Lally sent an email to Quinter when the final budget was passed, noting that "we were able to free up the 500K so they can hire some internal staff."

Around the time of these final budgetary meetings in June 2006, Quinter was getting emails about renewing Topazio's consulting agreement from the paralegal at Cognos who kept track of the lobbyist budget.  After the six-month contract expired in March 2006, DiMasi instructed Topazio to contact McDonough about renewing it.  At McDonough's direction, Topazio faxed a new six-month contract to Cognos on June 20, 2006.  Although Quinter had been ignoring earlier emails about renewing the Topazio agreement, he then got an email from Lally on June 20, 2006: "Chris, I am getting a call on the renewal for Steve Topazio can we talk about this? It is important that we talk before you act."  Quinter replied, "Joe, I am getting questions as to who he is and what he has done for us. Considering the nature of this relationship, I can't answer those questions."  Lally then responded, "Do I need to talk someone? I would not cancel this it could affect MASSDOE . . . ."  The paperwork was then processed to renew and backdate the second renewal of Topazio's consulting contract.

Shortly thereafter, on June 30, 2006, the legislature passed the budget with the $4.5 million earmark for EDW software intact.

McDonough sent an email to Lally attaching the EDW budget amendment, noting "Mission Accomplished." On July 31, 2006, DOE paid Cognos $4.5 million for the EDW software licenses. On August 24, 2006, Cognos paid Montvale its 20% commission, $891,000, for the DOE deal. Montvale then paid $100,000 to McDonough, even though McDonough was already being paid by Cognos as its lobbyist. For no apparent efforts connected to the DOE contract, Montvale also paid $100,000 to Vitale through an entity named WN Advisors LLC ("WN Advisors").

**F.   Vitale Surfaces in the Conspiracy.**

Vitale formed WN Advisors around the same time that the DOE budget amendment for the EDW was under consideration in June 2006. Lally told Bruce Major that Vitale, a close friend to DiMasi, was going to help them close deals in Massachusetts. Lally also told Major that Vitale would be paid $100,000 if the DOE deal closed. Indeed, a few weeks after Montvale was paid $891,000, Lally paid WN Advisors $100,000 even though Vitale had done no work on the DOE deal. To hide this kickback, Montvale signed a sham consulting agreement for WN Advisors to provide business, tax and accounting services with a $100,000 advance payment.

The timing of Vitale's insertion into the scheme to trade on DiMasi's power in return for bribes and kickbacks was not coincidental because Vitale was also extending present and future financial benefits to a cash-strapped DiMasi. In June 2006, after

DiMasi had been turned down for a loan from a commercial lender, Vitale extended DiMasi a $250,000 line of credit through Washington North. The line of credit required DiMasi, whose financial situation was poor, to pay interest only at the prime lending rate.

Even before he loaned DiMasi money and was paid $100,000 for the DOE deal, Vitale was taking steps to ensure a stable financial future for DiMasi when he transitioned to the private sector. In January 2006, Vitale, together with two of his VCC clients, Tom Neve ("Neve") and Paul Grant ("Grant"), formed a property management firm called Genesis Management Group LLC ("Genesis"). Emails between them and other evidence show that Vitale was fronting a hidden interest for DiMasi in the venture and that DiMasi was going to share in Vitale's 1/3 ownership when he retired from the legislature. DiMasi assigned various trusted staff members and associates, including Toscano and Dino Difronzo ("Difronzo") to help Vitale on these "special projects." And by late 2007, after Vitale had received $600,000 in kickbacks after his introduction into the Cognos deals, the planning for DiMasi's move to the private sector was becoming more concrete. In December 2007, DiMasi, Vitale, Difronzo, among others, met at Vitale's office to discuss a succession plan for the Speakership. Around the same time, Vitale confirmed to Difronzo that DiMasi would have an interest in Genesis when he retired. Vitale also told one of his VCC associates that he was helping DiMasi with his finances,

that DiMasi was not making enough money as the Speaker, and was thinking about making the change to the private sector.

### G.  Funding Performance Management and Crafting Legislative Language.

In the Summer of 2006, even as the DOE deal was being finalized, Lally and Cognos executives launched a project to sell a statewide enterprise license agreement("ELA") for PM to the ITD of Massachusetts.  Lally proposed selling the ELA for $20 million for Massachusetts, with a $5 million credit for the DOE contract. Although a contract this size  would be the biggest deal in Cognos' 31-year history, Lally indicated and assured Quinter that he would be able to work with "Sal" to get funding for the project.

Besides obtaining funding for PM, Lally's and Cognos's aim was to word the legislation to favor the Cognos software.  Lally had reached out to the Deputy Chief Information Officer of ITD, Bethann Pepoli ("Pepoli"), and told her that DiMasi was interested in PM and that he wanted to set up a meeting with her.  Pepoli met with DiMasi on July 26, 2006 to discuss PM and in an email exchange the next day, Pepoli and Maryann Calia, DiMasi's Chief of Staff, acknowledged DiMasi's interest in PM and agreed to meet again on drafting legislation.  In another email from Pepoli to her boss, Louis Gutierrez, she recapped the meeting, noting that DiMasi wanted to make it mandatory in any ITD bond bill that PM be implemented.

13

Initial efforts to secure legislative funding for the $15 million ELA were unsuccessful in July 2006 when an ITD bond bill failed to pass. Lally then sent an email to Quinter and various Cognos executives on August 1, 2006, stating that "the good news [is] we can craft legislative language that will guarantee us our statewide deal. . . . I have been told that the legislature will take this up in a 'special session' the date will be announced in a couple of weeks."

In a string of emails in September 2006, Lally, Quinter and Cognos executives passed along draft legislative PM language for comments. Then, on October 11, 2006, in advance of a pre-arranged golf outing between DiMasi, McDonough, Lally and Robert Ashe ("Ashe"), who was then the CEO of Cognos and based in Ottawa, Lally sent an email to Quinter, stating:

> I just got off the phone with the Speaker. I was prepping him for the Ashe meeting and he informed me that he was going to tell Ashe that the legislature was most likely going to come back and do the IT Bond bill in the next two weeks. He also spoke with the Secretary of A&F Trimarco and the secretary has agreed to the Performance Management Concept and they will jointly work on the language. They like the Cognos language to a point but they need to turn it into legislative speak.

In fact, DiMasi, Lally and McDonough played golf with Ashe on October 12, 2006 at the Ipswich Country Club and discussed performance management.

Five days later, Lally, through Major, sent the Cognos version of legislative language for PM to McDonough who had an associate,

14

Charles Stefanini ("Stefanini"), turn the Cognos draft into legislative speak. On November 16, 2006, Stefanini sent an email to Lally and McDonough, attaching the legislative language for PM and asking, "Is [sic] there any other specific parameters of this system that are unique to Montvale's product that we can include in this?"

Vitale, DiMasi and Lally met on November 21, 2006, and in an email dictated to Major the next day, Lally summarized their discussion of the PM language:

Re: Yesterday's meeting

1.   With regard to the IT Bond performance management language, the Speaker was going to talk to his legal advisors and ensure that the language relating to Performance Management cannot be interpreted as anything but a Mandate that cannot be possibly overturned. We will check with our legislative writers to see if we can offer some input as well.

Vitale replied in an email, "I will be with sal on golf trip and will work on all the issues all next week with him." Two days after Major's email, Vitale sent an email to Lally, stating "On future emails let Bruce know not to use you know who's name or title, use WN Advisors." Lally later told Major that Vitale said never to use "Speaker" or DiMasi's name in an email again.

**H.   Getting Topazio Payments Back on Track.**

Meanwhile, Topazio's second agreement had lapsed in March 2006 and Topazio had stopped paying DiMasi the monthly $4,000. Although the agreement was back in place in September 2006, Topazio was

15

initially not paid retroactively for the five months between contracts. DiMasi told Topazio to call McDonough about the lack of payment, and McDonough again told Topazio he would look into the matter. On December 12, 2006, Lally emailed Quinter that, according to McDonough, Topazio was not getting paid, and that they should not "piss anyone off" this late in the game. Cognos cut a $25,000 check to Topazio the following day, which Topazio deposited on December 18, 2006.

Topazio called DiMasi and told him about the $25,000 Cognos check, and DiMasi demanded the entire amount. On December 20, 2006, Topazio wrote DiMasi a check for $25,000 and mailed it, along with other office mail, to DiMasi's office at the Statehouse. On December 28, 2006, DiMasi went to the office and told Topazio he did not want the $25,000 check but instead wanted it broken into four checks with different amounts and dates. Using the envelope in which Topazio had placed the original $25,000 check, DiMasi wrote out the four dates and amounts for the new checks: Dec. 20, $8,000, Dec. 22, $4,000, Dec. 26, $6,000, and Dec. 28, $7,000. Topazio then wrote out and gave DiMasi the four checks as instructed. DiMasi deposited the four checks in his bank account. The flow of bribe money had continued.

   **I.   Emergency Bond Bill.**

   The Romney Administration came to an end without any action on PM. When Governor Deval Patrick ("Patrick") assumed office in

January 2007, one of the administration's first priorities was to get through the legislature an emergency bond bill ("EBB") to fund ongoing projects and programs about to expire or lose federal funding, most notably certain transportation programs.  The need for the EBB was discussed early in the Patrick Administration at a legislative leadership meeting with DiMasi.  DiMasi said he was interested in seeing business intelligence or performance management included in the EBB, and that there was PM software available which the current administration could use to monitor finances and funding.

Earlier administration drafts of the EBB from February up to through early March 2007 did not include the $15 million PM provision.  The administration would have preferred not to have any new programs in the EBB, but it was understood that granting DiMasi's request to include the $ 15 million for PM software was the best way to ensure swift passage of the EBB.  Indeed, the Patrick Administration would not have included PM in the EBB were it not for DiMasi's request and position as Speaker.

While DiMasi through his staff was using his influence with administration officials to ensure that the EBB included funds for PM, Lally was discussing the EBB behind the scenes with ITD employees.  Lally told Pepoli that if the EBB did not include the $15 million PM provision in the EBB, DiMasi would add it himself on the floor.  Pepoli subsequently sent emails A&F officials asking if

PM would be in the EBB, stating, "I know that Speaker DiMasi really really wants the performance management project in the emergency bond bill and will add it if we don't include it."

By March 12, 2007, the PM provision was in the draft EBB.  On that day, officials in the Patrick Administration exchanged an email which read:

> I just spoke with Mary Anne Calia.  I told her we were including the Speaker's request in the bill.  She was very appreciative.  She stated that she will call the clerk's office and make sure that the bill is immediately referred to Ways & Means instead of Long term debt.  This is an important step in ensuring quick action.

The legislative language which made its way to the EBB had been circulated among the coconspirators and delivered to DiMasi back in January 2007.  However, before the final bill was introduced, a provision known as Section 13 was added to the EBB by the Senate Ways and Means Committee.  Section 13 required full and fair open competition for any ITD procurement, including the $15 million PM procurement.  On March 14, 2007, Governor Patrick filed the EBB and on March 23, 2007, the full legislature enacted the final version.

### J.    Topazio Payments End and Vitale Goes for a Bigger Kickback.

Around the same time the EBB negotiations were occurring, events involving the bribes and kickbacks were also transpiring. In February and March, 2007, Cognos employees were considering whether to renew Topazio's contract.  On March 15, 2007, Quinter sent an email to Lally with a six-month renewal of Topazio's contract.

18

Lally then forwarded the email both to McDonough and Vitale, saying, "Guys, can we talk about this?"  Phone records show calls between the defendants were made that same day.  Ultimately, the contract was not renewed.  But between March 2005 and March 2007, Topazio had received $125,000 from Cognos and never actually performed any services of any kind. Through this sham consulting agreement arranged by the defendants, Lally, essentially through Topazio, paid DiMasi $65,000 from Cognos funds.

While the Topazio payments were ending, efforts were made to increase the amount of the kickback paid to Vitale and have Cognos pay it directly.  Lally had previously told Major that they would have to pay Vitale $500,000 if and when the ELA deal closed, an arrangement which was not part of the business consulting agreement signed in September 2006.[1]  But right before the EBB was to be voted on, Lally and Vitale tried to get Cognos to pay Vitale directly a $750,000 "consulting fee" when the ELA contract was executed.  Lally and Vitale exchanged drafts of a proposed contingent consultant agreement, which Lally forwarded to Cognos's acting President for the Americas, Richard Gilbody.  The proposal was ultimately rejected by Cognos, and Lally was left to pay

---

[1]Major, who was not privy to all of the details of the scheme including the Topazio arrangement, would later make a comment to Lally about DiMasi probably sharing in Vitale's $500,000 and Lally became agitated, stating that "we don't want to know and we don't care.  As far as we know, this is a $500,000 payment to WN Advisors, end of story."

Vitale's "fee" of $500,000 out of Lally's sale commission.   Again phone traffic among the defendants surrounds these efforts to increase and shift financial responsibility for Vitale's kickback.

### K.   PM Procurement.

Lally and Cognos executives had been preparing to close the deal with ITD as a straight no-bid procurement.   ITD officials also believed they could purchase the PM software off the state contract that Cognos already had from deals with other agencies.   When Lally and Cognos executives became aware of Section 13's requirements for open competition, Quinter, who was also a lawyer, was tasked with preparing talking points explaining that the "fair and open" bidding requirements of the EBB did not apply to the PM product. Quinter forwarded those talking points to McDonough, who forwarded them to Vitale, who arranged for them to be hand-delivered to DiMasi.

ITD counsel ultimately advised that a request for quotes procurement would have to be conducted.   Pepoli put together a procurement management team and three companies -- Cognos, SAS, and Oracle -- submitted bids.   ITD is an agency under A&F, so the actual decision to select a winning vendor and the timing and negotiating the contract rested with A&F, more specifically with Secretary Leslie Kirwan ("Kirwan") and her Under Secretary, Henry Dormitzer ("Dormitzer").

Throughout the procurement process, DiMasi exerted his influence directly – while McDonough and Lally leveraged DiMasi's position indirectly – to affect the progression of the procurement. For example, in April, DiMasi called Kirwan and asked how they were doing on the business intelligence procurement.  In a May 16, 2007 email to Cognos executives, Lally stated: "I just got off the phone with the Coach [DiMasi] and Dickey . . . . He also communicated that he will call Leslie [Kirwan] secretary of A/F tomorrow and put the heat on to get this deal done ASAP."  A few days later, DiMasi spoke to Kirwan at a function, saying that he would call or come by to speak with her about the business intelligence procurement. On May 18, 2007, Pepoli met with Dormitzer, gave a presentation and recommended Cognos.   After the meeting, Pepoli received a message that DiMasi had called looking for her.  She called him back, and he asked how the meeting went and what the next steps were.  She told him that she recommended Cognos as the winner.

At the same time as DiMasi was having direct contacts with high-level officials in the Administration pushing the procurement of the PM contract, McDonough was invoking DiMasi's interest in the PM contract with other Administration officials, causing them to prod Kirwan on the procurement.  Lally summarized DiMasi's efforts to get Cognos the deal in an email to Quinter on June 22, 2007:

> Sal, Dick and I discussed this last night at the democratic fundraiser. Sal said when he wants something done within his domain he is ultimately going to get what he wants.  As he put it "in the end it is my domain and

I am held accountable for all decisions that come out of his office." He said it may take some time for a staff person or subordinate legislator to understand what he wants and what time frame he wants it. That is the situation we are currently involved in right now. We have a rogue Secretary that has some issues on how PM should be purchased and implemented. We are dealing with her boss and he is coaching us how to handle the situation. Out consensus is to ride it out with her management for now and trust that they will come through. An analogy he used was a baseball theme: He said the score in the game may end up 18 to 13 but we'll be 18.

Kirwan ultimately signed the ELA with Cognos for a total of $13 million, which represented a discount for closing before the end of the quarter. In an email to an administration official, Kirwan wrote, referring to DiMasi, "Hope the big guy down the hall is happy and we get some credit for the next stick."

On August 31, 2007, Cognos wired Montvale $2.8 million as its commission for the ITD contract. On the same day, Lally had Major write checks for $500,000 to WN Advisors and $200,000 to McDonough. A week later, a Cognos executive emailed Lally: "Please be sure to thank Dick and Sal for getting the contract closed."

Lally subsequently transferred $800,000 of the Montvale proceeds from the ITD deal into a Bank of America CD. On August 4, 2008, Lally caused $432,416.33 to be transferred from the Bank of America CD to a Bank of America Money Market Deposit Account. The August 4, 2008 transaction forms the basis for the money laundering charge against Lally.

Not long after the ITD deal with Cognos closed, a competitor of Cognos, SAS, retained counsel and protested the award to A&F,

which subsequently referred the matter to the Inspector General of the Commonwealth (the "IG").   The IG investigation revealed improper conduct by ITD in the selection of Cognos and recommended the contract be unwound.   In March 2008, Cognos agreed to pay back the $13 million, but Cognos never recouped the $2.8 million paid to Montvale for the re-sale fee.

### L.   The Defendants' Cover-Up Attempts.

In March 2008, the *Boston Globe* began a series of articles relating to the Cognos deal, among other things.   When the articles were published, Lally and DiMasi separately made admissions and some false exculpatory statements to one or more individuals.   Vitale and DiMasi took additional actions to attempt to conceal the scheme.   Those details and admissibility of those cover-up efforts are discussed more fully below.

## III. LEGAL ELEMENTS AND PRINCIPLES.

The essential elements of the offenses charged in the Superseding Indictment are set forth below, with accompanying citation to the legal authority.

### A.   Conspiracy to Commit Mail/Wire Honest Services Fraud ("HSF") and to Violate the Hobbs Act by Extortion Under Color of Official Right -- Count 1.

Count 1 charges a conspiracy in violation of 18 U.S.C. §371 with three object crimes -- HSF mail fraud, HSF wire fraud, and Hobbs Act extortion under color of official right.   Superseding Indictment, ¶ 12.   In order to find the defendants guilty of the

conspiracy in count 1, the government must prove the following three elements beyond a reasonable doubt:

> 1.    that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to commit the crimes of honest services mail or wire fraud or extortion under color of official right;
>
> 2. that the defendant willfully joined in that agreement; and,
>
> 3. that one of the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy.

Pattern Criminal Jury Instructions for the District Courts of the First   Circuit,   §   4.18.371(1)   (2009),   available   at http://www.med.uscourts.gov/practices/crpjilinks_09oct2.pdf.

The conspiracy need not be found by direct evidence, but can be inferred from the circumstantial evidence.  United States v. Lopez, 944 F.2d 33, 39 (1st Cir. 1991) ("[d]ue to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either 'express or tacit' and that a 'common purpose and plan may be inferred from a development and collocation of circumstances'") (quoting United States v. Sanchez, 917 F.2d 607, 610 (1st Cir. 1990)).  The government is not required to prove that the coconspirators agreed upon every detail of the agreement.  Id.  All that is required is to show the essential nature of the plan and the coconspirators' connections with it.

Of course, the government need only prove beyond a reasonable doubt one of the three criminal objects of the conspiracy.  Griffin

24

v. United States, 502 U.S. 46, 47-48 (1991); United States v. Mitchell, 85 F.3d 800, 809-811 (1st Cir. 1996). Thus, in order to find a defendant guilty of the conspiracy the jury only has to reach unanimity as to only one of the three objects.

**B.   HSF Mail and Wire Fraud - Counts 2-8.**

HSF mail and wire fraud, 18 U.S.C. §§ 1341, 1343, and 1346, in addition to being objects of the conspiracy, constitute the substantive counts 2-4 and 5-8 respectively.   To convict the defendants of HSF mail and wire fraud, the government must prove beyond a reasonable doubt the following four elements:

> 1. the defendant knowingly devised or participated in a scheme to defraud the Commonwealth of Massachusetts and its citizens of its right to the honest services of Salvatore DiMasi through bribery and kickbacks;
>
> 2. the defendant did so knowingly, willfully and with intent to defraud and;
>
> 3. the scheme or artifice to defraud involved a material misrepresentation, false statement, or false pretense, or concealment of fact; and
>
> 4. the use of the mails or wires in furtherance of the scheme.[2]

Pattern Criminal Jury Instructions for the District Courts of the First Circuit, § 4.18.1341 and 1343 (2009), available at http://www.med.uscourts.gov/practices/crpjilinks_09oct2.pdf.

---

[2]The use of the mails or wires need not be essential to the scheme, but it must have been made for the purpose of carrying it out.   See Pattern Criminal Jury Instructions for the District Courts of the First Circuit, § 4.18.1341 (2009), available at http://www.med.uscourts.gov/practices/crpjilinks_09oct2.pdf.

### 1.   Scheme to Defraud - Bribes/Kickbacks.

In light of <u>Skilling v. United States</u>, 130 S. Ct 2896, 2931 (2010), the government must prove beyond a reasonable doubt that the HSF scheme involved a breach of fiduciary duty by DiMasi through his participation in a bribery or kickback scheme.   Of course, the non-fiduciary defendants, Lally, McDonough, and Vitale, can also be convicted of HSF mail or wire fraud.   <u>United States v. Urciuoli</u>, 613 F.3d 11, 17-18 (1st Cir. 2010).

To prove such a scheme, the government will show that DiMasi breached a fiduciary duty to the Commonwealth and it citizens as an elected member of the House of Representatives and Speaker by participating in the bribery/kickback scheme which called for him to perform official acts in return for money he received and money his co-defendants McDonough and Vitale received.[3]   <u>United States v. Silvano</u>, 812 F.2d 754, 759 (1st Cir. 1987) (intangible right to honest services and impartial government "is premised on an underlying theory that a public official acts as 'trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty' to them") <u>quoting</u>

---

[3]Of course, to convict a defendant of HSF mail or wire fraud, the actual exchange of money or the taking of official actions is not even required.   <u>United States v. Potter</u>, 463 F.3d 9, 17 (1st Cir. 2006) ("That [public official] might prove unwilling or unable to perform, or that the scheme never achieved its intended end, would not preclude conviction for either the substantive offense (sending the fax) or forming the conspiracy.").   As alleged in the Superseding Indictment, the evidence will show payments were made in return for official acts.

United States v. Mandel,591 F.2d 1347, 1362 (4th Cir.) aff'd in relevant part en banc, 602 F.2d 653,653 (4th Cir. 1979), cert. denied, 445 U.S. 961 (1980)).

The bribery/kickback scheme need not be evidenced by any express agreement between the defendants or any statements of intent by the parties to prove such an agreement existed. United States v. Urciuoli, 613 F.3d 11, 15 & n. 3 (1st Cir. 2010) citing United States v. Kincaid-Chauncey, 556 F.3d 923, 943-47 (9th Cir. 2009) (quid pro quo bribe need not be evidenced by any express agreement or statements of intent); United States v. Kemp, 500 F.3d 257, 282-85 (3rd Cir. 2007) (same). Such agreements can, and often must be, inferred from the facts. Urciuoli, 613 F.3d at 14(A "rational jury could find that Urciuoli's purpose was for Celona to use his office on behalf of RWMC and that Celona did so, that the compensation nominally for marketing was in reality for Celona's misuse of his powers, and that the result was a conspiracy to deprive Rhode Island citizens of Celona's honest services as a Rhode Island senator."); United States v. Woodward, 149 F.3d 46, 60 (1st Cir. 1998) ("Thus, [t]he best evidence of Woodward's intent to perform official acts to favor Hancock (and LIAM's) interests is the evidence of Woodward's actions on bills which were important to Hancock."); United States v. Potter, 463 F.3d at 16, 18 ("coded references to legislator, descriptions of his power and discussions of accomplishments" along with "sum involved, its contingent

character and link to specific legislative ends" could "easily permit jury to find this was a heartland quid pro quo case."). See also United States v. Friedman, 854 F.2d 535, 554 (2nd Cir. 1988)("Indeed, evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. This is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny. As a result a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating a consciousness of guilt.").

Though a bribe/kickback scheme must involve the exchange of a thing of value, in this case money, for official action, such an exchange does not mean that specific payments had to be matched with specific actions. Urciuoli, 613 F.3d at 14. To the contrary, the "general support" of a legislator on an as-needed basis in exchange for money is sufficient. Id.; United States v. Ganim, 510 F.3d 134, 148 (2nd Cir. 2007) (honest services bribery conviction requires "an intent to effect an exchange, but [] 'each payment need not be correlated with a specific official act . . . In other words, the intended exchange in bribery can be 'this for these' or 'these for these', not just 'this for that.''") (citation omitted); United States v. Kemp, 500 F.3d 257, 282 (3rd Cir. 2007) (affirming

jury instruction regarding "stream of benefits in implicit exchange for one or more official acts").

An official act in this case does not simply mean a vote cast by DiMasi on a legislative item.   The term is far broader than that.  Official action means DiMasi's "informal and behind-the-scenes influence on legislation."   United States v. Potter, 463 F.3d at 18 ("The honest services that a legislator owes to citizens fairly include his informal and behind-the-scenes influence on legislation.").   It also means the "implied threat" that DiMasi could use his legislative power in negotiations with the then new Patrick Administration in pushing A&F to close the Cognos PM contract.   See Urciuoli, 613 F.3d at 16 (convening meetings of constituents to exert implied threat of legislative action constitutes official acts).

### 2.    Intent to Defraud/Deceive - Bribes/Kickbacks.

The government must show the defendants intended to engage in the HSF bribery/kickback scheme and intended to deceive the public about that.  United States v. Sawyer, 85 F.3d 713, 731-733 (1st Cir. 1996) (requiring intent to deprive public of honest services and intent to deceive public about that conduct); United States v. Sawyer, 239 F.3d 32, 41 n. 10 (1st Cir. 2001) (acknowledging redundancy in formulation of intent element where failure to

disclose in presence of a duty satisfied intent to deceive).[4]
"[T]he specific intent to deceive may be proven (and usually is) by
indirect and circumstantial evidence." Sawyer, 85 F.3d at 733,
citing United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1995)
("Guilty knowledge, like specific intent, seldom can be established
by direct evidence.  This principle has particular pertinence in
respect to fraud crimes which, by their very nature, often yield
little in the way of direct proof.  Unless an accomplice turns, a
miscreant confesses, or suspect is snared by his own rodomontade,
prosecutions for fraud must routinely be mounted on the basis of
direct evidence.").

The evidence of the intent to engage in a bribery/kickback
scheme and to deceive the public is, in large part, overlapping.
See Sawyer, 85 F.3d at 733 ("we have little doubt that bribes are
usually given in secrecy").  For example, as alleged in the
Superseding Indictment, the bribes paid to DiMasi were disguised as
fees paid to Topazio by Cognos for work which he never did.  These
bribes were concealed within Cognos by Lally carrying Topazio as a
lobbyist for New England on Cognos's books, though Topazio had
never lobbied and performed no lobbying work.  See United States v.
Potter, 463 F.3d at 16 ("evidence of conspiracy and concealment

---

[4]This simply means that a fully disclosed bribe or kickback to
a public official would not constitute an HSF scheme to defraud
because the public is not deceived.  Sawyer, 85 F.3d at 733
("Ostensibly, a person could offer an illegal bribe to a public
official and not be concerned with its secrecy.").

included concealment of the plan or critical details of it from [supervisor] and [company] board"). Similarly, the $100,000 payment from Montvale to Vitale's WN Advisors from the DOE transaction was disguised as a fee for business, tax and accounting consulting, of which Vitale performed little if any.[5] Vitale's email instructing Lally to remind his partner Bruce Major not to use DiMasi's name in future emails further shows the intent to deceive. The evidence will also show that McDonough did not disclose the $100,000 and $200,000 payments he received from Montvale with the Secretary of the Commonwealth as lobbying fees.[6]

### 3. Materiality - Bribes/Kickbacks.

Though the concept of materiality was not mentioned by the Supreme Court in <u>Skilling</u>, it is apparent from <u>Neder v. United States</u>, 527 U.S. 1, 25 (1999), that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." <u>See also</u> <u>United States v. Rybicki</u>, 354 F.3d 124, 127 (2nd Cir. 2003) (listing elements of HSF mail/wire fraud, including

---

[5]Vitale has continually argued that he was paid the $100,000 and $500,000 for "legislative consulting" work. This defense is plainly at odds with the terms of the written contract he signed with Montvale for the first $100,000, which makes no mention of legislation. Moreover, the contingent nature and disproportionately enormous amount of the payments are further evidence that they were kickbacks as part of the scheme.

[6]McDonough has asserted that he was paid those substantial sums for merely acting as a lobbyist or "legislative consultant" -- protected activity under the First Amendment. <u>See</u> <u>Sawyer</u>, 85 F.3d at 731 n. 15. His failure to report those payments as lobbying fees certainly undercuts such an argument.

materiality).  In the context of an HSF bribery/kickback scheme, it would seem self-evident that the concealed bribes and kickbacks in the alleged scheme satisfy the materiality element because DiMasi's fellow public officials, and the public generally, would consider it important to know that a fiduciary is secretly engaging in such conduct.[7]  Certainly the evidence will show that DiMasi's fellow public officials at DOE and within the Administration would not have acted as they did had they known about the HSF scheme.

   **C.   HSF Mail/Wire Fraud – Aiding and Abetting; <u>Pinkerton</u>**

   The defendants can also be guilty of the substantive counts of HSF mail and wire fraud if the jury finds that they aided and abetted another in the commission of those offenses.   <u>United States v. Sanchez</u>, 917 F.2d 607, 611 (1st Cir. 1990) ("Aiding and abetting is "an alternative charge in every count whether explicit of implicit.'") (citation omitted).

   The defendants can also be guilty of the substantive counts of HSF mail and wire fraud pursuant to <u>Pinkerton v. United States</u>, 328 U.S. 640 (1947).   <u>United States v. Sanchez</u>, 917 F.2d at 612 (substantive counts need not reference co-conspirator liability in order for jury instruction).   Thus, if the jury finds beyond a reasonable doubt that one of the defendants committed the substantive crime of HSF mail or wire fraud in furtherance of the

---

[7]A false statement or concealed fact is material if it "has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body".  <u>Neder</u> 527 U.S. at 16.

charged the conspiracy, then the jury can find any co-conspirator of that defendant guilty as well.  Id.

### D.   Hobbs Act - Extortion Under Color of Official Right - Count 9.

In addition to being the third object of the conspiracy, the Hobbs Act violation, 18 U.S.C. § 1951, also constitutes the substantive crime charged in count 9 against DiMasi alone.  The elements of Hobbs Act extortion under color of official right are as follows:

1.   DiMasi knowingly and willfully obtained property, that is payments of money to DiMasi and to others, from defendant Joseph Lally and Cognos Corporation with Lally's and C o g n o s Corporation's (or its employees) consent;

2.   the defendant did so under color of official right;

3.   the defendant's conduct affected interstate commerce.

The term "property" includes money and other tangible things of value.  See 10th Cir. Pattern Instruction, §2.71; Pattern Criminal Jury Instructions for the District Courts of the First Circuit, § 4.18.1951 (2009), available at http://www.med.uscourts.gov/ practices/crpjilinks_09oct2.pdf.

Though the charging language is styled in terms of DiMasi obtaining the money or property, it is well settled that a Hobbs Act extortion under color of official right also occurs when a third party is the one who obtains the money or property in return for the public official's acts.  See generally United States v. Green, 350 U.S. 415, 420 (1956); United States v. Vigil, 523 F.3d

1258, 1263-1264 (10th Cir. 2008) United States v. Antico, 275 F.3d 245, 255-56 (3d Cir. 2001); United States v. Bradley, 173 F.3d 225, 231-32 (3d Cir. 1999); United States v. Margiotta, 688 F.2d 108, 133 (2d Cir. 1982) ("A Hobbs Act prosecution may lie where the extorted payments are transferred to third parties, including political allies and political parties, rather than to the public official who has acted under color of official right.").

"To prove extortion under color of official right, 'the government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" United States v. Rivera-Rangel, 396 F.3d 476, 484 (1st Cir. 2005) quoting Evans v. United States, 504 U.S. 255, 268 (1992).   DiMasi need not have solicited or demanded the payment; passive acceptance of the payment is enough. Evans, 504 U.S. at 260-261.

The government is not required to prove that DiMasi made a specific promise to perform a particular official act at the time of payment or that the agreement to do so was even expressed. Evans v. United States, 504 U.S. 255, 274 (1992) (Kennedy, J. concurring) ("The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods."); United States v. Vazquez-Botet, 532 F.3d 37, 61 (1st Cir. 2008) (government "need not prove a formal agreement" in Hobbs Act conspiracy); United States v.

34

<u>Kemp</u>, 500 F.3d 257, 284 (3rd Cir. 2007) (<u>citing</u> <u>United States v.</u>
<u>Antico</u>, 275 F.3d 245, 275 (3rd Cir. 2001) (Hobbs Act color of
official right "conviction can occur if the Government shows [the
defendant] accepted payments or other consideration with the
implied understanding that he would perform or not perform an act
in his official capacity").

As with the HSF mail and wire scheme, the term official act is
broadly construed.  <u>See</u> <u>United States v. Rivera-Rangel</u>, 396 F.3d at
476, 484 (executive assistant to governor who made phone calls from
her government office in her official capacity took official acts).
It is also irrelevant if the public official lacked the ultimate
authority to achieve the aim of the payor.  <u>Id.</u> at 485.  Therefore,
it is not a defense for DiMasi to contend that he as the Speaker of
the House lacked the authority to actually award any procurement to
Cognos and could not have performed any official act to further
that interest.  DiMasi, "in [his] official capacity, had the power
to facilitate [Cognos and Montvale's] government business, and it
was that power that [Lally and Cognos] paid [him] to exercise."
<u>Id.</u>

And the law, whether it be the Hobbs Act, honest services
fraud under 1346, or the federal bribe statute, simply does not
require proof that the public official altered or took a position
he would not have otherwise taken but for the payment.  <u>See</u> <u>United</u>
<u>States v. Quinn</u>, 359 F.3d 666, 675 (4th Cir. 2004) (regarding 18

U.S.C. §201(b) bribery conviction, "it does not matter whether the government official ends up taking the same action he would likely have taken if he were not bribed"); <u>United States v. Reeves</u>, 892 F.2d 1223, 1226 (5th Cir. 1990)(no error to charge the jury in Hobbs Act case that "it is not a defense to extortion that, had there been no extortion, the defendants might, under available information, lawfully and properly have acted just as they did"); <u>United States v. Jannotti</u>, 673 F.2d 578, 601 (3rd Cir. 1982) (reiterating prior holding that "it is neither material nor a defense to bribery that 'had there been no bribe, the [public official] might, on the available data, lawfully and properly have made the very recommendation that [the briber] wanted him to make'"); <u>United States v. Blanding</u>, 966 F.2d 1444 (4th Cir. 1992) (unpublished opinion) ("An elected official's prior support of a particular bill does not insulate him from a claim of extortion, if he solicits or accepts money from another in exchange for an explicit promise or undertaking to support or continue supporting such bill.").

   **E.   Money Laundering – Count 10**.

   Count 10 charges defendant Lally with money laundering in violation of 18 U.S.C. § 1957.  Superseding Indictment, ¶ 119.  In order to find defendant Lally guilty of money laundering as charged, the government must prove the following elements beyond a reasonable doubt:

1.    Lally transferred over $10,000 through a financial institution affecting interstate commerce on the date specified;

2.    Lally knew that the money came from some kind of criminal offense;

3.    the money was in fact criminally derived from mail and wire fraud; and

4.    the mail and wire fraud took place in the United States.

United States v. Benjamin, 252 F.3d 1 (1st Cir. 2001); United States v. Richmond, 234 F.3d 763 (1st Cir. 2000).

"Affecting interstate commerce" means that the transaction affected commerce in any way or degree; a minimal effect is sufficient. Benjamin, 252 F.3d at 9. Transactions involving FDIC-insured banks are considered to have had an effect on interstate commerce. Id. at 10. The interstate commerce element can also be found if the underlying specified unlawful activity affected interstate commerce. Id.

The government does not have to prove that the defendant knew the money was derived from wire fraud or that the defendant committed the wire fraud. Benjamin, 252 F.3d at 7; Richard, 234 F.3d at 768. It is enough that the defendant had general knowledge that the money came from some kind of criminal offense. Richard, 234 F.3d at 768.

**F.    Forfeiture.**

In this case, the United States seeks forfeiture of specific assets, as well as a forfeiture money judgment against the

Defendants.   The amount of a forfeiture money judgment is determined by the Court, and not the jury.   See Fed.R.Crim.P. 32.2(b)(5)(A) (providing for retention of jury at party's request only to determine forfeitability of specific property); United States v. Teder, 403 F.3d 836, 841 (7th Cir. 2005) (jury right under Rule 32.2 is limited to nexus between funds and crime, and does not entitle defendant to jury verdict on amount of forfeiture); United States v. Reiner, 393 F.Supp.2d 52, 55-57 (D. Me. 2005) (same); United States v. Roberts, 631 F. Supp. 2d 223, 227 (E.D.N.Y. 2009) (same).   However, either party may request that the jury be retained[8] to determine the forfeitability of specific property if it returns a guilty verdict.   Fed.R.Crim.P. 32.2(b)(5)(A).   The Court must determine before the jury begins deliberating whether either party requests a jury determination as to the forfeiture of the specific assets identified in the indictment.   Id.

The government has requested advanced notice from the Defendants as to whether they will request a jury determination of forfeiture for the specific assets named in the indictment.   In the event the Defendants request a jury determination, the government will submit proposed jury instructions and special verdict forms for the forfeiture phase sufficiently in advance of trial.

---

[8] The guilt and forfeiture phases of a criminal trial are bifurcated.   Fed.R.Crim.P. 32.2(b).

38

## IV.   EVIDENTIARY ISSUES.

## A.   Admissibility of Email Correspondence.

The government will offer several emails into evidence at trial.  As with any other documentary evidence, the admissibility of emails is a two-step analysis.  First, the Court must consider whether the email is authentic.  Second, the Court must consider whether the information contained in the email is admissible as either non-hearsay or under an exception to the hearsay rule.  The government will be able to satisfy its burdens as to each of the emails it intends to offer.

### 1.   Authentication.

As with paper documents, emails must be authenticated before they are admissible.[9]  Fed.R.Evid. 901(a).  The standard for authentication of emails is no different from that of paper documents – the proponent must offer "evidence sufficient to support a finding that [the email] is what its proponent claims." Id.  The authentication requirement is not a particularly high hurdle.  United States v. Ortiz, 966 F.2d 707, 716 (1st Cir. 1992). "If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the

---

[9]The government will seek stipulations from the Defendants as to the authenticity of the emails it intends to offer into evidence.  This information is included in the event that the parties are not able to reach an agreement as to the authenticity of all of the government's proposed email exhibits.

jury." Id. (quoting United States v. Ladd, 885 F.2d 954, 956 (1st Cir. 1989)).

Rule 901(b) of the Federal Rules of Evidence sets forth several ways in which a document may be authenticated. These methods are "illustration(s) only," and are not exclusive. Fed.R.Evid. 901(b). Rule 902 identifies several categories of documents which are self-authenticating, in that extrinsic evidence of authenticity is not required.

The vast majority of the emails can be authenticated under Rule 901(b)(1) through testimony of a witness with knowledge of the email that the email "is what it is claimed to be." For example, the government anticipates that former Cognos employee Christopher Quinter will be able to authenticate emails on which he is identified as a sender or recipient.

Another method of authentication is to examine the email's "distinctive characteristics and the like," including "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." United States v. Safavian, 435 F.Supp.2d 36, 40 (D.D.C. 2006) (quoting Fed.R.Evid. 901(b)(4)). In Safavian, the trial court examined the authenticity of several emails offered by the government and found that most of them could be authenticated under Rule 901(b)(4), citing the following distinctive

characteristics :

- email addresses using the "@" symbol, which is widely known to be part of an email address;

- email addresses containing the names of the persons connected to the email addresses;

- the names of the sender and/or recipients contained in the body of the email (<u>e.g.</u> in the "To:" and "From:" headings, signature blocks, and signature of the sender; and

- the contents of the emails (<u>e.g.</u> discussions of identifiable matters).

Likewise, several emails the government intends to offer through witnesses who are not identified as senders or receivers can be authenticated by their distinctive characteristics.  For example, with respect to emails to and from "tom@nevemorin.com," the government anticipates that one or more VCC employees will testify that VCC client Tom Neve ran a company called Neve Morin.

With respect to emails that clearly could not be identified on their own, the trial court in <u>Safavian</u> examined them under Rule 901(b)(3), which provides that the jury may compare evidence with "specimens which have been [otherwise] authenticated."   435 F.Supp.2d at 40.   Likewise, to the extent any emails are not authenticated either by testimony or by means of their own distinct characteristics, those emails can be authenticated by the trier of fact if appropriate by comparison to other previously authenticated emails.

Finally, several of the emails that the government intends to offer as evidence at trial constitute records of regularly conducted activity which are admissible under Rule 803(6).  Such documents are self-authenticating under Rule 902(11).

## 2.   Admissibility.

Just as the government can establish that the proffered emails are authentic, it can also establish that they are admissible as either non-hearsay or under one of the hearsay exceptions.  In fact, the vast majority of the emails contain co-conspirator admissions under Rule 801(d)(2)(E), the admissibility of which is explored later in this trial brief.

In addition, several of the emails contain statements by non-defendants that are not offered for the truth of the matter asserted, and thus are not hearsay.  Fed.R.Evid. 801(c).  For example, questions are not hearsay because they are not assertions and instructions are not hearsay because they are not offered as evidence of the truth of the matter asserted therein.  <u>United States v. Vest</u>, 842 F.2d 1319, 1330 (1st Cir. 1988) (question not hearsay); <u>United States v. Murphy</u>, 193 F.3d 1, 5 (1st Cir. 1999) (instruction not hearsay).  Thus, the question "Is this MA legislation for IT purchases for real?" contained in an email from Cognos employee David Marmer to Christopher Quinter is not a hearsay statement.  Likewise, the instruction "Please be sure to Thank Dick and Sal for getting the contract closed," contained in

42

an email from Cognos executive Robert Murphy to defendant Lally, is not excludable as hearsay.

Several emails contain statements that, if hearsay, are admissible under Rule 803(1), which excepts from the hearsay rule statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Each of the statements is admissible under the "present sense exception" because: (1) the statement is limited to an explanation or description of the event, (2) the declarant personally perceived the event described, and (3) the declaration was made contemporaneously or immediately after the event described. United States v. Ferber, 966 F.Supp. 90, 97 (D.Mass. 1997) (citations omitted). For example, in a June 20, 2006 email to Christopher Quinter, Cognos paralegal Amy Scarpaci wrote:

> Re: Topazio
>
> Just got a call from this lobbyist. Their agreement has expired in March . . .

The email itself reflects that it was sent immediately after[10] a phone call from Topazio, and describes that phone call. To the

---

[10]Precise contemporaneity is not required. "Courts have recognized that the passage of a short amount of time will not preclude evidence otherwise admissible under" Rule 803(1). Ferber, 966 F.Supp. at 99 (citations omitted).

extent these statements are hearsay[11], they are admissible under Rule 803(1).

Other emails contain statements that, if hearsay, are admissible under Rule 803(3), which excepts from the hearsay rule statements of the declarant's "then existing state of mind, emotion, sensation, or physical condition." The exception includes statements about conditions such as the declarant's "intent, plan, motive, design, mental feeling, pain, and bodily health." For example, Secretary Kirwan sent an email to her Under Secretary, Henry Dormitzer, stating that the Cognos PM contract was signed and further stating: "Everyone seems happy. Hope the big guy down the hall is, too, and we get some credits for the next 'stick'." The government does not intend to use this email to prove the truth of any of the statements that were made, but rather to show what Kirwan thought about why she agreed to the Cognos contract. Because the email is offered as evidence of Kirwan's state of mind at the time, it is admissible under Rule 803(3). See, e.g., United States v. Kelly, 722 F.2d 873, 878 (1st Cir. 1983) (statements made by extortion victims, including that they acted out of fear of retribution, admissible under Rule 803(3)).

The government also anticipates offering several emails as records of regularly conducted business activity admissible under

---

[11]The statement may also be admissible as a business record under Rule 803(6).

Rules 803(6).  For example, an email from DOE Chief Information Officer Maureen Chew to Tom Moreau, Research Director for the Joint Committee on Education, attaches a new budget and provides information relevant to the budget request.  To the extent the statements in Chew's email constitute hearsay, testimony will reflect that it was the regular practice of DOE[12] officials to provide information to the legislature regarding DOE funding requests, that Chew was a person with knowledge of the facts recorded in the email, and that Chew drafted the email at or near the time of the events recorded therein.  Thus, her statements are admissible under Rule 803(6).

Chew's email, as well as other emails among state agencies which the government intends to offer, also would be admissible under Rule 803(8)(A) which provides a hearsay exception for "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . the activities of the office or agency."  To the extent such emails are confined to the activities of the respective public offices or agencies, the are admissible under this public records exception to the hearsay rule.  See Sable v. Mead Johnson, 737 F.Supp. 135, 146 (D. Mass. 1990) (to be admissible under Rule 803(8), document must be

---

[12]DOE would qualify as a business as that term is defined in the Rule:  "The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit." Fed.R.Evid. 803(6).

confined to activities of the public office or agency); <u>Lester v. Natsios</u>, 290 F.Supp.2d 11, 26 (D.D.C. 2003) (noting that agency emails are generally admissible under Rule 803(8)).

**B.    Fed. R. Evid. 801(d)(2)(D) - Statements by a Party's Agent.**

The government intends to introduce certain "statements" made by defendant DiMasi's Chief of Staff, Maryann Calia, and his Legal Counsel, Daniel Toscano, as agent admissions pursuant to Fed. R. Evid. 801(d)(2)(D).  Under this rule such statements are excluded from the rule against hearsay and are admissible as vicarious admissions of a party opponent, provided the statements were made "concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).

"Parties wishing to introduce statements into evidence under the aegis of Rule 801(d)(2)(D) must establish, by a preponderance of the evidence, (1) that an agency relationship existed; (2) that the statements were made during the course of the relationship; and (3) that the statements relate to matters within the scope of the agency."  <u>Gomez v. Rivera Rodriquez</u>, 344 F.3d 103, 116 (1st Cir. 2003) (requisite foundation not laid to prove Mayor's wife was an agent for purpose of hiring employees) (citing <u>Larch v. Mansfield Mun. Elec. Dep't</u>, 272 F.3d 63, 72 (1st Cir. 2001)).

Accordingly, the government will lay the agency foundation through testimony and other evidence that Calia and Toscano were

46

employed by DiMasi as his Chief of Staff and Legal Counsel, respectively, and that the legislative matters in question -- the DOE budget amendment for the EDW and the inclusion of PM in the Bond Bill (and subsequent procurement of PM) -- were certainly matters within the scope of the Speaker's office and the agency relationship.

For example, the government will offer a March 12, 2007 email between two high ranking members of the Governor's administration which stated that Calia had just been informed of the decision to include DiMasi's request for the PM language in the Bond Bill and that she was "very appreciative."  The foundation evidence will prove that Calia was DiMasi's Chief of Staff at the time of the email and that the inclusion of the PM language in the Bond Bill was a matter within the scope of Calia's employment with DiMasi, and that she routinely conveyed DiMasi's legislative views and interests to members of the Governor's office.

Similarly, the government will offer two emails from Toscano to defendant McDonough on April 12, 2006 containing the $5.2 million EDW budget amendment and corresponding budget increase for the DOE of $2.5 million, both of which were drafted for Rep. Robert Coughlin of Dedham as the sponsor.[13]   (The Microsoft Word

---

[13]The evidence will show that McDonough then forwarded the emails and attachments to Lally, who forwarded them to the Cognos sales executive Quinter.

"properties" associated with the two documents attached to Toscano's emails indicate that a "Dtoscano" was the author of the documents.)  Coughlin will testify that he knew Toscano to be employed by DiMasi and that Toscano telephoned him prior to April 12, 2006 to ask him if he would be willing to sponsor a budget amendment for the DOE, and that Coughlin agreed.  Further, Coughlin understood Toscano to be making the request on behalf of his employer, Speaker DiMasi, and that such an occurrence was routine practice at the State House.

Various courts have addressed the agency relationship between an elected official and members of the official's staff in the context of Fed. R. Evid. 801(d)(2)(D).  Most notably, in <u>United States v. Mandel</u>, 591 F.2d 1347, 1368 (4th Cir. 1979) the Fourth Circuit held that legislative aides of the defendant governor of Maryland were agents of the governor in an honest services fraud case concerning alleged gifts taken by the governor in return for positions he took on certain legislation.  Though the court rejected the notion that certain state senators were agents of the governor, the court held that the legislative aides who were employees were, "and their statements on Governor Mandel's views were within the scope of the agency relationship." <u>Id.</u>; <u>see also</u> <u>United States v. Rioux</u>, 97 F.3d 648, 660 (2nd Cir. 1996) (affirming district court admitting statements of supervisors employed by defendant Sheriff); <u>United States v. Riley</u>, 621 F.3d 312, 337-338

(3rd Cir. 2010) (Deputy Mayor's statements admissible against Mayor under 801(d)(2)(D)).

### C. Prior Inconsistent Statements – Admissibility of Grand Jury Testimony Under Fed. R. Evid. 801(d)(1)(A).

Many of the government's witnesses at trial have testified under oath in the grand jury. Many of the witnesses testified three years ago. To the extent any witness at trial testifies inconsistently with his previous grand jury testimony, the government intends to offer the prior testimony as substantive evidence. United States v. Butterworth, 511 F.3d 71 (1st Cir. 2007). In Butterworth, the First Circuit noted that inconsistent does not mean the trial testimony must contradict previous grand jury testimony "in every respect" or that it must be "diametrically opposed or logically incompatible" to be inconsistent. Id. at 75. Rather, evasive answers, silence, or even memory loss can be sufficient to find the testimony inconsistent. Id. In such an instance, the government may read the prior grand jury testimony into the record even after the witness leaves the witness stand. Id. See also United States v. Woodward, 149 F.3d at 59-60(noting that jury could well believe that grand jury testimony of witness admitted under Fed. R. Evid. 801(d)(1)(A) instead of his trial testimony was true).

### D. Additional Statements and Acts of the Defendants.

The government anticipates introducing a number of

"statements" made by the defendants and their co-conspirators. These statements, for the most part, can be classified into the following categories, which overlap to some extent: (1)statements made by the defendants, some of which were false, which constitute acts and conduct offered to prove the conspiracy and their intentional participation in it; (2) statements to others that constitute instructions, are verbal acts, or are offered for other non-hearsay purposes; and (3) declarations by defendants and, in some cases by unindicted co-conspirators, admissible under Fed. R. Evid. 801(d)(2)(E) as co-conspirator statements offered for the truth of their contents.

### 1.  Acts of Concealment and Evidence of Consciousness of Guilt.

The government intends to offer evidence of certain conduct, including making false exculpatory statements, committed by the defendants to conceal that there was a conspiracy and fraudulent scheme as charged, as well as their participation in the charged offenses.  Some of this evidence of concealment occurred during the operation of the charged conspiracy.  For example, McDonough, a registered lobbyist, did not report to the Massachusetts Secretary of State as lobbying income either the $100,000 payment of August 31, 2006 or $200,000 payment of August 31,2007 received from Montvale.  And, in violation of the VCC partnership agreement, Vitale concealed from his partners that he, as WN Advisors, received $600,000 from Montvale.  Also during the conspiracy Lally

made statements to another unindicted co-conspirator, Bruce Major,
about not wanting to know who else shared in the $500,000 he paid
Vitale which not only demonstrate Lally's consciousness of guilt
but are relevant to prove that the payment to Vitale was
extortionate in nature.[14]

Other evidence of concealment, including the making of false
exculpatory statements by DiMasi and Lally, occurred after a series
of articles in the *Boston Globe* ("the *Globe*") regarding Cognos
began appearing in March, 2008.   This evidence includes the
following:

- After he knew that a *Globe* story about his connections to
  DiMasi was going to run in late April 2008, Vitale left a
  voice mail for a partner at VCC seeking to delete his already-
  deleted emails from the VCC server.

- After a series of *Globe* articles came out in the Spring of
  2008, Vitale asked for and retrieved from his secretary a file
  she kept for him containing copies of documents he had hand-
  delivered to DiMasi at the State House, which included
  legislative language for performance management provided by
  Lally.

- After a second article in the *Globe* which reported the
  breakdown of Cognos payments made to Topazio, he met with
  DiMasi and showed DiMasi the entries in his check register
  from December 2006 and the voided $25,000 check.   DiMasi
  feigned ignorance, claiming he never got any money from the
  Cognos payments.   Topazio reminded him of the December 2006
  meeting at the office at which he made Topazio write the

---

[14]In the fall of 2007, in a conversation between Major and
Lally, Major said that it was likely that the Speaker was sharing
in WN money. In an agitated manner Lally responded, "We don't know
and we don't care.  As far as we know this is a 500k payment to WN,
end of story."

separate checks.  DiMasi said "it would be nice if you could lose your check register."  DiMasi also suggested that Topazio could put names of other cases on the register.  Topazio flatly refused.

- In preparing responses to the *Globe* inquiries and stories in March-May, 2008, DiMasi falsely told his press secretary among other things, that he (DiMasi) did not know of Lally's involvement with Cognos; that he was not aware of any connection between Topazio and Cognos nor any payments from Cognos to Topazio; and that he never spoke to Bethann Pepoli about the Cognos contract.

- After a *Globe* story in Summer 2008, Lally falsely told Richard Gilbody, a Cognos executive, that he (Lally)had hired Topazio for Cognos to work on initiatives related to the National Speakers Association.  Lally also told another former Cognos executive that Vitale and Topazio were business partners helping develop a business plan for Montvale.

The evidence recited above is admissible in the first instance because it constitutes direct proof intrinsic to the charged offenses.  The defendants' concealing conduct and evidence of consciousness of guilt are probative of the very existence of an illegal conspiracy and their intentional participation in it.  Such evidence also "supports the inference of concealment and deceit, which is a necessary part of a 'scheme or artifice to defraud'".  United States v. Potter, 463 F.3d 9, 16 (1st Cir. 2006), citing Sawyer II, 239 F.3d at 41.

Evidence that is "intertwined" with the criminal conduct at issue is admissible as intrinsic to the crime.  See United States v. Epstein, 426 F.3d 431, 439 (1st Cir. 2005)(tax return which failed to income from illegal acts proved defendant's knowledge of

fraudulent scheme and was part and parcel of the crime charged).
McDonough and Vitale's deliberate concealment of the Cognos
payments from entities to which they otherwise owed a legal or
fiduciary duty to report goes to prove their knowing participation
in the unlawful scheme.  See United States v. Ryan, 213 F.3d 347,
350 (7th Cir. 2000)(defendant's efforts to conceal participation in
bank fraud scheme by failing to report income from kickbacks on tax
returns was circumstantial evidence of intent to defraud).
Accordingly, this evidence is probative of the crime charged rather
than uncharged crimes, and should be admitted.  See United States
v. DeLuna, 763 F.2d 897, 913 (1st Cir. 1985)("Evidence which is
probative of the crime charged, and not solely uncharged crimes, is
not 'other crimes' evidence.")(citations omitted).

    This principle also supports the admission of evidence of
concealment, including making false exculpatory statements, which
occurred after the *Globe* articles brought the specter of criminal
wrongdoing to light.  For example, DiMasi's attempt to have Topazio
change his check register, just like Vitale's retrieving his file
containing documents hand-delivered to DiMasi at the state house
and asking to have his emails deleted from the server, constitute
obstruction of justice-like conduct and demonstrate a
consciousness of guilt which is admissible as intrinsic evidence.
See, e.g., United States v. Smith, 354 F.3d 390, 396 n.7 (5th Cir.
2003)(attempt to get witness to change testimony would be

considered as relating to pending conspiracy and not a prior bad act). The same is true of DiMasi's false denials to his press secretary about knowing that Lally was connected to Cognos or that Topazio received payments from Cognos. As evidence of consciousness of guilt, it is intrinsic to the charged crimes and, thus, not excluded under 404(b). See, e.g., United States v. Simmons, 470 F.3d 115, 1121 (5th Cir. 2006) ("'[A] defendant's exculpatory statements which are shown by other evidence to be false may give rise to an inference of consciousness of guilt.'") (citation omitted). See also United States v. Ramirez-Jimenez, 967 F.3d 1321, 1327 (9th Cir. 1992) (explaining that evidence that defendant lied to government agents when stopped during crime was "probative of his consciousness that his conduct was illegal" and thus Rule 404(b) was inapplicable). Indeed, this evidence is particularly probative where the likely defense will be that the defendants acted in the good faith belief that they were carrying out lawful lobbying and First Amendment activities and/or that the Cognos-Topazio-DiMasi payments were legitimate legal fees.

Even if resort to an analysis under Rule 404(b) is undertaken, courts have routinely recognized that evidence introduced to show "consciousness of guilt" is a proper purpose under Rule 404(b). See, e.g., United States v. Kemp, 500 F.3d 257, 296 (3rd Cir. 2007) ("evidence to demonstrate [defendant's] consciousness of his guilt of the underlying charges ... is a proper purpose under Rule

404(b)"); <u>United States v. Mangual-Santiago</u>, 562 F.3d 411 (1st Cir. 2009) (evidence of defendant's use of false name while fugitive from justice admissible under Rule 404(b) because shows effort to conceal identity, which shows consciousness of guilt); <u>United States v. Levy-Cordero</u>, 67 F.3d 1002, 1011 (1st Cir. 1995) (fraudulent passport and social security card in defendant's possession during time when defendant knew police sought to arrest him admissible under 404(b) to show consciousness of guilt); <u>United States v. Rosa</u>, 705 F.2d 1375, 1377 (1st Cir. 1983) (evidence of threats to witness relevant and admissible to show consciousness of guilt). <u>See also United States v. Brown</u>, 2010 WL 3294179 (11th Cir. Aug. 23, 2010) (affirming admission of evidence of defendant's prior false statements introduced to show defendant's "intent and knowledge of the impropriety of his actions").

Moreover, this evidence of false denials and attempts to conceal by the defendants should be admitted against all defendants even though the "statements" or conduct constituting the evidence occurred after the charged conspiracy had ended and will not be offered as co-conspirator statements.  An established line of cases supports this conclusion.  In <u>Anderson v. United States</u>, 417 U.S. 211 (1974), the Supreme Court held that out-of-court statements which are not offered for their truth are not hearsay, and, as such, are admissible if relevant to prove the conspiracy, regardless whether the requirements of the co-conspirator hearsay

exception rule are met.  Id. at 218.  In Anderson, a conspiracy by election officials to cast fraudulent votes was charged.  After the conspiracy achieved its primary objective, two codefendants testified under oath at a hearing concerning the election contest. At the later criminal trial, the government sought to and did introduce that testimony, not for its truth, but rather as perjury to help prove the existence of the conspiracy.  On appeal, the other codefendants argued that the testimony should not have been admitted against them because the conspiracy had ended and thus the testimony could not have been in furtherance of the conspiracy. Id. at 217.

The Supreme Court analyzed the issue in a way which is directly applicable to the circumstances surrounding the proffered statements here.  The Court stated:

> [A]s the Court emphasized in Lutwak, the requirement that out-of-court declarations by a conspirator be shown to have been made while the conspiracy charged was still in progress and in furtherance thereof arises only because the declaration would otherwise be hearsay.  The ongoing conspiracy requirement is therefore inapplicable to evidence, such as that of acts of alleged conspirators, which would not otherwise be hearsay.  Thus the Court concluded in Lutwak that acts of one alleged conspirator could be admitted into evidence against the other conspirators, if relevant to prove the existence of the conspiracy, even though they might have occurred after the conspiracy ended.

Id. at 219.

The Court then evaluated whether the previous testimony of the co-conspirators/defendants was hearsay and concluded that it was

56

not.  It held:

> Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted.  The election contest of [the co-defendants], however, was not admitted into evidence to prove the truth of anything asserted therein.  **Quite the contrary, the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false. The rationale of the hearsay rule is inapplicable as well. The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence.  Here, since, the prosecution was not contending that anything [the co-defendants] said at the election contest was true, the other defendants had no interest in cross-examining them so as to put their credibility in issue.(emphasis added).**

Id. at 219-220.

Here, DiMasi and Vitale's ineffective attempts to have others alter or hide evidence and DiMasi's later false denials, which involve no hearsay in the first place, is probative of the existence of the conspiracy itself.  See United States v. Manqual-Santiago, 562 F.3d 411, 428-429 (1st Cir. 2009) (evidence of actions which occurred after the conspiracy has ended admissible; defendant's financial activity, coupled with failure to report his income, indicative of intent to conceal funds, which is relevant evidence in establishing the existence of, and defendant's participation in, charged money laundering conspiracy); United States v. Fields, 871 F.2d 188, 197 (1st Cir. 1989) ( "evidence of a conspirator's post conspiracy activity is admissible if probative

of the existence of the conspiracy 'even though they might have occurred after the conspiracy ended'")(quoting <u>Anderson</u>, 417 U.S. at 219).

Thus, DiMasi and Lally's false statements relating to Topazio and Cognos are not being offered for the truth of anything in them, but rather to later show their demonstrable falsity and as evidence of the charged conspiracy against all defendants. The unobjectionable use of this kind of evidence under <u>Anderson</u> has also been approved by the First Circuit. In <u>United States v. Munson</u>, 819 F.2d 337 (1st Cir. 1987), Munson was charged, among other things, with conspiracy to distribute drugs. At trial the court permitted the testimony of a DEA agent who had been given false and conflicting answers by two of Munson's co-conspirators, Pierce and Grenier, when they were questioned. The First Circuit upheld the admission of this testimony because "[t]hese statements were admitted to show, through subsequent testimony, that Grenier and Pierce were lying about their activities. They were not offered to prove the truth of the matter asserted." <u>Id.</u> at 340. Citing <u>Anderson</u>, the court held that "[a]s nonhearsay, they were admissible as long as they were relevant in some way to prove the conspiracy charged." <u>Id.</u> Then, without stating any requirement that Munson coordinated the co-conspirator's false stories, the court concluded that "[t]he statements showed that Grenier and Pierce were trying to conceal what they had done, and, therefore,

were relevant to prove the existence of the conspiracy between
Grenier, Pierce and Munson.   Id.

## 2.   Other Non-hearsay Statements.

There will also be introduced statements made by a defendant
or co-conspirator that, in essence, constitute instructions or
other verbal acts.  For example, in an email from Lally to Quinter
in which he forwards the DOE budget amendment authored by Toscano,
Lally said, "FYI. This is confidential. Do not forward!!"  Or in an
email from Bruce Major to Vitale's secretary on January 10, 2007,
Major attaches the performance management language for the bond
bill and says "to be printed and delivered" to the State House.
These kinds of statements are admissible as non-hearsay, because
they are not offered to establish the truth of the matter asserted.
Fed. R. Evid. 801(c).  The hearsay rule does not exclude evidence
of out-court statements offered to establish the "knowledge or
state of mind of the declarant, United States v. Figueroa, 818 F.2d
1020, 1026 (1st Cir. 1987), or to establish that the declarant
engaged in verbal act, such as making of a "request for
assistance," United States v. Hicks, 848 F.2d 1, 3 (1st Cir. 1988),
or giving of a "directive" to do something.  United States v.
Cintolo, 818 F.2d 980, 997-98 & n.8 (1st Cir. 1987).  "Verbal acts
are simply one example of many out-of-court statements offered for
something other than their truth.  So long as out-of-court
statements for their truth, they are not hearsay and it is

unnecessary to fit such statements into one particular category."
United States v. Murphy, 193 F.3d 1, 5 (1st Cir. 1999)(finding that
instructions given by one conspirator to another were not offered
for truth). And "out-of-court statements offered not to prove the
truth of the matter asserted but merely to show context - such as
a statement offered for the limited purpose of showing what the
effect the statement had on the listener - are not hearsay."
United States v. Cruz-Diaz, 550 F.3d 169, 176-177 (1st Cir. 2008).

### 3.  Declarations of Co-Conspirators

The government intends to offer numerous declarations of the
defendants -- as well as some declarations of non-defendant co-
conspirators - that were made during and in furtherance, of the
conspiracy charged in the superseding indictment.[15]  Under Rule
801(d)(2)(E), such statements are not hearsay and the government
may introduce them against the defendants.  See United States v.

---

[15]Certain statements that the government intends to offer were
made by agents of the defendants, as discussed above.  Statements
of an agent which are admissible against one defendant pursuant to
Rule 801(d)(2)(D) may also be admissible as coconspirator
statements against all defendants if the requirements of Rule
801(d)(2)(E), described below, are met.  In re Coordinated Pretrial
Proceedings in Petroleum Products Antitrust Litigation, 906 F.2d
432, 459 (9th Cir. 1990) (statements of defendant's employee
admissible against all codefendants); Re/Max Intern. Inc. v. Realty
One Inc., 173 F.3d 995, 1011-12 (6th Cir. 1999) (employee's
statement admissible against employer/defendant under Rule
801(d)(2)(D) would have been admissible against all codefendants if
the requirements of Rule 801(d)(2)(E) had been met); City of
Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 559 (11th Cir.
1999) (same).

Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002) (citing United States v. Sepulveda, 15 F.3d 1161, 1180-82 (1st Cir. 1993).

To admit a statement under the co-conspirator exception, the government must show by a preponderance of the evidence that the defendant and declarant were in the same conspiracy, and that the statement was made "during the course and in furtherance of the conspiracy." Bourjaily v. United States, 483 U.S. 171, 175 (1987) (quoting Rule 801(d)(2)(E)); United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980). The text of Rule 801(d)(2)(E) requires at least some evidence that the declarant is a member of the conspiracy that is independent of the proffered statements themselves. See Fed.R.Evid. 801(d)(2)(E); United States v. Felton, 417 F.3d 97, 102 (1st Cir. 2005); see also United States v. Garcia-Torres, 280 F.3d 1, 5 (1st Cir. 2002); Sepulveda, 15 F.3d at 1181-82. However, statements of other co-conspirators, if themselves admissible under Rule 801(d)(2)(E), may serve as independent evidence of a declarant's involvement in the conspiracy. See Garcia-Torres, 280 F.3d at 5-6 (allowing a statement by one co-conspirator, once properly admitted under Rule 801(d)(2)(E), to furnish independent evidence of another co-conspirator's participation in the conspiracy). As set forth in the previous Facts section, there is ample evidence to support the Court's finding under Petroziello by a preponderance that each of the defendants and the non-defendant declarant was a member of the

conspiracy.

Statements are to be deemed in furtherance of a conspiracy when they "tend to advance the objects of the conspiracy as opposed to thwarting its purpose." United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985). "To be deemed 'in furtherance,' a statement need not be necessary or even important to the conspiracy, or even made to a conspirator, as long as it can be said to advance the goals of the conspiracy in some way." United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir. 2002). For example, in assisting in the renewal of the Topazio contract in July 2006, Quinter emailed a Cognos employee who administered the lobbying program that "Lally set this up and he is getting the paperwork signed." Later, in December, Quinter emailed that same person noting that "it seems Topazio put in a complaint through Lally that he was not getting paid."

Once admitted, each statement may be used for its truth against the defendant, irrespective of the original addressee of the statement. See United States v. LiCausi, 167 F.3d 36, 46 (1st Cir. 1999) (holding co-conspirator statements admitted against one defendant admissible against all other members of the same conspiracy); United States v. Kaplan, 832 F.2d 676, 685 (1st Cir. 1987) (holding co-conspirator statements admissible even where the defendant was unaware the statements were made). The rule is that [a]s long as it is shown that a party, having joined a conspiracy,

is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of. United States v. Marino, 277 F.3d 11, 25 (1st Cir. 2002).

It is immaterial that a declarant, such as Quinter, is not actually charged as a co-conspirator; see United States v. Lara, 181 F.3d 183, 196 (1st Cir. 1999); United States v. Innamorati, 996 F.2d 456, 486 (1st Cir. 1993), or that a conspiracy has been charged at all. See Advisory Notes to Fed.R.Evid. 801(d)(2)(E) ("While the rule refers to a conspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a conspirator for purposes of this rule even though no conspiracy has been charged.").[16]

---

[16]Even if Quinter and other Cognos executives were not deemed to be members of the charged conspiracy, the Court would easily find by a preponderance of evidence that they knowingly participated in a joint venture with the defendants to use DiMasi's power and influence to benefit Cognos. There is substantial authority that statements admitted under Fed. R. Evid. 801(d)(2)(E) are not limited to unlawful combinations. See United States v. Gewin, 471 F.3d 197,201 (D.C. Cir. 2006)(recognizing that the Rule, based on concepts of agency and partnership law "embodies the long-standing doctrine that when two are more individuals are acting in concert toward a common goal, the out-of-court statements of one . . . are admissible against the others, if made in furtherance of the common goal."); United States v. Russo, 302 F.3d 37,45 (2nd Cir. 2006)("Indeed, the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all."); United States v. Saimento-Rozo, 676 F.2d 146, 149 (5th Cir. 1982)("nor need the agreement or conspiracy be

## E.    Summary Charts and Witnesses.

The government intends to offer, through the testimony of Andrea Roller, an auditor from the U.S. Attorney's Office, summary charts of certain documentary evidence.  The first is a chart summarizing the payments from Cognos to Topazio and from Topazio to DiMasi.  The second and third charts summarize the DiMasis' income between the years 2003 and 2007, and in particular defendant DiMasi's law practice income.  The fourth and fifth charts summarize the DiMasis' consumer debt during the same time period, including their credit card debt.  The last chart summarizes Lally's movement of funds after Cognos paid Montvale $2.8 million in August 2007.

In addition, through the testimony of Special Agent Marc Toulouse of the FBI, the government intends to offer charts summarizing telephone calls made between the co-conspirators surrounding specific events such as the Vitale's entry into the conspiracy, the issue of renewals of Topazio's consulting contract with Cognos, the need to get Topazio paid, and the attempt to get

---

criminal in nature; it may be in the form of joint venture); <u>United States v. Coe</u>, 718 F.2d 830, 835-36 (7th Cir. 1983); <u>United States v. Layton</u>, 855 F.2d 1388, 1399 (9th Cir. 1988). <u>Cf</u>. <u>Earle v. Benoit</u>, 850 F.2d 836, 841 n.6 (1st Cir. 1988)("Although most of the cases discussing the co-conspirator evidentiary exception are criminal, the exception is equally applicable in civil cases.").

Cognos to pay Vitale instead of Lally.   The underlying documents for all these charts have been produced to the defendants.

The Federal Rules of Evidence contemplate and permit the introduction of just such summary exhibits.   Rule 1006 provides that:

> The contents of voluminous writings, recordings, or photographs which cannot be conveniently examined in court may be presented in the from of a chart, summary or calculation.  The originals, or duplicates, shall be made available for examination or copying or both, by other parties at reasonable timer and place.  The court may order that hey be produced in court.

Under this rule, the summary itself is admitted as evidence and does not need to be based upon evidence independently admitted in the record so long as the other side has had notice and an opportunity to examine the underlying data.  See United States v. Milkiewicz, 470 F.3d 390, 398 (1st Cir. 2006) ("Charts admitted under Rule 1006 are explicitly intended to reflect the contents of the documents they summarize and typically are substitutes in evidence for the voluminous originals.").  Here the bank records, checks, credit card records, tax returns, and telephone records are several hundred pages such that an accurate summary is an acceptable way for the jury to receive this evidence.

Where a summary chart also contains information which is based on testimony or other evidence in the record, a trial judge may allow the use of the chart typically as a "pedagogical device"

to "clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or to the jury." Milkiewicz, 470 F.3d at 398, quoting United States v. Bray, 139 F.3d 1004 (6th Cir. 1998). This applies to the charts summarizing the Topazio checks to DiMasi and the movement of funds by Lally, as well as the telephone summaries which include references to emails which will also be introduced (and admitted) into evidence. While such charts do not always go to the jury, "in some cases such pedagogical devices may be sufficiently accurate and reliable that they, too, are admissible in evidence, even though they do not meet the specific requirements of Rule 1006." United States v. McElroy, 587 F.3d 73, 81 (1st Cir. 2009). Here, the charts are derived from disparate records (some of which will also be introduced) from telephone providers, banks, and Topazio's check register and are presented in a comprehensible, accurate, and concise summary. As such, the auditor and agent should be permitted to use the charts in their testimony and the charts should be admitted into evidence.

Respectfully Submitted,

CARMEN M. ORTIZ
United States Attorney

Dated: February 18, 2011      By:  /s/ S. Theodore Merritt
                                   S. Theodore Merritt
                                   Anthony E. Fuller
                                   Kristina E. Barclay
                                   Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, S. Theodore Merritt, Assistant United States Attorney, do hereby certify that this document, was filed on the above date through the ECF system which sends copies electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

/s/ S. Theodore Merritt
S. Theodore Merritt
Assistant U.S. Attorneys