```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
     v.                  )        Cr. No. 09-10166-MLW
                         )
SALVATORE F. DIMASI,     )
JOSEPH P. LALLY, JR.,    )
RICHARD W. MCDONOUGH,    )
and RICHARD D. VITALE,   )
     Defendants.         )
```

### ORDER

WOLF, D.J.                                           March 16, 2011

Pursuant to the March 16, 2011 Memorandum and Order concerning the Boston Globe's Motion to Intervene (Docket No. 328) the attached redacted affidavit of Assistant United States Attorney S. Theodore Merritt is hereby made part of the public record of this case.

                              _____
                                  UNITED STATES DISTRICT JUDGE

CR. 99-10166-MLW

FILED
IN CLERKS OFFICE

2010 MAR 11 P 4: 16

U.S. DISTRICT COURT
DISTRICT OF MASS.

# FILED UNDER SEAL

## Pursuant to Court's Order of February 23, 2010

REDACTED

## AFFIDAVIT

I, S. Theodore Merritt, hereby depose and say:

1. I am and have been an Assistant U.S. Attorney("AUSA")in the District of Massachusetts since 1985. I am currently assigned to the Public Corruption Unit.

2. In around November, 2008, AUSA Anthony E. Fuller and I were assigned to conduct a grand jury investigation into allegations previously reported in the press concerning the current defendants' roles in procuring legislation and contracts favorable to Cognos.

3. On December 9, 2008, a grand jury subpoena, attached as Exhibit 1, was faxed to Frank Libby, Esq, attorney for Vitale, Caturano & Co,LTD ["VCC"] requesting the production of a number of categories of records. VCC, through counsel, agreed to make a rolling production of the identified records and began productions in January, 2009.

4. On February 2, 2009, AUSA Fuller requested by letter to counsel, attached as Exhibit 2, that VCC provide copies of any documents produced to any other law enforcement entity or third party. On February 4, 2009, VCC provided such documents in electronic format. Included in this production were some emails sent and received by Richard Vitale relating to Genesis Management Group, LLC, a company owned by Vitale, Tom Neve ["GP-1 in superseding indictment] and Paul Grant ["GP-2"]. One such email sent by Neve to Vitale, which is Overt Act #48 in the superseding

indictment, asked Vitale to call him "since I have an idea about an arrangement which will benefit you, me, Paul and Sal." Other emails indicated that Vitale, Grant and Neve discussed how DiMasi could use his status as Speaker to help Genesis get business in the public and private sector.

5. On March 24, 2009, Daniel Toscano, a senior staff counsel to DiMasi [identified as SS-1 in the superseding indictment], testified before the grand jury. The questioning focused on his alleged role in requesting Representative Robert Coughlin to introduce amendments to the Department of Education's budget for education data warehouse software to be provided by Cognos for $4.5 million. See Overt Acts 39-44. Toscano was also questioned about his knowledge of Genesis because several emails and other records indicated that he had multiple meetings with the principals of Genesis and DiMasi. In fact, one attachment to emails was called the "Danny List," referring to Toscano, which contained a list of potential state, federal, and city properties to bid for and contacts that could be called. Toscano's grand jury testimony about Genesis, which is attached as Exhibit 3, in sum, was that:

- Vitale, Grant and Neve wanted DiMasi's help getting business

- Toscano only spoke to one official on behalf of Genesis, State Transportation Secretary John Cogliano, in their effort to win the State Transportation Building contract, but Toscano could or would not be specific about what he said to him

- He was not aware of any financial interest DiMasi had in

2

Genesis

- He did not believe that the Genesis principals wanted to use DiMasi's influence to get contracts

6. VCC continued to make rolling productions, and on or about May 8, 2009, counsel for VCC informed AUSA Fuller that VCC recently located an additional 70,000 emails that had not been searched in response to the subpoena. AUSA Fuller then requested that the production be initially limited to searches for emails to and from the currently named defendants. On May 18, 2009, AUSA Fuller requested that emails to or from Paul Grant, Tom Neve, or concerning Genesis also be searched.

7. 

3



8.  On May 26, 2009, Paul Grant testified before the grand jury. His transcript is attached as Exhibit 4. In sum, Grant testified that DiMasi had no interest in Genesis and his name never came up in forming Genesis as a silent partner or at all. Grant did state that at meetings with DiMasi and sometimes Toscano, he asked DiMasi for whatever support he could lend to a myriad of projects. Grant said he did not promise DiMasi anything in return. Specifically, Grant disclaimed any knowledge of what Neve meant in the email to Vitale about "an arrangement that could benefit you, me, Paul and Sal." Grant testified that although he, Vitale and Neve continued to discuss enlisting the help of DiMasi and Toscano, and later DiFronzo and ▇▇▇▇▇▇▇▇▇▇, to secure business for Genesis, he was not aware of any actual help provided by them. Grant also testified that in his presence he never heard Vitale tell DiFronzo that DiMasi would have interest after he left the State House.

9.  On June 2, 2009, Tom Neve testified before the grand jury. His transcript is attached as Exhibit 5. Neve's testimony was similar to Grant's. Neve explained that his initial email

4

about an "arrangement" was not referencing a financial arrangement but a networking one, and that it was not referencing the formation of Genesis. Neve said that he frequently discussed with Vitale and Grant getting DiMasi and his staff to make phone calls for Genesis on a number of bids on state, city and federal buildings. Neve testified that he was frustrated at the apparent lack of efforts on DiMasi's part.

10. On June 2, 2009, the original indictment was presented to the grand jury. The indictment charged the defendants with conspiring to commit honest services mail and wire fraud in violation of 18 U.S.C. § 371 and committing and aiding abetting the commission of honest services mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346 and 2. The indictment alleged that the defendants conspired to commit honest services fraud in two ways: (1) "arranged to have regular payments made to DiMASI from Cognos for the purpose of influencing DiMASI to use his authority as Speaker of the House to assist the interests of Cognos for the financial benefit of the coconspirators" [¶13]; and (2) "deceived the citizens of Massachusetts by DiMASI deliberately failing to disclose his financial ties to Cognos, as well as the personal enrichment of his friends from his official actions." [¶¶ 14,15]. See United States v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998)(identifying two ways in which public official's honest services can be stolen from the public).

11. The original indictment did not include any reference to Massachusetts conflict of interest disclosure laws because under First Circuit jurisprudence, proof of a state law violation is not required for a conviction for honest services fraud. See United States v. Sawyer, 85 F.3d 713, 726 (1st Cir. 1996).

12. The original indictment also did not include any allegations or charges relating to Genesis because the investigation was yet not completed to determine if there was a provable commission of a crime related to DiMasi's role in connection with Genesis. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and the government had not yet been able to find and thoroughly search for any evidence from city, state or federal officials that any contacts were made by DiMasi on behalf of Genesis. [Former Transportation Secretary Cogliano was interviewed on March 30, 2009 and did not recall Toscano's visit. Two state officials at the Division of Capital Assets Management also were interviewed about the State Transportation Building bid and had no information of any contacts from DiMasi]. It was determined that the investigation would continue.

13. On June 29, 2009, the Supreme Court granted cert. in Weyhrauch v. United States, No. 08-1196 on the following question: Whether, to convict a state official for depriving the public of

6

its right to the defendant's honest services through the non-disclosure of material information, in violation of the mail fraud statute (18 U.S.C. §§ 1341 and 1346), the government must prove that the defendant violated a disclosure duty imposed by state law.

14. On July 2, 2009, VCC made its final rolling production of email from the 70,000 emails that had not been originally searched. This production contained new Genesis emails that were explosive from an evidentiary point of view in proving DiMasi's future hidden interest in Genesis, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and contradicting Grant and Neve. These emails, which constitute Overt Acts 53-55 in the superseding indictment, in the government's view, show that, consistent with Neve's original email about an "arrangement" that could benefit all four of them, Neve proposed a four-way partnership for Genesis which included DiMasi. Vitale later clarified that he would take care of DiMasi out of his third of the ownership for the time being.

15. The government continued to investigate both through the grand jury and agent interviews whether any new charges or new defendants related to the Genesis matter could be brought. Specifically, the investigation sought to determine further if DiMasi exerted any influence on behalf of Genesis in exchange for an undisclosed future interest. See United States v. Potter, 463 F.3d 9, 19 (1st Cir. 2006)("[A] payment that had been promised in advance but paid afterwards could be unlawful."). The grand jury

7

also was investigating further whether Grant and Neve had perjured themselves in their grand jury testimony.

16. On July 7, 2009, the above-referenced emails were presented to the grand jury by FBI Special Agent Marc Toulouse. Also two Genesis employees, ▓▓▓▓▓ and ▓▓▓▓▓, testified with little significant information.

17. In July through October, 2009, agents conducted interviews with several city, state and federal procurement and other officials but uncovered no evidence of contacts by DiMasi or others on behalf of Genesis.

18. 

19. On September 29, 2009, Grant and Neve were given the opportunity to testify again about the emails produced on July 2, 2009. Transcripts are attached as Exhibits 6 and 7. In sum, they still testified that they were unaware of any discussions of any interest DiMasi had in Genesis but could not say who Vitale's "friend" was in the emails discussing the ownership structure of their company.

20. On October 6, 2009, a partner at VCC testified about a

statement Vitale made that turned out to be insignificant. On October 13, 2009, Andrea Roller, an auditor in the U.S. Attorney's Office, testified that House of Representatives documents showed no disclosure made by DiMasi regarding Cognos, which related to the addition of state law duties in the superseding indictment. She also testified about a Vitale calendar entry showing a meeting with Vitale, McDonough and Lally on May 17, 2006.

21. On October 13, 2009, the superseding indictment was presented to the grand jury and returned. This indictment superseded the original indictment in the following ways: (1) added in ¶10 that in addition to a general fiduciary duty owed by DiMasi to the Commonwealth of Massachusetts and its citizens, DiMasi had certain duties and obligations imposed by state law; (2) added Count 9 charging DiMasi with Hobbs Act extortion under color of official right in violation of 18 U.S.C. § 1951 and added that violation as an object of the charged conspiracy in ¶12c; (3) added in ¶14 that "[i]t was a further object of the conspiracy for DiMASI to receive, and cause others to receive, money from LALLY and Cognos in return for performing official acts as a member and Speaker of the Massachusetts House of Representatives that would further the interests of LALLY and Cognos in the Commonwealth of Massachusetts; (4) added allegations in Overt Acts 48-55 that DiMasi had a future hidden interest in Genesis; (5) added two additional payments of $4,000 from Topazio to DiMasi in Overt Acts

9

84 and 88 which had not been specified in the original indictment; and (6) added Overt Act 56 alleging a meeting on May 17, 2006 between Lally, McDonough and Vitale.

22. The allegations concerning state law were included in light of the potential outcome of the Supreme Court's decision in Weyhrauch. The Hobbs Act extortion under color of official right charges were added for a number of reasons. Although the original indictment charging honest services fraud in the government's view proceeded clearly on both a bribery and concealed conflict of interest theory, at the hearing on June 17, 2009 defense counsel claimed the indictment failed to give the defendants notice of what "theory of criminality" was alleged, arguing that "the traditional theories [of honest services fraud] were not delineated." See Transcript of June 17, 2009 Hearing, at 15-16. The Hobbs Act allegations make explicit that money from Lally and Cognos were alleged to have been received by DiMasi and others in return for DiMasi's performing of official acts. Second, although the government was always aware that the Hobbs Act charges could present some degree of difficulty for a jury to comprehend that "extortion" in this context does not require that the payer be a victim, see Lally's Motion to Dismiss Hobbs Act charges [Docket #142], the uncertainty of the fate of honest services law has become more real as exemplified by the Supreme Court's decision to review the statute itself and perhaps whether it is

unconstitutionally vague. See Skilling v. United States, No. 08-1394, cert. granted October 13, 2009. While the government could have theoretically presented a superseding indictment to reflect solely these changes somewhat earlier than it did, it was believed that waiting until the continuing investigation of Genesis was concluded served better the purposes of judicial efficiency and the convenience of the parties.

23.    As for the Genesis allegations, as noted above, the investigation did not result in sufficient evidence to prove beyond a reasonable doubt that in return for a future interest in Genesis, DiMasi performed official acts.  Although no new charges were added, the allegations were included because they are relevant to fully explain the chain of events that unfolded as part of the charged conspiracy, to show the nature of the illegal relationship between Vitale and DiMasi, and to explain some of their motives and conduct. See Government's Opposition to Motion to Strike Genesis Allegations. In particular, Vitale's providing to DiMasi the hidden future interest in Genesis, along with the $250,000 line of credit he extended to DiMasi on June 22, 2006 [Overt Act #58], are probative of why Vitale formed WN Advisors around the same time and got inserted into the Cognos deals, resulting in a $600,000 pay day.  Paragraph 14 reflects that it was not just an object of the conspiracy for DiMasi to receive money but to cause others to receive money as well from Lally and Cognos in return for DiMasi's

performance of official acts.

_____
S. THEODORE MERRITT
Assistant U.S. Attorney

Date: December 18, 2009