UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
        v.               )          Cr. No. 09-10166-MLW
                         )
SALVATORE F. DIMASI and  )
RICHARD W. MCDONOUGH,    )
        Defendants.      )

MEMORANDUM AND ORDER

WOLF, D.J.                                     August 30, 2011

I.    SUMMARY

        In this case defendants Salvatore DiMasi, the former Speaker

of the Massachusetts House of Representatives, Richard McDonough,

Richard Vitale and Joseph Lally were charged with conspiracy to

commit three crimes: honest services mail fraud; honest services

wire fraud; and extortion under color of official right. See Count

1 and 18 U.S.C. §§371, 1341, 1343, 1346, 1951. The four defendants

were each also charged with three counts of honest services mail

fraud, see Counts 2, 3, and 4, and four counts of honest services

wire fraud, see Counts 5, 6, 7 and 8. In addition, DiMasi was

charged with extortion under color of official right. See Count 9.

The essence of all of the charges was that Lally conspired with his

codefendants and caused his employer, Cognos Corporation, and later

his company, Montvale Solutions, to make payments in exchange for

official acts by DiMasi as Speaker to benefit Cognos. It was

alleged that payments for this corrupt purpose were made to DiMasi

personally, in the form of purported referral fees, through his

unwitting associate in the practice of law, Stephen Topazio, and to Vitale and McDonough.

Lally pled guilty and agreed to cooperate with the government. As a result, Lally was called by the government and testified at trial. Topazio was also called by the government and testified.

After a six-week trial, DiMasi and McDonough were each convicted of conspiracy, two counts of mail fraud, and three counts of wire fraud. In addition, DiMasi was convicted of extortion. DiMasi and McDonough were each found not guilty of one count of mail fraud and one count of wire fraud. Vitale was found not guilty of all of the charges against him.

DiMasi and McDonough have each filed motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial pursuant to Federal Rule of Criminal Procedure 33. DiMasi and McDonough argue, in essence, that: the court erroneously admitted certain evidence against them as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E); the court's rulings on some other evidentiary issues and its jury instructions were incorrect in material respects; and the evidence was insufficient to prove them guilty beyond a reasonable doubt of any or all of the charges. DiMasi and McDonough have each filed several lengthy memoranda in support of their contentions. The government has opposed defendants' motions in its own series of substantial submissions.

The defendants' assertions concerning the court's evidentiary rulings and jury instructions essentially reiterate arguments that were made, carefully considered, and decided by the court before and/or during trial. The reasons for those decisions have previously been explained in detail on the record and, in some instances, summarized in various orders. Defendants have not persuaded the court that any of its evidentiary rulings or instructions were erroneous.

In addition, essentially for the reasons explained fully by the government in its submissions and summarized in this Memorandum, when viewed in the light most favorable to the verdicts, there was ample evidence for the jury to find beyond a reasonable doubt that DiMasi and McDonough were guilty of all of the charges on which they were convicted. Therefore, the Rule 29 motions for acquittal are not meritorious.

In contrast to an analysis under Rule 29, in deciding a Rule 33 motion for a new trial, the court may weigh the evidence, evaluate the credibility of the witnesses, and order a new trial if the evidence predominates heavily against the verdicts and allowing them to stand would result in a miscarriage of justice. In essence, Rule 33 provides a means to rectify only a result that the court, on reflection, regards as seriously erroneous. This is not such a case. At the conclusion of all of the evidence presented at trial the court found that the government had proven by a preponderance

of the credible evidence that DiMasi, McDonough, Lally, and Vitale
were each members of the conspiracy charged in Count 1 of the
indictment and, therefore, that all of the statements conditionally
admitted during trial were admissible against them under Rule
801(d)(2)(E). See <u>United States v. Petrozziello</u>, 548 F.2d 20 (1st
Cir. 1977) (the "<u>Petrozziello</u> rulings"). The court reached this
conclusion because it was, and remains, persuaded that, beginning
no later than December, 2004, DiMasi, McDonough, and Lally
conspired to have payments made to DiMasi in exchange for DiMasi
performing official acts as Speaker to benefit Cognos when DiMasi
was asked to do so or when the opportunity arose. Later that
conspiracy evolved to include payments to Vitale and McDonough,
with the payments to Vitale being for DiMasi's benefit. The court
also was, and remains, persuaded, that Vitale joined that
conspiracy in about May, 2006.[1]  Therefore, the court concludes
that the jury's verdicts of guilty were reasonable, and it is not

_____

[1]It is again necessary for the court to express its view of
whether Vitale was a member of the alleged conspiracy. The court
does not intend any disrespect for the jury's finding that he had
not been proven guilty. Rather, the court was, for the purpose
of making its required <u>Petrozziello</u> rulings at trial, obligated
to make an independent decision concerning whether Vitale had
been proven to be a member of the alleged conspiracy by a
preponderance of the evidence. The difference in the decisions
of the court and the jury on this issue may be attributable to
the fact that the burden of proof is higher to convict than to
admit evidence. In any event, the Rule 33 motions have required
the court to consider its <u>Petrozziello</u> ruling further and to
state now that the court again finds that the credible evidence
proved Vitale was also a member of the conspiracy of which DiMasi
and McDonough were convicted.

permissible or appropriate to grant defendants' request for a new trial.

In essence, despite the energetic efforts of able and imaginative defense counsel, the government proved to the jury, and the court, that DiMasi and McDonough participated in a classic scheme to sell DiMasi's official powers as Speaker to Cognos and to structure that exchange in a way intended to keep their corrupt conduct from being detected and demonstrated. That scheme has failed.

Therefore, DiMasi's and McDonough's motions for acquittal or a new trial are not being allowed. Instead, they will be sentenced on September 8, 2011, as previously ordered.

II. THE RULE 29 MOTIONS FOR ACQUITTAL

A. The Legal Standard

Rule 29(c)(2) provides that, "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." The court must "'scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt.'" United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)). In making this sufficiency inquiry, the court must consider the direct and

circumstantial evidence, as well as all plausible inferences drawn from it.  <u>See</u> <u>United States v. Rivera Calderon</u>, 578 F.3d 78, 88 (1st Cir. 2009).  This includes all of the evidence submitted to the jury regardless of whether it was properly admitted. <u>See</u> <u>United States v. Diaz</u>, 300 F.3d 66, 77 (1st Cir. 2002).

In deciding a Rule 29 motion, the court may not "weigh the evidence or make any credibility judgments." <u>Merlino</u>, 592 F.3d at 29; <u>see</u> <u>United States v. Ayala-Garcia</u>, 574 F.3d 5, 11 (1st Cir. 2009).  Rather, credibility issues must be resolved in favor of the verdict. <u>See</u> <u>Rivera Calderon</u>, 578 F.3d at 88 (quoting <u>United States v. Perez-Ruiz</u>, 353 F.3d 1, 7 (1st Cir. 2003)).

The court must decide if the evidence is sufficient to permit a rational jury to find each essential element to have been proven beyond a reasonable doubt. <u>Olbres</u>, 61 F.3d at 970.  However, the government does not have to rule out every hypothesis "'congenial to a finding of innocence.'"  <u>United States v. Valle</u>, 72 F.3d 210, 216 (1st Cir. 1995) (quoting <u>United States v. Gifford</u>, 17 F.3d 462, 467 (1st Cir. 1994)).

Moreover, the government is not bound by all of the evidence that it presents. However, if the government introduces evidence contrary to the inferences it wants the jury to draw, it must introduce other direct or circumstantial evidence to relieve itself of the effect flowing from the evidence introduced.  <u>See</u> <u>Rodgers v. United States</u>, 402 F.2d 830, 833-35 (9th Cir. 1968); <u>United States</u>

v. Canessa, 534 F.2d 402, 404 n.* (1st Cir. 1976)(distinguishing Rodgers).

The acquittal of one defendant on a particular charge is not relevant to the analysis of whether there was sufficient evidence to prove another defendant guilty of any charge, including the same charge, even if the acquittal and the finding of guilt are logically inconsistent. See United States v. Powell, 469 U.S. 57, 68 (1984); United States v. Rogers, 121 F.3d 12, 16 (1st Cir. 1997); United States v. Bucuvalas, 909 F.2d 593, 597-98 (1st Cir. 1990).[2]

In Bucuvalas, for example, the First Circuit held that even where a defendant's sole alleged co-conspirator was acquitted of conspiracy, the defendant's conviction for participation in the conspiracy should not be disturbed if there was sufficient evidence to find the defendant guilty. See 909 F.2d at 594, 596-97. The court explained that "the acquittal of all conspirators but one does not, under Powell, necessarily indicate that the jury found no agreement to act." Bucuvalas, 909 F.2d at 596; see also Rogers,

_____

[2]In this case, the court does not view Vitale being found not guilty as logically inconsistent with DiMasi and McDonough being convicted based in whole or in part on the payments made to Vitale. "[A]n acquittal can be based on the absence of only one incident or element . . . ." United States v. DeVincent, 632 F.2d 155, 160 (1st Cir. 1980). The jury could have found, for example, that DiMasi, McDonough, and Lally conspired or schemed to route kickbacks to Vitale for DiMasi's ultimate benefit, in exchange for official acts, but that Vitale participated without understanding the true nature of the scheme or otherwise lacked the requisite criminal intent.

121 F.3d at 16. Rather, "'[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on one offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the other offense.'" Bucuvalas, 909 F.2d at 595 (quoting Powell, 469 U.S. at 65 (brackets omitted)). In any event, in deciding the Rule 29 motions, the court is not required to attempt to divine the jury's logic or reasoning in finding Vitale not guilty. Id. at 597 n.8.

Consequently, even to the extent that certain theories of guilt regarding DiMasi and McDonough might arguably be logically inconsistent with Vitale's acquittal, the only question for Rule 29 purposes is whether the evidence, taken as a whole and considered with respect to all theories of guilt presented at trial, was sufficient to support the jury's decision that DiMasi and McDonough were guilty of particular charges -- a review that must be undertaken independent of the jury's determination that Vitale had not been proven guilty. See Powell, 469 U.S. at 67; Bucuvalas, 909 F.2d at 597. "If the reviewing court finds the evidence was sufficient to support the verdict against the convicted defendant, the conviction must stand despite the co-conspirator's acquittal." Rogers, 121 F.3d at 16.

B.  Analysis

As indicated earlier, the government's substantial submissions reliably state the relevant law and provide a detailed summary of

the relevant evidence. The court is not engaging in as comprehensive review of the law or the evidence. It does, however, note the following to address some of the arguments made by DiMasi and McDonough.

As the jury was instructed, it is axiomatic that a conspiracy can be proven by direct and/or circumstantial evidence. See, e.g., United States v. Castro-Davis, 612 F.3d 53, 60 (1st Cir. 2010); Rivera Calderon, 578 F.3d at 88-89; see also Pattern Criminal Jury Instructions for the District Courts of the First Circuit §4.18.371(1) (1997). Circumstantial evidence alone may be sufficient to prove the existence of a conspiratorial agreement and a defendant's participation in it. See United States v. Pesaturo, 476 F.3d 60, 72 (1st Cir. 2007); United States v. Perez-Gonzalez, 445 F.3d 39, 49 (1st Cir. 2006); United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005).

Circumstantial evidence may be particularly important in determining a defendant's intent. See Anthony v. Sundlun, 952 F.2d 603, 605 (1st Cir. 1991). As the First Circuit has held, a "defendant's intent can be inferred from his conduct, seen in the light of all the surrounding circumstances." United States v. Sutton, 970 F.2d 1001, 1008 (1st Cir. 1992) (describing United States v. Cintolo, 818 F.2d 980, 989-91 (1st Cir. 1987)). "[I]t is an accepted proposition, logically and legally, that subsequent events may shed light upon, and be relevant in determining, what

transpired at an earlier time," particularly including whether a defendant had the legally required criminal intent at an earlier time. See id. at 1007-08.

These principles have special relevance in cases in which it is alleged that public officials have corruptly sold the powers of their office. As the Second Circuit has explained:

> [E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. Cf. United States v. Manton, 107 F.2d 834, 839 (2d Cir. 1939) ("often if not generally, direct proof of a criminal conspiracy is not available"), cert. denied, 309 U.S. 664 (1940). This is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny. As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.

United States v. Friedman, 854 F.2d 535, 554 (2d Cir. 1988). Also recognizing this reality, the First Circuit has found that "the best evidence of [a public officials'] intent to perform official acts to favor [the payor's] interests is the evidence of [the public official's] actions on bills which were important to [the payor]." United States v. Woodward, 149 F.3d 46, 60 (1st Cir. 1998) (internal quotation marks and some brackets omitted).

The relevant law establishes the elements of each offense and, therefore, provides the framework for determining whether the evidence was sufficient to prove every essential element beyond a reasonable doubt. See Olbres, 61 F.3d at 970. The basic law

concerning extortion under color of official right in violation of §1951 is clearly established. See Evans v. United States, 504 U.S. 255, 268-69 (1992); United States v. Cruz-Arroyo, 461 F.3d 69, 73-4 (1st Cir. 2006); United States v. Rivera Rangel, 396 F.3d 476, 484 (1st Cir. 2005). As required by that jurisprudence, the court instructed the jury that the government was required to prove, among other things, that DiMasi knowingly and willfully obtained money from Lally and/or Cognos to which DiMasi was not entitled; that he obtained the money for himself, or for Vitale or McDonough;[3] that any such payments were made because DiMasi was a

---

[3] "[E]xtortion as defined in [§1951] in no way depends upon having a direct benefit conferred on the person who obtained the property." United States v. Green, 350 U.S. 415, 420 (1956). While Green did not involve extortion under color of official right, the principle is equally applicable to such cases. See United States v. Margiotta, 688 F.2d 108, 113-14 (2d Cir. 1982); United States v. Bradley, 173 F.3d 225, 231 (3d Cir. 1999); United States v. Vigil, 523 F.3d 1258, 1264 (10th Cir. 2008).

In contrast, for purposes of honest services fraud the court instructed the jury in this case that the government was required to prove that payments to McDonough and/or Vitale were made for DiMasi's benefit. The government made this distinction in the proposed jury instructions it filed before trial. However, the government eventually abandoned this position during discussions of the final jury instructions, arguing that no benefit to DiMasi needed to be proven for either extortion or honest services fraud. The court did not decide, as a matter of law, whether a benefit to DiMasi was required in order to convict defendants of honest services fraud. Rather, given the government's longstanding position and the defendants' claimed reliance on it, the court instructed the jury in a manner that maintained the distinction between the two crimes.

On that basis, because there was insufficient evidence that the payments to McDonough were for DiMasi's benefit, the court instructed the jury that they could consider the payments to

legislator or Speaker of the House of Representatives, in return for his official acts; and that DiMasi knew that the payments were made in return for his official acts.

The law concerning the scope of honest services fraud was clarified by the Supreme Court in Skilling v. United States, 130 S. Ct. 2896 (2010), and subsequently by the First Circuit in United States v. Urciuoli, 613 F.3d 11, 17-18 (1st Cir. 2010) ("Urciuoli II"). In Skilling, the Supreme Court narrowed the scope of honest services fraud to payments made in exchange for the performance of one or more official acts. See 130 S. Ct. at 2932-33. The Supreme Court held that the honest services fraud statutes "draw[] content" from federal statutes prohibiting bribery and similar crimes. Id. at 2933-34. In doing so, the Court cited three decisions: United States v. Ganim, 510 F.3d 134, 147-49 (2d Cir. 2007); United States v. Whitfield, 590 F.3d 325, 352-53 (5th Cir. 2009); and United States v. Kemp, 500 F.3d 257, 281-86 (3d Cir. 2007). Skilling, 130 S. Ct. at 2934.

The Court's reliance on this trilogy of cases makes clear that, contrary to what defendants sometimes argue, honest services fraud does not require proof that specific payments were intended

_____

McDonough as a possible basis for the charge of extortion under color of official right, but not as a basis for finding honest services fraud.

to be in exchange for particular official acts.[4] In <u>Ganim</u>, the Second Circuit held that when there is a stream of payments, "'each payment need not be correlated to a specific official act.'" 510 F.3d at 148 (quoting <u>United States v. Jennings</u>, 160 F.3d 1006, 1014 (4th Cir. 1998)). Rather, it stated that it would be "'sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence – i.e., on behalf of the payor – as specific <u>opportunities arose</u>.'" <u>Id.</u> at 145 (quoting <u>United States v. Coyne</u>, 4 F.3d 100, 114 (2d Cir. 1993)) (emphasis added).

In <u>Kemp</u>, the Third Circuit held that "the government need not prove that each gift was provided with the intent to prompt a specific official act" and that payments may be "made with the <u>intent to retain</u> the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf." <u>Kemp</u>, 500 F.3d at 282 (emphasis added).

In <u>Whitfield</u>, the defendants were judges and the essence of the alleged honest services fraud scheme involved arranging or guaranteeing loans to the judges in exchange for favorable

---

[4]DiMasi has not been consistent in making this argument. For example, he concedes in his reply brief that, "[i]t's true that you don't have to tie specific payments to specific acts – that a stream of payment for specific acts surfaces [<u>sic</u>]." DiMasi's Mem. in Reply to Gov't's Opp. to DiMasi's Mot. for Post-Verdict Acquittal on All Counts and, in the Alternative, Mot. for New Trial at 6 (Docket No. 618).

decisions in cases. <u>See</u> 590 F.3d at 335. The Fifth Circuit rejected a claim that an explicit quid pro quo agreement involving specific official acts identified at the time loans were arranged or guaranteed was required to prove honest services fraud. <u>Id.</u> at 351-53. Rather, it held that "[t]he law only requires that the Government prove the specific intent to give or receive something of value <u>in exchange</u> for an official act to be performed sometime in the future." <u>Id.</u> at 353 (internal quotation marks omitted). In doing so, the court noted that, "it would have been impossible" for the defendants to have agreed on what cases the judges would fix at the time the loans were arranged because one of the cases at issue had not been filed in one of the judge's court and the other judge was only then running for election and "was not yet on the bench." <u>See</u> <u>id.</u> at 353 n.17.

In <u>Urciuoli II</u>, the First Circuit interpreted <u>Skilling</u> in a manner that is consistent with <u>Ganim</u>, <u>Kemp</u>, and <u>Whitfield</u>, on facts comparable to the payments to DiMasi personally in this case. <u>See</u> <u>Urciuoli II</u>, 613 F.3d at 13-15. "The gravamen of the charge against Urciuoli was his role in a scheme to bribe -- in the guise of an employment contract -- John Celona, then a Rhode Island state senator." <u>Id.</u> at 13. In affirming the conviction, the First Circuit wrote that:

> [A] rational jury could find that Urciuoli's purpose
> was for Celona to use his office on behalf of [the
> hospital making the payments] and that Celona did so,
> that the compensation nominally for marketing was in

> reality for Celona's misuse of his powers, and that the result was a conspiracy to deprive Rhode Island's citizens of Celona's honest services as a Rhode Island senator . . . The inferred conspiracy between Urciuoli and Celona was adequately proved.
>
> Urciuoli's counter arguments are not persuasive. That Celona performed some marketing services did not prevent the jury from regarding the payments as primarily intended by Urciuoli to secure Celona's legislative help. <u>Nor does it matter whether Celona expressly agreed to help [the hospital] on specific bills, for the jury could infer an understanding that he provide [the hospital] general support in exchange for money (even if occasionally opposing [the hospital]</u>). Urciuoli was free to make such arguments to the jury, but the jury could fairly reject them.

<u>Id.</u> at 14-15 (citing <u>Kemp</u>, 500 F.3d at 284-85; <u>United States v. Kincaid-Chauncey</u>, 556 F.3d 923, 943-47 (9th Cir.) <u>cert.</u> <u>denied</u>, 130 S. Ct. 795 (2009)) (footnote omitted) (emphasis added). Therefore, <u>Urciuoli II</u> also makes clear that honest services fraud does not require proof that payments were made in exchange for official acts concerning matters identified when the payments were made and that an unlawful agreement to commit honest services fraud need not be express, but can be proven by inference, based on circumstantial evidence.

The court's instructions to the jury in this case concerning honest services fraud closely tracked the language in <u>Skilling</u>, <u>Urciuoli II</u>, <u>Ganim</u>, <u>Kemp</u>, <u>Whitfield</u>, and <u>Kincaid-Chauncey</u>. They required, among other things, proof that payments were made with the intent to influence an official act and be received with the intent to be influenced in an official act. <u>See</u> <u>United States v.</u>

<u>Sun-Diamond Growers of California</u>, 526 U.S. 398, 404-05 (1999). The jury was also instructed that it was not necessary for the government to prove that the scheme involved making a specific payment for a specific official act; rather, it would be sufficient if the government proved beyond a reasonable doubt a scheme to make a series of payments in exchange for DiMasi performing official actions benefitting Lally or Cognos as opportunities arose or when DiMasi was called upon to do so.

In addition, as requested by the defendants, the court instructed the jury on the purposes for which payments to DiMasi, Vitale, or McDonough would be lawful. The jury was told that it was permissible for DiMasi to practice law and to receive payments genuinely made for referring a client to another lawyer for legal services. The jury was also informed that it was lawful for Vitale and McDonough to receive payments for lobbying or for providing strategic advice to clients seeking public business. Moreover, the instructions explained the distinction between payments made in exchange for official acts, which would violate the statutes prohibiting honest service fraud and extortion, and payments made only to cultivate a business or political relationship with DiMasi, which would merely constitute a gratuity and, therefore, would not be a proper basis for establishing honest services fraud. <u>See</u> <u>Sun-Diamond</u>, 526 U.S. at 404-05; <u>United States v. Sawyer</u>, 85 F.3d 713,

720-22 (1st Cir. 1996) ("<u>Sawyer I</u>").[5]

In the context of the applicable law as described to the jury, the evidence, viewed in the light most favorable to the verdict, was more than sufficient to prove that DiMasi and McDonough were guilty of the charges on which they were convicted, including participating in the alleged conspiracy with Lally beginning no later than December, 2004. As indicated earlier, the government's submissions thoroughly and reliably review the most relevant evidence. The court notes only that, viewed most favorably to the verdict, it includes, but is not limited to, the following.

In December, 2004 DiMasi's income was diminishing because he had limited his law practice after being elected Speaker several months before. At the same time, he was developing substantial debts.

DiMasi's close friend and confidant, McDonough, told Lally in December, 2004 that he was looking for ways to get money to DiMasi. He proposed that Lally have Cognos put Topazio on a monthly

---

[5]The court did not give the instructions on the purposes for which payment would be lawful in the precise form requested by defendants. However, to the extent that defendants requested legally correct instructions on issues raised by the evidence, the court explained the relevant law to the jury in appropriate terms and the defendants were permitted to argue the issues to the jury. This was permissible because "so long as the charge sufficiently conveys the defendant's theory, it need not parrot the exact language the defendant prefers." <u>United States v. DeStefano</u>, 59 F.3d 1, 2-3 (1st Cir. 1995) (internal quotation marks and brackets omitted); <u>see also</u> <u>United States v. Gonzalez</u>, 570 F.3d 16, 21 (1st Cir. 2009).

"retainer." McDonough explained that Topazio would provide part of those payments to DiMasi.  Although Cognos had no need of Topazio's legal services and, indeed, never asked Topazio to do any work, Lally agreed to McDonough's proposal.

McDonough and Lally met with Topazio in December, 2004. At that meeting, Lally and McDonough arranged for Cognos to retain Topazio for $5,000 a month.  Lally testified that he arranged the payments in order to "funnel money to the Speaker, DiMasi." May 18, 2011 Tr. at 27.[6]  Lally further testified that he wanted to get money to DiMasi "in order to gain favor with the Speaker, to have him help us close software, cut deals, and obtain funding for us." Id.  The jury could have reasonably construed Lally's testimony as direct evidence that, from the outset, Lally intended the payments to Topazio, which he knew would be shared with DiMasi, to be in exchange for DiMasi's official acts as Speaker on behalf of Cognos.

In about March, 2005, the Massachusetts Department of Education ("DOE") requested proposals for an Education Data Warehouse ("EDW") pilot program, and for a state-wide expansion of the pilot.  Cognos wanted both the pilot and the much larger state-wide contracts.  If Cognos received a contract, Lally would receive a commission on payments to Cognos for software.

_____

[6]Although the trial transcript has not been completed, excerpts of parts of the testimony have been prepared and are being filed as part of the record of this case.  The final, full transcripts are likely to have different page numbers for the quoted statements.

Also in March, 2005, Lally caused Cognos to send Topazio a six-month contract, pursuant to his discussion with Topazio in December, 2004. Topazio signed the contract in late March, 2005. He received the first check from Cognos in early April, 2005. Cognos made these monthly payments to Topazio more or less continuously until March, 2007.[7] Although the financial arrangement between Topazio and DiMasi evolved over time, DiMasi initially took $4,000 out of each payment as a purported "referral fee." This was substantially more than his usual share.

In late 2004, and throughout 2005, DiMasi's conduct with regard to Cognos' interests is consistent with the conclusion that he knew he had been put on retainer by Cognos to take official actions as Speaker to advance Cognos' interests when asked to do so or as the opportunity arose. In December, 2004, DiMasi told Topazio twice that McDonough was bringing them a "client." He told Topazio to accept the Cognos monthly payments. When Cognos sent Topazio a contract for lobbying rather than for legal services, DiMasi instructed the reluctant Topazio to sign the agreement. DiMasi persuaded Topazio to initially give DiMasi substantially more than

---

[7]McDonough argues that Topazio did not pass on payments to DiMasi between April, 2006, and June, 2006, when DiMasi was alleged to have taken official action to secure funding for the EDW. See McDonough's Mot. at 12. However, the period of time from April, 2006, to August, 2006, was not a gap in payment, but rather was covered by a single $25,000 check provided by Cognos to Topazio in December, 2006. As demanded by DiMasi, Topazio gave DiMasi the entire sum.

his usual share of the Cognos payments as a purported "referral fee." Periodically, including in 2005, Topazio expressed concern that Cognos was not asking him to perform any work, and DiMasi told him to just continue taking the money.

In 2005, Cognos submitted a cost estimate for the larger, state-wide project with its proposal for the EDW pilot program. The state-wide project would require additional funding from the Legislature before any software or services could be purchased. Therefore, also in 2005, Lally went to McDonough and told him "we needed to get to the Speaker and get funding for this project that DOE wanted." Id. at 34. Lally "reminded [McDonough] of our relationship with Mr. Topazio and that it was time for it to pay off." Id. McDonough said he would speak to DiMasi and did so.

In mid-2005, before the DOE selected a vendor for the pilot project, Lally wanted DiMasi to speak to the Commissioner, David Driscoll, on behalf of Cognos. He discussed this with DiMasi and McDonough, and gave DiMasi some talking points. Among other things, the talking points suggested that DiMasi tell Driscoll that the DOE should not select Cognos' competitor Deloitte because Deloitte had done poor work for the state trial courts.

In about October, 2005, Driscoll spoke to DiMasi about getting legislation to fund an EDW project. DiMasi urged him not to choose the company that "screwed up the courts." See June 6, 2011 Tr. at 16-18. When Driscoll told DiMasi that Cognos had been selected for

the EDW project, DiMasi "seemed fine with that and said, "'if we can help, let us know.'" Id.

In October or November, 2005, Topazio told DiMasi that the six-month contract with Cognos had ended. DiMasi instructed Topazio to call McDonough, who arranged a new six-month contract that was retroactive to the date of the first contract's expiration.

When Governor Mitt Romney did not include funding for the EDW project in his proposed budget in 2006, DiMasi caused it to be included in the budget enacted by the Legislature. More specifically, in 2006, Dimasi caused his counsel to draft the legislative language for a budget amendment. Viewing the request as coming from the Speaker, another legislator was "honored" to be asked by DiMasi's counsel to propose that budget amendment to provide $5,200,000 for the EDW project, including a $4,500,000 earmark for software. DiMasi's staff then communicated DiMasi's support for the EDW funding to the House Ways and Means Committee, whose Chief of Staff kept DiMasi's staff informed of its progress. When the DOE asked that the software earmark be removed because spending $4,500,000 of the $5,200,000 for software would not leave sufficient funding to deploy it, Lally told DiMasi that the earmark for software should not be reduced because his commission would be proportionally diminished. DiMasi subsequently caused the $4,500,000 earmark for software to remain in the budget bill.

In May, 2006, as the final budget including the EDW amendment with the $4,500,000 earmark for software, was about to be enacted, McDonough told Lally that additional payments of $100,000 each would have to be made to Vitale and McDonough after the EDW deal closed. Lally agreed to make the payments because, he testified, McDonough said "[t]hat's what . . . I needed to do in order to get the Speaker to get . . . the funding through." May 18, 2011 Tr. at 57; see also id. at 72 (I paid Vitale $100,000 "[b]ecause I was told that's what I need to do in order to get the deal and the funding through the Speaker").

When the budget was enacted and Lally received his commission, he made the payments to Vitale and McDonough. McDonough told Lally that the $100,000 was going to be funneled to DiMasi in the form of a line of credit from Vitale. After giving Vitale a check for $100,000, Lally called DiMasi to let him know. DiMasi said, "'All right. Thank you.'" Id. at 75.

In June, 2006, in anticipation of the $100,000 payment to Vitale, a company controlled by Vitale extended a $250,000 line of credit to DiMasi in return for a third mortgage on his home. DiMasi drew on the line of credit. He did not fully repay the debt until after the media began reporting on his relationship with Cognos.

In June, 2006, while DiMasi was still acting to assure that $5,200,000 to fund the state-wide EDW project would remain in the

budget and that the $4,500,000 earmark for software would be preserved, DiMasi, McDonough, and Lally played golf. Lally testified that, on the golf course, DiMasi said to McDonough and him, "'I am only going to be Speaker for so long, so it is important that we make as much hay as possible.'" May 18, 2011 Tr. at 64. As they were leaving the golf club, McDonough gave Lally a "high five" and said: "'How about that. You got the speaker telling you something like that.'" Id. at 64-65.

Soon after, DiMasi, McDonough, and Lally began working to get Cognos what became a $13,000,000 state contract for Performance Management software, and a $2,800,000 commission for Lally. DiMasi met with the Acting Director of the Massachusetts Information Technology Division to express his interest in acquiring such software. DiMasi claimed that he wanted it to be able to track state spending on his computer, although he did not ever use a computer.

In December, 2006, DiMasi demanded that Topazio give him the full $25,000 Cognos had recently paid to Topazio to cover the months for which payments had been missed. After Topazio reluctantly sent DiMasi a check for $25,000, DiMasi returned it and asked instead for four, smaller checks, purportedly written on different dates. Topazio complied with this request.

After Deval Patrick took office as Governor in 2007, DiMasi repeatedly told him, as well as members of his administration, that

he wanted funding for Performance Management software in an Emergency Bond bill the Governor was seeking. At DiMasi's request, the administration included a provision for $15,000,000 for such software in that bill despite the fact the Secretary of Administration and Finance believed it was premature, at best, to fund such a purchase because the Administration did not know how it would use the software. DiMasi then worked successfully to assure the prompt passage of the Emergency Bond bill, with $15,000,000 in it for Performance Management software, described in a way that promoted Cognos' chance of winning the contract.

In this same period, Lally asked McDonough how much he would have to pay Vitale in connection with the Emergency Bond bill. McDonough referred him to Vitale, who said that Lally should pay him $500,000. Lally agreed to pay Vitale $500,000 when Cognos received the $13,000,000 contract because, he testified, "it was my understanding of what I needed to do to get the Speaker to fund the project." May 18, 2011 Tr. at 97. Vitale told Lally that DiMasi would get the benefit from the payment when he retired as Speaker and joined Vitale's newly formed lobbying firm. Vitale said he himself would not "get a dime" of any of Lally's payments to him. See May 18, 2011 Tr. at 134.

After the $500,000 payment to Vitale was agreed upon, Lally wanted to end the payments to Topazio. However, Vitale said, after consulting the "powers that be," that the payments to Topazio

should continue.

After the Emergency Bond bill was enacted, Cognos had to compete for the Performance Management contract. DiMasi took the unusual step of calling the then former Acting Director of the Information and Technology Division who was recommending the vendor to be selected and thanked her when she disclosed that she had chosen Cognos. After that discussion, DiMasi promptly called Lally, McDonough, and Vitale.

Subsequently, DiMasi repeatedly reminded Governor Patrick and his Secretary of Administration and Finance that the Performance Management software contract was important to him, characterizing it as one of his two top legislative priorities. Once the contract was signed, however, DiMasi never asked about the software again.

In March, 2008, reporters from The Boston Globe began inquiring about the Cognos software deals. DiMasi then made a series of false statements concerning his relationship with Cognos. For example, he told his press secretary that he did not know Lally was associated with Cognos and was not aware of any payments from Cognos to Topazio. In addition, DiMasi suggested to Topazio that he lose the part of his checkbook that showed the December, 2006 $25,000 check to DiMasi being replaced with the four checks in smaller amounts that Dimasi had requested.

After The Boston Globe called Lally for comment, he and McDonough met. McDonough then initiated what became their regular

practice of frisking each other before talking.  In addition, on one occasion, DiMasi told McDonough, Vitale and Lally that if one of them broke – meaning confessed – they all would fall.

Viewed in the light most favorable to the verdicts, the foregoing evidence was more than sufficient to convict DiMasi and McDonough of conspiracy to commit honest services fraud and/or extortion, and honest services mail and wire fraud.  It was also ample to convict DiMasi of extortion as well.[8]

---

[8] While the evidence was sufficient to support all of the convictions, defendants' Rule 29 motion with regard to Count 1 would be unmeritorious if the evidence was sufficient to prove a conspiracy involving only one of the alleged goals. In Count 1 DiMasi and McDonough were charged with conspiracy to commit three crimes: honest services mail fraud; honest services wire fraud; and extortion under color of official right.  As the court instructed the jury, the government was required to prove only one of the alleged objects of the conspiracy to the unanimous satisfaction of the jurors.  See Griffin v. United States, 502 U.S. 46, 51, 59-60 (1991); United States v. Capozzi, 486 F.3d 711, 717-18 (1st Cir. 2007).  Therefore, it would now be enough for Rule 29 purposes if the evidence were only sufficient to prove that DiMasi and McDonough were each members of the alleged conspiracy to commit extortion.

Similarly, it was alleged that DiMasi caused two forms of payments to be made in exchange for his official acts as Speaker: (1) payments to DiMasi himself through Topazio; and (2) payments to Vitale and McDonough.  Over the government's objection, the court instructed the jury that, in order to convict, they were required to find unanimously that one form of payment, or the other, or both were made in exchange for official acts. See Richardson v. United States, 526 U.S. 813, 824 (1999); cf. United States v. Lee, 317 F.3d 26, 35-36 (1st Cir. 2003); United States v. Marino, 277 F.3d 11, 32 (1st Cir. 2002); see also United States v. Torcasio, 959 F.2d 503, 507-08 (4th Cir. 1992).  Once again, the government was only required to prove the existence of one of the two alleged forms of corrupt payments.  See Griffin, 502 U.S. at 57-60.  Griffin is applicable because the issue now being addressed is the sufficiency of the evidence where there

As explained earlier, honest services fraud and extortion under color of official right involve schemes which both the public official and the person paying him want to conceal. Such schemes are often structured to be difficult to discover and to prove if discovered. Therefore, as noted earlier, circumstantial evidence is usually particularly important in proving the alleged corruption. See Friedman, 854 F.2d at 554. Once again, as the First Circuit has observed, "the best evidence of [a public official's] intent to perform official acts to favor [the payor's] interests is the evidence of [the public official's] actions on bills which were important to [the payor]. Woodward, 149 F.3d at 60 (internal quotation marks and some brackets omitted). Evidence of consciousness of guilt may also be probative. See Friedman, 854 F.2d at 554.

In this case, there was both the direct and circumstantial evidence described above to demonstrate a conspiracy between DiMasi, McDonough, Lally, and Vitale to engage in a scheme involving a series of payments to, and for the benefit of, Dimasi in exchange for the performance of official acts by DiMasi. After

---

are multiple possible bases of conviction.  See id. at 60.

The law relating to extortion under color of official right, which involves payments to a public official, is well-established. See Evans, 504 U.S. at 268; Cruz-Arroyo, 461 F.3d at 73-74; Rivera Rangel, 396 F.3d at 484. It is unaffected by the Supreme Court's decision in Skilling, on which the defendants primarily focus in their motions for acquittal or a new trial.

_Skilling_, this is the essence of honest services fraud. _See_ 130 S.
Ct. at 2930-31; _see also_ _Urciuoli II_, 613 F.3d at 14; _Ganim_, 510
F.3d at 137-40; _Kemp_, 500 F.3d at 284-85; _Whitfield_, 590 F.3d at
336-41. Payments known by DiMasi to be in exchange for his
official acts, including a stream of payments for unspecified
future official acts, also fully support a conviction for extortion
under color of official right in violation of §1951. _See_ _Ganim_,
510 F.3d at 143-47 (approving an instruction that to prove a
violation of §1951 "[i]t is sufficient if the defendant understood
that he was expected as a result of the payment to exercise
particular kinds of influence, that is, on behalf of the payor, as
specific opportunities arose"); _Coyne_, 4 F.3d at 114 (same);
_Bradley_, 173 F.3d at 231 (same); _Kincaid-Chauncey_, 556 F.3d at 937-
38 (same).

In _Skilling_, the Supreme Court noted that _McNally v. United_
_States_, 483 U.S. 350 (1987), involved payments through a middleman
for the benefit of a public official and characterized it as a
"paradigmatic" and "classic" case of an honest services fraud
scheme. _See_ _Skilling_, 130 S. Ct. at 2931, 2932. The instant case
fits that paradigm. Other classic schemes have involved middlemen
who were lobbyists. _See, e.g._, _Kincaid-Chauncey_, 556 F.3d at 926
(affirming convictions for honest services fraud and extortion).
Lawyers have also served as middlemen. _See, e.g._, _United States v._
_Shields_, 999 F.2d 1090, 1093-96 (7th Cir. 1993) (affirming

conviction for extortion). At times, the lawyer intended to serve as the conduit for corrupt payments has not been a knowing participant in the corrupt scheme. See, e.g., United States v. Potter, 463 F.3d 9, 16 (1st Cir. 2006). In essence, in this case, the evidence, viewed in the light most favorable to the verdicts, was sufficient to prove an unfortunately familiar scheme to funnel money to DiMasi through a middleman, Topazio, to provide kickbacks for his benefit to Vitale, and to cause payments that violated §1951 to be made to McDonough as well, all in exchange for DiMasi's official acts.[9]

Contrary to defendants' contention, the evidence was not insufficient to prove that DiMasi and McDonough each acted with the required criminal state of mind. DiMasi's statement that they had to "make hay" because he would not be Speaker long, and McDonough's "high fiving" Lally and saying "how about that" to celebrate DiMasi's invitation to expand their conspiracy are only two examples of the direct evidence that supports the jury's finding of their criminal intent.

This direct evidence is strongly reinforced by the conduct of DiMasi and McDonough as opportunities arose for DiMasi to use his

---

[9]As described in footnote 3, supra, the court found that there was insufficient evidence to establish that the payments to McDonough were for DiMasi's benefit. Accordingly, the court instructed the jury that the payments to McDonough could be considered for purposes of the extortion charges but not for the honest services charges.

official powers to assist Cognos. See Woodward, 149 F.3d at 60;
Friedman, 854 F.2d at 554. While defendants assert that the
temporal link between the Cognos' payments and DiMasi's official
acts is too attenuated to infer the necessary linkage, this is not
true. In Whitfield, the Third Circuit held that honest services
fraud was proven when the first official act occurred two years
after the first payment. See 590 F.3d at 339-40. As described
earlier, in the instant case, in March, 2005, Cognos developed the
prospect of getting a state-wide EDW contract which would require
funding by the Legislature. Topazio was then given a contract and
payments to him began the next month. Later in 2005, DiMasi,
McDonough, and Lally discussed the potential EDW contracts and
Lally gave DiMasi "talking points" to use on behalf of Cognos.
Also in 2005, DiMasi used one of the arguments Lally provided in an
effort to influence DOE Commissioner Driscoll to award the EDW
contract to Cognos. Moreover, DiMasi through his staff and
colleagues in the Legislature worked consistently and successfully
to provide funding for the contracts Cognos wanted and ultimately
received. When the Cognos contracts became the subject of public
scrutiny, DiMasi lied about his knowledge of them and encouraged
Topazio to lose the check register that contained damaging evidence
of DiMasi's conduct. Therefore, the direct and circumstantial
evidence of criminal intent is stronger in the instant case than in
Whitfield.

In essence, the evidence was sufficient for the jury to find that DiMasi was at all times after December, 2004, ready, willing, and able to perform official acts, as he had been retained to do, and McDonough was the trusted intermediary at the hub, orchestrating an effort to insulate the conspirators from being held accountable for their scheme to exchange the use of DiMasi's official powers for payments from Cognos and Lally. Therefore, their motions for judgments of acquittal are not meritorious.

III. THE RULE 33 MOTION FOR A NEW TRIAL

   A.   The Legal Standard

Under Rule 33(a), a court may grant a new trial "if the interests of justice so requires." In making this determination, a court "'may weigh the evidence and evaluate the credibility of witnesses.'" United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001) (quoting United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979)). However, the remedy of a new trial should be "sparingly used, and then only where there would be a miscarriage of justice . . . and where the evidence preponderates heavily against the verdict." Id. (internal quotation marks omitted). Where, as here, "'the award of a new trial is predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial . . . it [must be] quite clear that the

31

jury reached a seriously erroneous result.'" <u>Merlino</u>, 592 F.3d at
33 (quoting <u>Rivera Rangel</u>, 396 F.3d at 486). Moreover, "'[i]t is
only where exceptional circumstances can be demonstrated that the
trial judge may intrude upon the jury function of credibility
assessment.'" <u>Id.</u> (quoting <u>United States v. Cote</u>, 544 F.3d 88, 101
(2d Cir. 2008)).

In contrast to a Rule 29 motion, in deciding a Rule 33 motion,
the court may consider whether its evidentiary rulings at trial
were correct. <u>See</u> <u>Wilkerson</u>, 251 F.3d at 279-80. However, a new
trial is justified only if an error concerning the admission of
evidence was made and the error was not "harmless." <u>Id.</u> at 280.
"An error will be treated as harmless if it is highly probable that
the error did not contribute to the verdict." <u>Id.</u> (internal
quotation marks omitted).

B. <u>Analysis</u>

The court is not persuaded that it made any error in admitting
evidence or, as defendants also claim, in its instructions to the
jury. Nor does the court find that sustaining the jury's verdicts
concerning DiMasi and McDonough would result in a miscarriage of
justice. The jury's verdicts concerning DiMasi and McDonough were
consistent with the court's <u>Petrozziello</u> rulings at trial that the
government had proven by a preponderance of the evidence that
DiMasi, McDonough, Lally, and Vitale were members of the conspiracy
charged in this case. Therefore, the court concludes that the

jury's verdicts of guilty were reasonable rather than seriously erroneous.

In §II.B, _supra_, the court has summarized some of the relevant evidence in the light most favorable to the guilty verdicts. For the purposes of Rule 33 and _Petrozziello_ analyses, the court finds that those facts, and virtually all of the others described in the government's submissions, have been proven by the credible, admissible evidence.

Defendants argue, among other things, that Lally was not a believable witness and, therefore, his testimony could not have been properly relied upon by the court in making its _Petrozziello_ rulings or by the jury in deciding whether their guilt was proven. These contentions are incorrect.

Lally testified for several days. He was subjected to intensive, skillful cross-examination. Because Lally was an immunized, cooperating witness with a motive to lie to strengthen the government's case and thus enhance his hope of getting a reduced sentence, the jury was instructed to examine his testimony with care and rely on it with caution. _See_ _United States v._ _Simonelli_, 237 F.3d 19, 29 (1st Cir. 2001); _United States v._ _Newton_, 891 F.2d 944, 949-50 (1st Cir. 1989); _see also_ Pattern Criminal Jury Instructions for the District Courts of the First Circuit §2.08 (1997). The court has done the same.

From both the direct and cross-examination, the court was

persuaded that Lally had a long history of being an unsavory, dishonest businessman who would do almost anything to make money. However, it was also evident that his character and conduct were well-known to DiMasi and McDonough, who had vacationed with Lally in Florida and attended his wedding. In addition, DiMasi had defended Lally in a criminal case. It was Lally's demonstrated penchant for dishonesty that prompted McDonough to approach him when DiMasi and he devised their scheme to sell the powers of DiMasi's office as Speaker and needed a buyer.

While Lally's hope of a reduced sentence gave him a motive to lie, the fact that his immunity agreement provided that he could still be prosecuted for perjury at trial gave him an incentive to tell the truth. See Simonelli, 237 F.3d at 29; cf. United States v. Lara, 181 F.3d 138, 197-98 (1st Cir. 1999). More significantly, much of Lally's testimony was corroborated by contemporaneous email messages and telephone records, as well as by the testimony of Topazio, Cognos executive Christopher Quinter, Lally's partner Bruce Major, and other evidence. In addition, the conduct of DiMasi, McDonough and Vitale was repeatedly consistent with Lally's contention that the defendants had conspired with him to exchange the exercise of DiMasi's official powers as Speaker for payments from Cognos and Lally. See Woodward, 149 F.3d at 60; Sutton, 970 F.2d at 1008; Cintolo, 818 F.2d at 989-91. Therefore, this case is, like Friedman, one in which the testimony of an "unsavory"

accomplice witness was "corroborated in many important respects." <u>Friedman</u>, 854 F.2d at 571-72.

The court found in making its <u>Petrozziello</u> rulings that Lally's testimony was credible in all material respects. It would have been reasonable, rather than seriously wrong, for the jury to have reached the same conclusion.

The court's <u>Petrozziello</u> rulings, however, did not rely primarily, let alone exclusively, on Lally's testimony. Rather, the credible testimony of many witnesses and the substantial circumstantial evidence, again including the evidence of the defendants' own words and deeds, persuaded the court that DiMasi, McDonough, Lally, and Vitale had participated in the conspiracy charged in Count 1. Even if Lally's testimony was disbelieved and given no weight, the credible evidence supported both the court's <u>Petrozziello</u> rulings and the jury's verdicts.

In view of the credible evidence, the court did not err in its <u>Petrozziello</u> rulings in finding that the conspiracy involving DiMasi, McDonough, and Lally existed by at least December, 2004. In making its <u>Petrozziello</u> rulings, the court recognized that to admit statements under Rule 801(d)(2)(E) the government must prove, by a preponderance of the evidence, that a conspiracy embracing both the declarant and the defendant existed, and that the declarant made the statement during and in furtherance of the conspiracy. <u>See</u> <u>United States v. Mitchell</u>, 596 F.3d 18, 23 (1st

Cir. 2010). The court also understood that "while a trial court may consider the contents of the statement at issue as evidence of the elements of a _Petrozziello_ determination, the determination must rest in part on corroborating evidence beyond that contained in the statement at issue." _Id._ (internal quotation marks and brackets omitted).

In this case the credible evidence proved that, as charged in Count 1, by at least December, 2004, DiMasi and McDonough had devised a scheme to solicit payments to DiMasi in exchange for the use of DiMasi's official powers as Speaker, and to disguise the existence and purpose of those payments by using Topazio as a conduit for them. McDonough then recruited a readily responsive Lally to make the corrupt payments. As recounted earlier, Lally caused payments to be made by Cognos to Topazio in order to funnel money to DiMasi with the intention and understanding that DiMasi would use his power as Speaker to help Cognos get contracts from the Commonwealth of Massachusetts and, particularly, by causing the Legislature to provide the funding for those contracts. _See_ May 18, 2011 Tr. at 27.

DiMasi and McDonough knew that Congos was not hiring Topazio to do legal or lobbying work. Rather, their own comments and conduct show that they each understood and agreed that it was DiMasi as Speaker who had been retained by Congos.

DiMasi and McDonough also argue that the evidence was

36

insufficient to prove that they were members of the precise conspiracy to commit honest services fraud and extortion alleged in Count 1, particularly in 2005. More specifically, they assert that the payments made to DiMasi through Topazio prior to November, 2005, when a second six-month contract was executed, were at worst gratuities and, therefore, any agreement concerning them could not provide a basis for admitting otherwise hearsay statements under Rule 801(d)(2)(E). Once again, this contention is incorrect.

For <u>Petrozziello</u>, as well as other purposes, a defendant's later conduct can provide evidence of his criminal intent. <u>See</u> <u>United States v. Panas</u>, 738 F.2d 278, 283 (8th Cir. 1984); <u>United States v. Everidge</u>, 488 F.2d 1, 3 (9th Cir. 1973). "'The fact that some of th[e] evidence post-dated the statements in question is of no consequence, so long as its natural tendency, when introduced, was to show the concert of action to have been existing at the time of the statement.'" <u>Panas</u>, 738 F.2d at 283 (quoting <u>Everidge</u>, 488 F.2d at 3); <u>cf.</u> <u>Sutton</u>, 970 F.2d at 1008; <u>Cintolo</u>, 818 F.2d at 989-91.

In this case, the court finds that when Cognos became interested in getting the state-wide EDW contract in 2005, Lally told McDonough that it was time for the relationship with Topazio to pay off and that he wanted to get to the Speaker to provide funding for the project. McDonough did not question Lally or balk at his request. Rather, in 2005, Lally and McDonough met with

DiMasi to discuss Lally's interests, Lally gave DiMasi "talking points" to use in promoting Cognos to the Commissioner of the DOE, Driscoll, and DiMasi did so. In addition, the subsequent repeated and successful efforts by Dimasi to work, through his staff and colleagues in the Legislature, to get the required funding included in the budget bill indicates that DiMasi understood that the time had come to render the services as Speaker for which he had been retained. See <u>Woodward</u>, 149 F.3d at 60; <u>Friedman</u>, 854 F.2d at 554. DiMasi's later efforts to cover up his conduct supports this conclusion. See <u>Friedman</u>, 854 F.2d at 554.

Although not essential to the court's <u>Petrozziello</u> rulings, after particularly careful consideration, the court finds that, in 2006, DiMasi did tell Lally and McDonough that he would only be Speaker for a limited time and that they should "make hay" while they could. Lally's testimony was corroborated by proof that soon after this alleged statement DiMasi was secretly preparing to leave the Legislature and join Vitale's lobbying firm. DiMasi's statement about "making hay" provides direct evidence of DiMasi's criminal state of mind. The court also finds that soon after DiMasi's statement McDonough gave Lally a "high five" to celebrate it. This, and McDonough's related comment, is direct evidence of his criminal state of mind.

Although Vitale was found not guilty of the conspiracy and other charges against him, the court remains persuaded that he

joined the conspiracy in about May, 2006, when McDonough and Lally met with Vitale at Vitale's office. As indicated earlier, differing conclusions of the court and the jury may reflect the fact that _Petrozziello_ rulings must be supported by only a preponderance of the evidence, but proof beyond a reasonable doubt is required to convict. _See_ _Bourjaily v. United States_, 483 U.S. 171, 175 (1987); _Mitchell_, 596 F.3d at 23. It is also possible that the jury decided to be lenient with Vitale. _See_ _Powell_, 469 U.S. at 65-66; _Bucuvalas_, 909 F.2d at 597 & n.8. In any event, the court has a duty to make its _Petrozziello_ rulings independently and continues to find that Vitale joined the conspiracy charged in Count 1. Therefore, his statements in furtherance of it -- including his statement to Lally that the payments to Vitale were all for DiMasi's benefit -- were properly admitted and considered by the jury.

In summary, further consideration has confirmed the conclusion the court reached at trial that, for _Petrozziello_ purposes, DiMasi, McDonough, and Lally were, from at least December, 2004, engaged in a conspiracy to commit extortion, honest services mail fraud, and honest services wire fraud, and that Vitale joined that conspiracy later. Each conspirator made statements that were intended to achieve the goals of the conspiracy. Evidence of those statements was properly admitted against DiMasi and McDonough under Rule 801(d)(2)(E).

As indicated earlier, the court's required <u>Petrozziello</u> ruling is consistent with the jury's conclusion that DiMasi and McDonough had been proven guilty of certain charges beyond a reasonable doubt. Therefore, this is not the rare case in which the court should, or properly could, grant a new trial because the guilty verdicts were seriously erroneous. Accordingly, the defendants' Rule 33 motions are being denied.

IV.  ORDER

In view of the foregoing, the motions of DiMasi and McDonough for judgment of acquittal or, alternatively, for a new trial (Docket Nos. 609 and 610) are hereby DENIED.

<u>  /s/ Mark L. Wolf      </u>
UNITED STATES DISTRICT JUDGE
