UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                              )
        v.              )
                              )  Cr. No. 09-10166-MLW
                              )
SALVATORE F. DIMASI,       )
    Defendant.           )

MEMORANDUM AND ORDER

WOLF, D.J.                             November 17, 2016

TABLE OF CONTENTS

I.    SUMMARY ..................................................... 1

II.   PROCEDURAL HISTORY ........................................ 14

III. THE RELEVANT STANDARDS ................................... 21

     A.   18 U.S.C. §3582(c)(1)(A)(i) ......................... 21

     B.   The Sentencing Guidelines .......................... 22

IV.  THE BUREAU OF PRISONS COMPASSIONATE RELEASE PROGRAM, PROCESS,
     AND PRACTICES ........................................... 24

V.   THE FACTS ................................................ 29

VI.  DISCUSSION ............................................... 45

     A.   Extraordinary and Compelling Reasons Warrant a Reduction
        of DiMasi's Sentence to Time-Served ................ 45

     B.   Supervised Release ................................. 60

VII. CONCLUSION ............................................... 68

VIII.ORDER ................................................... 69

I.    SUMMARY

    In 2011, the court sentenced defendant Salvatore DiMasi to

serve eight years in prison for extortion and related crimes

committed while he was the Speaker of the Massachusetts House of Representatives. On October 13, 2016, the government filed on behalf of the Director of the Bureau of Prisons (the "Director") a motion to reduce DiMasi's sentence to time served (the "Motion"). It was filed pursuant to 18 U.S.C. §3582(c)(1)(A)(i), which gives the court the authority to reduce a sentence if the Director moves for a reduction and the court finds that "extraordinary and compelling reasons warrant such a reduction." Absent a motion by the Director pursuant to the statute the court does not have the authority to reduce DiMasi's sentence.

For the reasons described in detail in this Memorandum, the Motion is being allowed. The court is ordering that DiMasi be released on November 22, 2016, in North Carolina, to the custody of his wife Deborah DiMasi. Mr. and Mrs. DiMasi shall return forthwith to their residence in Massachusetts.

DiMasi's conditions of Supervised Release are being modified to require a period of six months home confinement and that Mrs. DiMasi assure that DiMasi is monitored while eating or drinking, by a member of his family or a health care professional his family may hire, to protect against the risk he will choke and be harmed. DiMasi, who will not be subject to electronic monitoring, may leave his residence for any medical emergency or, with the prior approval of the Probation Office, for medical appointments and religious observances.

If requested, after three months, the court will consider reducing DiMasi's 24-hour home confinement to a curfew. It may also consider extending his period of home confinement.

As ordered previously, DiMasi is prohibited from associating with his convicted co-defendant Richard McDonough. In addition, DiMasi's conditions of Supervised Release are being modified to prohibit him from working with his acquitted co-defendant Richard Vitale, and to prohibit DiMasi and his family from receiving anything of value from Vitale, to whom DiMasi directed hundreds of thousands of dollars DiMasi extorted in this case.

In summary, the reasons for these decisions are as follows. DiMasi began serving his eight-year sentence in November, 2011. With credit for "good time," DiMasi would ordinarily be released in November 2018.

In 2012, DiMasi was found to have cancer in his neck and tongue. DiMasi was treated with chemotherapy and radiation. This treatment required that DiMasi receive nourishment through a feeding tube for about a year. Tests have shown DiMasi to be free of tongue and neck cancer since at least July 2013.

However, the radiation treatment caused a narrowing of DiMasi's throat. Although there have been nine procedures to dilate it, his throat remains narrow and DiMasi has substantial difficulty swallowing. It has been recommended that he eat only pureed food. Nevertheless, he is at risk of choking when he eats. He is also at

risk of having food go into his lungs, which has in the past caused pneumonia and could again.

In 2015, DiMasi was found to have prostate cancer. It was treated with radiation. Tests have shown DiMasi to be free of prostate cancer since at least August 2016.

Beginning in 2015, DiMasi and his attorneys filed a series of requests for a motion, pursuant to §3582(c)(1)(A)(i), for his early release. These requests were repeatedly denied by the Bureau of Prisons, evidently as a result of the Bureau's interpretation of its established standards and its traditional practices.

Before 2013, pursuant to Bureau of Prisons policy and practices, motions for compassionate release were generally filed only for inmates who were terminally ill. Such motions were rare, averaging about 24 a year.

The Bureau of Prisons' restrictive policy for filing §3582(c)(1)(A)(i) motions was criticized by the Department of Justice Inspector General and various organizations, including Human Rights Watch. In 2013, the Bureau's policy was broadened to make inmates who are not terminally ill eligible for consideration, including elderly inmates with a serious medical condition. However, the Department of Justice Inspector General found in February 2016 that few aging inmates have been the beneficiaries of motions for compassionate release under the expanded policy. In an amendment which became effective on November 1, 2016, the United

4

States Sentencing Commission encouraged the Bureau of Prisons to file motions for compassionate release more often and, therefore, to permit courts to decide more often, after considering the legally required factors and the Commission's guidance, whether a reduction of sentence is warranted.

In June 2016, Kathleen Kenney, the Assistant Director and General Counsel of the Bureau of Prisons, denied DiMasi's then most recent request for a compassionate release motion. She noted that his cancers were in remission, and that he had no physical or work limitations. She concluded that DiMasi did not meet the criteria for a motion for a reduction in sentence because his health was not deteriorating and his ability to function in a correctional setting was not substantially diminished.

Bureau of Prisons regulations provide that if the Bureau determines that a motion for compassionate release is otherwise justified, the United States Attorney who prosecuted the case will be consulted to determine whether he or she objects to the motion being filed. Therefore, because the Bureau denied DiMasi's request for a compassionate release motion, the United States Attorney ordinarily would not have become involved in this matter.

However, in July 2016, the four lawyers representing DiMasi pro bono met, for at least the second time, with the United States Attorney for the District of Massachusetts, Carmen Ortiz. Ms. Ortiz then spoke with Ms. Kenney to encourage the Bureau of Prisons to

reconsider its denial of DiMasi's request for early release. The Bureau responded promptly and, ultimately, positively to this request.

On August 3, 2016, the first medical test to measure DiMasi's ability to swallow since 2014 was performed.

An August 9, 2016 Bureau of Prisons standard report indicated that DiMasi's medical condition was stable, that he had a chronic illness that required at least quarterly evaluation, and that he was able to function independently.

On August 11, 2016, however, DiMasi's Bureau of Prisons' doctor characterized DiMasi's medical condition as unstable and wrote that DiMasi was in the category of fragile outpatients who require daily to monthly clinical attention. Interpreting the August 3, 2016 swallowing test, the doctor noted that: DiMasi's throat had narrowed; he had great difficulty swallowing; and DiMasi reported repeated choking while eating. The doctor characterized DiMasi's condition as chronic, serious, deteriorating and unlikely to improve with treatment. He stated that DiMasi's ability to function while in custody was diminished. The doctor concluded that DiMasi was "probably" appropriate for a motion for a reduction in his sentence.

On August 15, 2016, at the request of the Associate General Counsel of the Bureau of Prisons, the Bureau's Medical Director reviewed DiMasi's record. The Medical Director wrote the attorney

that "it is medically indicated that someone be present to assist [DiMasi] with choking prevention while eating or drinking." DiMasi is in custody at a low security level facility in Butner, North Carolina. Butner has a companion program in which inmates provide assistance to other, impaired inmates. Therefore, the Bureau of Prisons could, if medically necessary, assign an inmate to monitor DiMasi when he is eating. However, the Medical Director concluded that DiMasi's health was deteriorating and substantially diminished his ability to function in custody. Therefore, he found DiMasi satisfied the criteria for a reduction in sentence motion for elderly inmates with medical conditions.

Such a motion was filed on October 13, 2016. The Motion gives the court the authority to reduce DiMasi's sentence. It does not, however, make such a reduction automatic. Nor does it give the court unfettered discretion.

Rather, the court is required to weigh the applicable statutory sentencing factors and make a decision that is consistent with the relevant advisory Sentencing Guidelines. The relevant statutory factors include, among others: the defendant's history and characteristics; the need to provide him with any required medical treatment in the most effective manner; the need for the sentence to reflect the seriousness of the defendant's crimes; and the related needs to avoid unwarranted disparities in sentences

between similarly situated individuals and to promote respect for the law.

The court issued a series of orders that required the parties to submit evidence and argument regarding the relevant factors. A hearing on the Motion was also held.

It is undisputed that DiMasi is not now terminally ill. Tests indicate that he does not now have throat or prostate cancer. DiMasi is being held in a low security facility, rather than in a Bureau of Prisons medical center. With the significant exception of DiMasi's difficulty in swallowing, he is able to function fully and independently.

Nevertheless, the court finds extraordinary and compelling reasons warrant reducing DiMasi's sentence to the five years he has served if certain modifications are made to the conditions of his Supervised Release.

The throat and prostate cancer DiMasi has experienced while in custody were unforeseen when he was sentenced in 2011. If he had then been suffering from cancer, the court would have considered imposing a sentence of less than eight years. The cancers that DiMasi developed while serving his sentence, and the fact that they could recur, are now part of his history and characteristics, and weigh in favor of reducing his sentence.

Although now cancer free, DiMasi is suffering from a serious medical condition. The treatment for his cancer has narrowed his

8

throat, requiring a special diet. He is, however, still at risk of choking whenever he eats. As previously noted, the Medical Director of the Bureau of Prisons found that "it is medically indicated" that DiMasi be monitored while eating. This opinion is central to the court's conclusion that DiMasi's release is justified. The Bureau of Prisons could provide an inmate companion to monitor DiMasi when he eats. However, the court finds that it would be more effective for his family, and professionals it may hire, to perform this function.

DiMasi's release will also serve the interest of providing him with the most effective medical treatment in another way. Inmates have a constitutional right to adequate medical care. They do not have a right to optimal medical care or to the doctors of their choice. While on Supervised Release, DiMasi will have the liberty of selecting the doctors and hospitals he wants to treat him, and will have the opportunity to obtain what may be better medical care than he would if he remained in custody.

In extorting payments in return for using his official power to cause the Commonwealth of Massachusetts to spend $17,000,000 on unneeded and unwanted software, DiMasi committed very serious crimes. Those crimes had victims. As the court said at DiMasi's sentencing, those victims included elderly individuals needing services, and students needing scholarships, that were not funded because DiMasi corruptly caused $17,000,000 to be misspent. As the

First Circuit agreed, in 2011 an eight year sentence was appropriate to recognize the seriousness of DiMasi's crimes. However, there is always a range of reasonable sentences in a particular case. The five years DiMasi will have served as a result of the reduction of his sentence is also a significant sentence. In view of the developments that were unforeseen when DiMasi was sentenced, the court now finds a five-year sentence sufficient to reflect the seriousness of his crimes.

The court also finds that five-year sentence sufficient to deter comparable corrupt conduct by others. Deterrence was an important consideration in determining DiMasi's original sentence. He was the third consecutive Speaker of the Massachusetts House of Representatives to be convicted of a federal crime. His predecessors were not sentenced to serve time in custody. A then recent five-year sentence imposed on a corrupt Mayor was not sufficient to deter DiMasi. However, DiMasi's medical problems while in prison have now been highly publicized. Knowledge of his experience should strongly discourage public officials and others from emulating DiMasi's example.

The court has also considered whether reducing DiMasi's sentence will be consistent with the important statutory interests of avoiding unwarranted sentence disparities and promoting respect for the law. As indicated earlier, motions for compassionate release were very rare before the Bureau of Prisons revised its

policy in 2013, and have continued to be rare for inmates, like DiMasi, who are not terminally ill. Since 2013, the Bureau has moved for a reduction of sentence for only 11 inmates in DiMasi's "Elderly with Medical Conditions" category and each of them appears to have been more debilitated than DiMasi.

It appears that the Bureau of Prisons' June 2016 denial of DiMasi's request for a motion for reduction in sentence was consistent with its usual--and criticized--restrictive interpretation of its policy and its standard procedures. The Bureau's attitude and actions concerning DiMasi changed beginning in July 2016. The record does not indicate that it was influenced by DiMasi's former status or by the two public officials who wrote to the Bureau on his behalf. Nor does the record suggest that the Bureau was affected by the Sentencing Commission's encouragement to file motions for compassionate release more often.

Rather, the conduct of the Bureau of Prisons changed after DiMasi's lawyers persuaded the United States Attorney to intervene, and she encouraged the Bureau's General Counsel to reconsider the denial of DiMasi's request for a motion to reduce his sentence. This was a deviation from the process prescribed by the Bureau's regulations. It suggests that the decision to file the Motion for a reduction of DiMasi's sentence was driven more by the judgment of lawyers than of medical professionals.

However, the government has represented that DiMasi did not get preferential treatment. It asserts that the United States Attorney frequently meets with defense counsel and takes actions on their behalf if persuaded it is appropriate. The Bureau of Prisons states that it filed the Motion on behalf of DiMasi because of his medical condition and would do the same for any inmate similarly situated. Although the involvement of the United States Attorney means the Bureau did not follow its established procedures with regard to DiMasi, its judgment is supported by the opinions of doctors and, therefore, deserves some deference.

The future conduct of the United States Attorney and, particularly, the Bureau of Prisons will determine whether releasing DiMasi now will be consistent with the court's obligation to avoid unwarranted disparities in sentencing. If in the future the Bureau evaluates the requests of elderly, ill inmates more generously and files §3582(c)(1)(A)(i) motions more frequently, DiMasi's release will not be injurious to this important interest.

The future, of course, cannot be foretold. The Sentencing Commission, the Department of Justice Inspector General, and organizations including Human Rights Watch have encouraged the Bureau of Prisons to file motions for compassionate release more often when an inmate's health seriously deteriorates while he is in custody. This would allow courts to perform their traditional role in weighing all of the competing considerations and deciding

what sentence is sufficient and no more than necessary for that
inmate. The court hopes that the decision in this case will
contribute to the humane administration of §3582(c)(1)(A)(i) by
the Bureau of Prisons in the future.

DiMasi's release is justified, however, only if his
conditions of Supervised Release are modified to, among other
things, address the changes in circumstances that weigh most
heavily in favor of his release. Pursuant to statute and Bureau of
Prisons policy, eligible inmates usually serve the last six months
of their sentences in a Residential Re-Entry Center and, at times,
in home confinement. It is particularly important that DiMasi be
treated similarly. The Bureau of Prisons substantially justified
its decision to file the Motion on the view it developed in August
2016 that DiMasi should be monitored while eating. The court's
decision to release DiMasi now rests in meaningful measure on its
conclusion that the required monitoring will be better provided,
for at least a usual period of home confinement, by members of his
family and professionals they may hire.

Finally, the court is ordering that DiMasi be released, in
North Carolina, to the custody of his wife, and that they return
home promptly and directly. Ordinarily, granting the Motion would
result in DiMasi being transported by bus to Massachusetts, with
many stops at Bureau of Prisons facilities that may not be familiar
with, or able to meet, the medical needs which justify DiMasi's

early release. That would be inconsistent with the primary purpose of this decision.

In conclusion, the court finds that it is permissible and appropriate to grant the Motion and order DiMasi's early release. It hopes that this decision will not prove to provide unusually favorable treatment for DiMasi, but rather that it will contribute to the enlightened and appropriately compassionate administration of justice for comparable inmates in the future.

II.  PROCEDURAL HISTORY

After a six-week trial, on June 15, 2011, defendants Salvatore DiMasi and Richard McDonough were convicted of conspiracy to commit honest services mail fraud, honest services wire fraud, and/or extortion under color of official right, and of honest services mail and wire fraud as well.[1] In addition, DiMasi was convicted of extortion under color of official right. All of the charges involved payments made in exchange for official acts by DiMasi as Speaker of the Massachusetts House of Representatives to assist Cognos ULC obtain funded contracts for computer software with the Commonwealth of Massachusetts.

The Sentencing Guideline range for DiMasi's crimes was 235 to 293 months in prison. The government recommended a 150-month

---

[1] Richard Vitale, a co-defendant, was acquitted of the conspiracy and other charges against him.

14

sentence. After a two-day sentencing hearing, the court found an eight-year sentence, 96 months, to be sufficient but no more than necessary to serve the required statutory purposes of sentencing. See Sept. 8 and 9, 2011 Transcripts ("Tr."). In addition, the court considered DiMasi's known medical condition, including his heart problems, and the medical condition of his wife as well. See Sept. 9, 2011 Tr. at 28-29 (Docket No. 674 at 38-39). Based on these considerations, it recommended that DiMasi serve his sentence in Massachusetts at Federal Medical Center ("FMC") Devens. Id. at 17.

The court subsequently denied DiMasi's request for release pending appeal. See United States v. DiMasi, 817 F. Supp. 2d 9 (D. Mass. 2011), aff'd No. 11-2163 (1st Cir. Nov. 14, 2011). DiMasi began serving his sentence on November 30, 2011. The First Circuit later affirmed his conviction and sentence. See United States v. McDonough, 727 F.3d 143 (1st Cir. 2013).

The Bureau of Prisons did not follow the court's recommendation that DiMasi serve his sentence in Massachusetts at FMC Devens. Rather, it assigned DiMasi to the Federal Medical Center in Lexington, Kentucky.

As described in more detail in §V, infra, in 2012 DiMasi was diagnosed with throat cancer. He was then transferred to the Federal Medical Center in Butner, North Carolina, where his throat cancer was treated with radiation and chemotherapy. Tests show he has been free of throat cancer since at least July 30, 2013. See

15

Docket No. 907-1, Ex. B at 1. However, the radiation and chemotherapy caused a narrowing of DiMasi's esophagus. This condition has required repeated dilations, the last of which was on May 31, 2016.[2] See Docket No. 907-3 at 2, 7. Despite the dilations, it remains difficult for DiMasi to swallow even pureed food and he is at risk of choking while eating.

In 2015, DiMasi was found to have prostate cancer. It was treated with radiation until February 2016. Tests have shown that DiMasi has been free of prostate cancer since at least August, 2016. See Docket No. 907-1, Ex. B at 1, 2.

As also discussed in more detail below, beginning in 2015, DiMasi, personally and through his attorneys, requested that the Director of the Bureau of Prisons file a motion for his compassionate release pursuant to 18 U.S.C. §3582(c)(1)(A)(i). Those requests were repeatedly denied, most recently in June 2016 by the Assistant Director and General Counsel of the Bureau of Prisons, Kathleen Kenney. See Docket No. 885-13.

---

[2] In her record of an August 5, 2016 visit with DiMasi, a Bureau of Prisons dietician noted that his last dilation was on "May 31, 2015." Docket No. 907-3 at 7. However, other notations in the record indicate that this date was likely entered in error. For example, an August 3, 2016 barium swallow study states that DiMasi's most recent dilation was in May 2016, not 2015. See Docket No. 907-3 at 2.

In July 2016, DiMasi's attorneys met for at least the second time with the United States Attorney for the District of Massachusetts, Carmen Ortiz. See Docket No. 885-15 at 1; Nov. 1, 2016 Tr. at 26, 29. Ms. Ortiz subsequently spoke with Ms. Kenney. Docket No. 885-15 at 1. An additional medical test of DiMasi's ability to swallow was conducted on August 3, 2016. On August 15, 2016, the Medical Director of the Bureau of Prisons wrote that DiMasi met the medical criteria for a reduction of sentence under the "Elderly Inmates with Medical Conditions" provision of the Bureau's compassionate release policy. See Docket No. 907-1, Ex. G. He specifically noted that it is "medically indicated that someone be present to assist [DiMasi] with choking prevention while eating and drinking" and that he "requires assistance with his Instrumental Activities of Daily Living." Id.

As stated earlier, on October 13, 2016, the government filed on behalf of the Director of the Bureau of Prisons a motion, pursuant to §3582(c)(1)(A)(i), to reduce DiMasi's sentence to time served. The Motion states, in part, that DiMasi "is a senior who has served 56 months (58%) of his 96-month term of imprisonment and is experiencing deteriorating physical health that substantially diminishes his ability to function in a correctional facility." Docket No. 872 at 2. The Motion was not accompanied by an affidavit or a supporting memorandum as required by Rule 7.1(b)(1) of the Local Rules of the United States District Court

17

for the District of Massachusetts. Therefore, as the court stated in its October 17, 2016 Memorandum and Order, "the government ha[d] provided the court only unverified statements, but not any evidence, regarding DiMasi's medical history in prison, current medical condition, prognosis, or ability to function in prison."[3] Docket No. 873 at 1-2.

It is important to the administration of equal justice, and public confidence in it, that established standards be employed and standard procedures, including the requirements of Local Rule 7.1(b), be followed in every case. As Supreme Court Justice Louis Brandeis wrote, "[k]nowledge is essential to understanding, and understanding should precede judging." Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 520 (1924) (Brandeis, J., dissenting); see also United States v. Sampson, 300 F. Supp. 2d 275, 276 & n.3 (D. Mass. 2004) (Wolf, D.J.) ("I always try to understand the people that I am called upon to judge. Usually, knowledge is a foundation for understanding."). The requirements of Local Rule 7.1(b) that all motions be accompanied by evidence and argument are intended to provide judges with the information necessary to make decisions

---

[3] Unverified statements in a motion or brief do not constitute "evidence." See Rivera-Corraliza v. Morales, 794 F.3d 208, 224 (1st Cir. 2015); Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991); Inman v. Siciliano, No. C.A. 10-10202-FDS, 2012 WL 1980408, at *5 (D. Mass. May 31, 2012).

that are based on proven facts and according to law, both of which are essential to administering equal justice under law.

As discussed at the November 1, 2016 hearing, it was particularly important that the requirements of Local Rule 7.1 be satisfied in this case. First, motions for compassionate release are very rare and, therefore, unfamiliar. This court cannot recall receiving one in its 31 years of service. Nor have most of its colleagues ever been presented with such a motion. Indeed, the instant Motion is the first filed in the District of Massachusetts since the Bureau of Prisons liberalized its stated compassionate release policy in 2013, as discussed in §IV, _infra_.

In addition, as explained in §III.A, _infra_, in deciding the Motion the court is required to consider the need to avoid unwarranted disparities in sentencing. _See_ 18 U.S.C. §3582(c)(1)(A)(i) and §3553(a)(6). Because motions for compassionate release have historically been rare, the court has been required to consider "whether the Director's decision to file the Motion was influenced by DiMasi's former status as the Speaker of the Massachusetts House of Representatives and the stature of some who may be advocating for his release." Docket No. 873 at 4. The Motion did not, however, provide any information, let alone evidence, concerning these issues.

Accordingly, on October 17, 2016, the court ordered the government to file one or more affidavits, evidence, and a

memorandum addressing, among other things, the issues that the court had identified and explained. Id. at 7-8. The court offered DiMasi an opportunity to address the merit of the Motion as well. Id. at 8.

The government and DiMasi submitted responses to the October 17, 2016 Memorandum and Order on October 27, 2016. On October 28, 2016, the court ordered that, by October 31, 2016, the parties address additional questions presented by those submissions. See Docket No. 883. The responses to that Order prompted the court to direct the government to file another document from DiMasi's medical record. See Docket No. 893. A hearing on the Motion was held on November 1, 2016.

As the court wrote in the October 17, 2016 Memorandum and Order:

> The decision to sentence DiMasi to serve eight years in prison was made carefully, after the required weighing of all of the §3553(a) factors. See Sept. 8 and 9, 2011 Transcripts. That sentence was affirmed on appeal. See United States v. McDonough, 727 F.3d 143, 165-66 (1st Cir. 2013). However, when sentencing DiMasi, the court could not have foreseen that he would, as represented in the Motion, develop cancer while in prison. The Motion presents the court an opportunity to decide whether the eight-year sentence that was most appropriate in 2011 should now be reduced because of an unanticipated deterioration of DiMasi's health. That decision too must be made carefully, based on a proper record, after considering all of the relevant §3553(a) factors. See 18 U.S.C. §3582(c)(1)(A)(i); U.S.S.G. §1B1.13.

Docket No. 873 at 7.

III. THE RELEVANT STANDARDS

A.    18 U.S.C. §3582(c)(1)(A)(i)

18 U.S.C. §3582(c)(1)(A)(i) states, in pertinent part, that "the court, upon motion by the Director of the Bureau of Prisons may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) . . . if it finds that . . . extraordinary and compelling reasons warrant such a reduction." This means that the court may not reduce a sentence of an elderly or ill inmate unless the Bureau of Prisons moves for such a reduction.

However, while a motion by the Bureau of Prisons is necessary, it does not make a reduction in sentence automatic. Rather, §3582(c)(1)(A) requires that the court "consider[] the [sentencing factors] set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable" in determining whether "extraordinary and compelling reasons warrant [] a reduction." In the instant case, this means that the court must decide what sentence for DiMasi is now sufficient, but not greater than necessary, in view of, among other things:

1.    The nature and circumstances of his crimes and his history and characteristics as of today, see 18 U.S.C. §3553(a)(1);

2.    The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for DiMasi's crimes, see §3553(a)(2)(A);

3.    The need for the sentence to afford adequate deterrence to comparable criminal conduct, see §3553(a)(2)(B);

4.    The need for the sentence to protect the public from further crimes by DiMasi, see §3353(a)(2)(C);

5.    The need for the sentence to provide DiMasi with needed medical care most effectively, see §3353(a)(2)(D); and

6.    The need to avoid unwarranted sentence disparities among similarly situated defendants, see §3553(a)(6).

B.    The Sentencing Guidelines

In addition to requiring that the court consider the applicable §3553(a) factors in determining whether "extraordinary and compelling reasons warrant [] a reduction" of a sentence, §3582(c)(1) requires that the court find that "such a reduction is consistent with applicable policy statements issued by the [United States] Sentencing Commission." On January 15, 2016, the Sentencing Commission proposed an amendment to the pertinent provision of the Sentencing Guidelines, §1B1.13, which broadened the eligibility criteria for compassionate release. See 81 Fed. Reg. 2,295, at 2,299-300 (January 15, 2016). On May 5, 2016, the Commission submitted the final version of that Amendment to Congress. See 81 Fed. Reg. 27,261, at 27,261-63 (May 5, 2016). The

Amendment became effective on November 1, 2016. Application Note 1 to §1B1.13 now states, in part, that "extraordinary and compelling reasons" for a reduction of sentence exist if: the defendant (i) is suffering from a terminal illness; or (ii) is suffering from a serious physical or medical condition, a serious functional impairment, or deteriorating physical or mental health because of the aging process that substantially diminishes his ability to care for himself in a correctional facility and from which he is not expected to recover.

The amended Application Note to §1B1.13 also encourages the Bureau of Prisons to file motions for compassionate release more frequently in the future than it has in the past. This is, in part, because the Sentencing Commission found that, "[w]hile only the Director of the Bureau of Prisons has the statutory authority to file a motion for compassionate release, . . . 'the court is in a unique position to assess whether [extraordinary and compelling] circumstances exist, and whether a reduction is warranted (and, if so, the amount of the reduction) . . . .'" 81 Fed. Reg. at 27,264 (quoting proposed language now codified in U.S.S.G. §1B1.13, A.N. 4). In essence, the Sentencing Commission has encouraged the Bureau of Prisons to be more liberal in creating opportunities for judges to consider whether compassionate release is justified, and reminded judges of their statutory obligation to consider the

applicable §3553(a) factors and the Commission's guidance in making such decisions.

The amendment to §1B1.13 was the result of a 2013 revision of the Bureau of Prisons' compassionate release policy and subsequent monitoring of the implementation of that revised policy. As the Commission wrote in explaining the amendment:

> The Commission conducted an in-depth review of this topic, including consideration of Bureau of Prisons data documenting lengthy review of compassionate release applications and low approval rates, as well as two reports issued by the Department of Justice Office of the Inspector General that are critical of the Bureau of Prisons' implementation of its compassionate release program. See U.S. Department of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, I-2023-006 (April, 2013); U.S. Department of Justice, Office of the Inspector General, The Impact of the Aging Inmate Population on the Federal Bureau of Prisons, E-15-05 (May 2015). In February 2016, the Commission held a public hearing on compassionate release and received testimony from witnesses and experts about the need to broaden the criteria for eligibility, to add guidance to the medical criteria, and to remove other administrative hurdles that limit the availability of compassionate release for otherwise eligible defendants.

81 Fed. Reg. at 27,263.

IV.   THE BUREAU OF PRISONS COMPASSIONATE RELEASE PROGRAM, PROCESS, AND PRACTICES

In contrast to the statute and Guidelines, the court is not legally required to consider the Bureau of Prisons' standards in deciding whether extraordinary and compelling reasons exist to reduce an inmate's sentence. However, if the Bureau of Prisons has employed its established standards and procedures, its decision to

file a motion deserves a degree of deference by the court. In any event, such standards and procedures are relevant to whether granting a motion for compassionate release would be consistent with the court's obligation to seek to avoid unjustified sentencing disparities.

Prior to 2013, the Bureau of Prisons "generally . . . exercised its authority [to file motions for compassionate release] only [for] inmates who [were] suffering from a life-threatening or terminal medical condition, or who [were] severely and permanently mentally or physically disabled." Office of the Inspector General, U.S. Department of Justice, The Federal Bureau of Prisons' Compassionate Release Program, I-2023-006, at 2 (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf. The Director of the Bureau of Prisons had issued a memorandum stating that a terminally ill patient was one with a life expectancy of no more than a year. Id. at 8-9. However, the medical staff at some institutions only approved requests from inmates with a life expectancy of six months or less. Id. at 16-17. Even in such circumstances, the Bureau of Prisons rarely filed motions for reduction of sentence. In 2012, Human Rights Watch reported that between 1992 and 2012 an average of less than 24 such motions by the Bureau of Prisons were filed annually. Human Rights Watch, The Answer is No: Too Little Compassionate Release in US Federal

Prisons, at 34 (2012), https://www.hrw.org/sites/default/files/ reports/us1112ForUploadSm.pdf.

In 2013, the Bureau of Prisons revised its policy to make some inmates who are not terminally ill or severely disabled eligible for a compassionate release motion. See U.S. Department of Justice, Background on Compassionate Release/Reductions in Sentence (August 12, 2013), https://www.whitehouse.gov/ sites/default/files/ondcp/Fact_Sheets/final_ris_background_summa ry.pdf. The 2013 Bureau of Prisons Compassionate Release Policy provides for §3582(c)(1)(A)(i) motions based on age and other conditions as well as medical circumstances. See Federal Bureau of Prisons, Program Statement 5050.49, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§3582(c)(1)(A) and 4205(g), at 3-4 (March 25, 2015), https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf. Inmates who are terminally ill, completely disabled, or so debilitated that they are confined to a bed or chair more than 50% of waking hours are in the "Medical Category." Id. at 3.

The "Non-Medical" category has several subcategories, one of which is "Elderly Inmates with Medical Conditions." Id. at 4. The "Elderly Inmates with Medical Conditions" designation is for "inmates who fit the following criteria:

- Age 65 and older.
- Suffer from chronic or serious medical conditions related to the aging process.

- Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility.
- Conventional treatment promises no substantial improvement to their mental or physical condition.
- Have served at least 50% of their sentence."

Id. The Bureau of Prisons has placed DiMasi in this "Elderly Inmates with Medical Conditions" subcategory.

In February 2016, the Department of Justice Inspector General reported that, "[a]lthough the [Bureau of Prisons] has revised its compassionate release policy to expand consideration for early release to aging inmates, . . . few aging inmates have been released under it." Office of Inspector General, U.S. Department of Justice, The Impact of an Aging Inmate Population, E-15-05, at 51 (February 2016), https://oig.justice.gov/reports/2015/e1505.pdf. Human Rights Watch similarly stated that, "[f]rom August 2013, to December 2015, the Bureau of Prisons received 3,142 requests for compassionate release, and approved only 261. Of these approvals, 178 (68%) were for cases in which the applicant had a terminal condition." Human Rights Watch, Public Comment on Proposed Amendment 81 Fed. Reg. 2295, at 3 (March 21, 2016), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20160321/HRW.pdf.

With regard to elderly inmates: in 2013, 216 inmates applied for compassionate release as elderly inmates and no such requests for a §3582(c)(1)(A)(i) motion were granted by the Bureau of

27

Prisons. In 2014, 206 such applications were made and 16 were granted, four of which were "Elderly Inmates with Medical Conditions," as DiMasi has now been designated. In 2015, 137 applications were made and 15 were granted, five of which were "Elderly Inmates with Medical Conditions." See U.S. Department of Justice, Public Comment on Proposed Amendment 81 Fed. Reg. 2295, at 17-18 (Feb. 12, 2016), http://www.ussc.gov/sites/default/files/pdf/amendment-process/ public-hearings-and-meetings/20160217/DOJ.pdf. Evidently, prior to the instant Motion, the Bureau of Prisons granted two more requests for compassionate release motions for Elderly Inmates with Medical Conditions in 2016, because in this case the Bureau reports a total of eleven such applications have been allowed. See Docket No. 907-1, Ex. A.

The Bureau of Prisons has, by regulation, established procedures it must follow in considering applications for compassionate release. See 28 C.F.R. §571.62. An application may be granted by the Director "only after review of the request by the Warden [of the facility in which the defendant is serving his sentence], the General Counsel [of the Bureau of Prisons], and [] the Medical Director for medical referrals . . . ." Id. §571.62(a).

Under the regulation, if the General Counsel determines that an inmate's request for a compassionate release motion warrants approval, he or she "will solicit the opinion of the United States

Attorney in the district in which the inmate was sentenced." Id. §571.62(a)(2). Therefore, the regulation contemplates that the United States Attorney will become involved only after officials of the Bureau of Prisons decide that a motion for compassionate release is medically justified.

The regulation does not require that the inmate's Bureau of Prisons doctor be consulted. Nor does it prohibit such a consultation.

V.   THE FACTS

DiMasi is now 71 years-old. He began serving his 96 month sentence on November 30, 2011. He has earned "good time" credits which, if retained, would reduce his sentence by 15%. His present projected release date is November 17, 2018. See Docket No. 881-1 at 4.

In April 2012, tests disclosed that DiMasi had cancer in his tongue and neck. It was treated for four months with 35 rounds of radiation and six cycles of chemotherapy. Id. at 5. Tests have shown DiMasi to be free of this cancer since at least July 30, 2013. See Docket No. 907-1, Ex. B.

However, the radiation treatments caused a narrowing of DiMasi's esophagus, which injures with his ability to eat without choking or aspirating his food. See Docket No. 881-1 at 5. In addition, according to DiMasi's counsel, in January 2013, DiMasi developed aspiration pneumonia from aspirating food and the

pneumonia has periodically recurred.[4] Also in January 2013, DiMasi's esophagus was medically dilated to improve his ability to swallow. See Docket No. 885-1 at 7. This procedure has been repeated eight times, most recently on May 31, 2016.[5]

In March and May 2014, a Congressman from Massachusetts wrote to the Bureau of Prisons requesting that DiMasi be moved from FMC Butner, where he was sent after being diagnosed with cancer of the tongue and neck, to FMC Devens in Massachusetts. See Docket No. 889 at 4. In December 2014, the President of the Massachusetts Senate wrote to the Bureau of Prisons requesting that DiMasi be considered for compassionate release or transferred to FMC Devens. See id. The government represents that these are the only public officials who communicated with Bureau of Prisons decision-making officials on DiMasi's behalf. See id. In its response to the October 28, 2016 Order, the government does not address whether the United States Attorney had communications concerning DiMasi from or with any public officials, other than officials in the Bureau of Prisons. See id.

---

[4] There is no reference to pneumonia in the incomplete medical records submitted to the court by the parties. Pneumonia is, however, repeatedly referenced in letters from DiMasi's counsel to the Bureau of Prisons. See, e.g., Docket No. 885-4 at 7-9.

[5] See supra n.2.

On June 18, 2014, at the request of DiMasi's Bureau of Prisons doctor, Michael Nwude, a barium study was done of DiMasi's throat. The physician who conducted the study found that it was difficult for DiMasi to initiate swallowing, that DiMasi's esophagus was narrow, and that he aspirated barium during the test. See Docket No. 907-2 at 1.

In November 2015 a biopsy revealed that DiMasi had prostate cancer. See Docket No. 885-4 at 9. He received 42 radiation treatments. DiMasi no longer tests positive for prostate cancer. See Docket No. 881-1 at 6.

In July 2015, DiMasi's counsel wrote to Stephanie Hollembaek, the Warden at the Federal Correction Institution ("FCI") Butner Low, where DiMasi was then being held, requesting that the Bureau of Prisons file a motion for his compassionate release pursuant to §3582(c)(1)(A). See Docket No. 885-1. In August 2015, that request was denied because, by the Bureau of Prisons' calculation, DiMasi had not yet served 50% of his sentence and, therefore, was not eligible for consideration under the Bureau's policy. See Docket No. 885-2.

In December 2015, DiMasi's counsel renewed the request to the Bureau of Prisons for a motion for compassionate release. See Docket No. 885-4.

As explained earlier, the Bureau of Prisons regulations provide for consultation by the Bureau with the United States

Attorney only after its officials find that a motion for compassionate release is medically justified. See 28 C.F.R. §571.62(a)(2). However, in the week before January 12, 2016, the United States Attorney, Ms. Ortiz, and her First Assistant, John McNeil, met with four attorneys, including a former federal judge, who are representing DiMasi pro bono, to discuss the request for a motion seeking his compassionate release. See Docket No. 885-5.[6] The government represents that such meetings with defense counsel are common and that it would meet with counsel for any inmate who asserts that he is not being treated properly by the Bureau of Prisons. See Nov. 1, 2016 Tr. at 26-27.

DiMasi's counsel emphasized that DiMasi was then assigned to the medical category requiring the most intense medical care, medical Level 4.[7] They argued that, "[t]he fact that Mr. DiMasi is assigned to the highest level (4), suggests that his [medical] situation is dire, even when compared to other inmates seeking

---

[6] The former federal judge who met with the United States Attorney in January 2016, has not filed an appearance in this case, and did not sign any submission to the court or participate in the November 1, 2016 hearing.

[7] The Bureau of Prisons places inmates with medical needs into one of four classifications. A Level 4 inmate is described as "hav[ing] acute medical or chronic mental health conditions resulting in severe impairments to physical and cognitive functioning." Office of the Inspector General, U.S. Department of Justice, The Federal Bureau of Prisons' Efforts to Manage Inmate Health Care, Audit Report 08-08, at 16 (Feb. 2008).

compassionate release." Docket No. 885-5 at 2. Evidently in response to an inquiry, they also asserted that the fact that DiMasi was a white, middle class, "white collar" offender would not be a basis for any reasonable criticism that a motion for compassionate release on his behalf would constitute preferential treatment. Id. at n.1.

DiMasi's lawyers asked the United States Attorney to inform the Bureau of Prisons that she would not object to a motion seeking a reduction of DiMasi's sentence if it was medically justified. Id. The documents and information submitted by the parties do not indicate whether or not the United States Attorney then communicated with the Bureau of Prisons in early 2016.

In any event, in a letter dated January 13, 2016 and postmarked February 12, 2016, the Complex Warden at FCC Butner, which includes both FMC Butner and FCI Butner Low, denied DiMasi's second, December 15, 2015 request for a motion for compassionate release. See Docket No. 885-6. In that letter, the Warden stated that DiMasi "does not meet the medical guidelines for reduction in sentence consideration." He acknowledged that DiMasi had a narrowed esophagus and had been "referred to a gastroenterologist for esophageal dilation as needed." Id. DiMasi also had a "[h]istory of head and neck cancer, post treatment." Id. However, after an evaluation on December 25, 2015, there was "no evidence of active cancer at this time." Id. Although "DiMasi [was]

currently being treated for prostate cancer with radiation," his doctors expected that he would be cured and "his life expectancy appear[ed] to be greater than 18 months." Id. In addition, he then weighed 185 lbs, which was "normal for a man with his height." Id. Finally, the Warden wrote, "DiMasi's medical condition [was] stable. He reside[d] in an outpatient setting and [was] independent with his activities of daily living. He d[id] not require any assistive devices or direct medical assistance with his care." Id. at 1-2.

In March 2016, DiMasi's attorneys requested reconsideration of the Warden's decision. See Docket No. 885-8. Among other things, they argued that in basing his denial on the fact that DiMasi's life expectancy was less than 18 months, the Warden had mistakenly considered the request as being based on an alleged terminal condition and, therefore, applied the wrong standard. They clarified that the request was, instead, based on "the substantial deterioration of [DiMasi's] health subsequent to sentencing in 2011, his extensive medical problems[,] and their impact on his ability to function in prison, the standard applicable to requests under the elderly, non-medical category." Id. at 2.

The Warden of FCI Butner Low subsequently agreed to review DiMasi's request under the "Elderly with Medical Conditions" category of the Bureau of Prisons compassionate release policy. See Docket No. 885-9 at 1. However, on April 12, 2016, she again

34

denied the request for a compassionate release motion, writing to

DiMasi, in part:

> At this time you do suffer from chronic or serious
> medical condition[s] related to the aging process
> but [] you do not experience deterioration of mental
> or physical health that substantially diminishes
> your ability to function in a correctional
> facility. At this time you have no limitation of
> activities of daily living such as feeding or
> dressing yourself.

Id. at 2.

On May 10, 2016, DiMasi had a PET scan that revealed "no

evidence of metastatic disease." Docket No. 907-1, Ex. B at 1.

On May 16, 2016, DiMasi's lawyers appealed the most recent

denial of his request for a compassionate release motion, arguing

that the Warden had not recognized the seriousness of DiMasi's

condition. See Docket No. 885-11. Among other things, they wrote

that DiMasi's "throat constantly closes down . . . making it

virtually impossible to consume . . . more than a small portion of

food in the time allotted for meals," and that "even when he is

able to take food back to his cell, he often finds it difficult to

eat . . . ." Id. at 2.

On May 17, 2016, DiMasi himself filed another request for

reconsideration of the denial by the Warden.[8] See Docket No. 885-

---

[8] The Warden's April 12, 2016 letter stated that DiMasi had "the
right to appeal this decision . . . within 20 days upon receipt of
this memorandum . . . ." Docket No.885-9 at 2. DiMasi received the

10. In it he wrote that as a result of his tongue and throat cancers:

> I produce very little saliva and have an esophageal stricture/dysphagia which restricts normal eating and drinking and requires regular esophageal dilations[, which] causes eating to be difficult and painful with episodes of choking and aspiration resulting in pneumonia, loss of sixty pounds and a feeding tube for a year [and] ha[d] to use a food thickener and Boost/Ensure, a nutrition supplement prescribed for me, but the effects of my radiation treatment for prostate cancer make it intolerable for me to consume. In effect I cannot feed myself and cannot obtain sufficient nutrition because of my condition and the food require [sic] time limits and other restrictions.

Id. DiMasi also stated that Bureau of Prisons officials did not "consult Dr. Nwude, my primary care physician, who on March 18, 2016 at a visit in his office told me that he was never asked about my physical condition in connection with my request . . . and [if] asked he would recommend" a compassionate release. Id.

---

letter on April 29. See Docket No. 885-10 at 1. As the Warden had already denied DiMasi's request, reconsidered it, and denied it again, DiMasi asked BOP personnel for an appeal form. He was told, however, that he could not file an appeal. He was told that instead, he must submit another request for reconsideration to the Warden. DiMasi did so. See Docket No. 885-10. Concerned that DiMasi was being prevented from filing a timely appeal, on May 16, 2016, his counsel filed an appeal to the Regional Director's office on behalf of DiMasi. See Docket No. 885-11. On May 27, 2016, an attorney in that office contacted counsel for DiMasi and said that the office could not consider an appeal filed by someone other than the inmate. See Docket No. 887 at 4; Docket No. 885-12 at 1. The attorney also said that if DiMasi himself then attempted to appeal, the appeal would be time-barred. See Docket No. 887 at 4. As a result, DiMasi was prevented from appealing the April 12, 2016 decision to the Regional Director.

In a memorandum dated June 7, 2016, Kathleen Kenney, the Assistant Director and General Counsel of the Bureau of Prisons, again denied DiMasi's request. See Docket No. 885-13. She stated that the documents submitted had been "carefully reviewed" and the Medical Director of the Bureau had been consulted. She explained the denial by writing, in part, that DiMasi's "medical record indicates his cancers have been treated and are in remission," and "[he] remains fully ambulatory and does not have any work restrictions or physical limitations." She concluded that, "Mr. DiMasi does not meet the criteria for [Reduction In Sentence] at this time as he is not experiencing deteriorating mental or physical health that substantially diminishes his ability to function in a correctional setting." Id. at 1.

On June 13, 2016, the Warden wrote a letter confirming that DiMasi's request for a compassionate release motion was denied. See Docket No. 885-14 at 1.

On June 30 and July 7, 2016, representatives of several organizations in the district DiMasi had represented wrote to the Acting Director of the Bureau of Prisons, noting DiMasi's involvement in passing healthcare legislation that helped their organizations and supporting DiMasi's request for compassionate release, "or at least [a transfer] closer to his home and family, with access to decent medical treatment." Docket No. 907-1, Ex. F.

The letters, which shared certain common language, were evidently part of a campaign prompted by DiMasi's devoted family.[9]

Following the June 2016 denials, DiMasi's counsel met again with the United States Attorney, Ms. Ortiz. See Docket No. 885-15; Nov. 1, 2016 Tr. at 26-27. Ms. Ortiz subsequently spoke to the General Counsel of the Bureau of Prisons, Ms. Kenney, "and conveyed her position with respect to [DiMasi's] request" for a motion seeking his compassionate release. Id. at 1. The parties have not submitted any evidence or additional information concerning what Ms. Ortiz said to Ms. Kenney. However, the court infers from the evolution of events that followed that Ms. Ortiz supported DiMasi's request and asked Ms. Kenney to reconsider it.[10] Indeed, at the

---

[9] For example, each of the letters stated that, "Sal is entering five years of an eight-year sentence. He turns 71 in August and is suffering from cancer. His wife, Deborah, is working to gain his freedom under a compassionate release program. We are asking you to consider a way out of prison for Sal or at least a prison facility closer to his home and family, with access to decent medical treatment." Docket No. 907-1, Ex. F at 1, 2, 3, 4.

[10] DiMasi's counsel wrote to Ms. Kenney on July 18, 2016:

> I understand that the United States Attorney for the District of Massachusetts, Carmen Ortiz, recently spoke to you, and conveyed her position with respect to our request. After that conversation, U.S. Attorney Ortiz suggested that I write directly to you to summarize why Mr. DiMasi meets the [Bureau of Prisons'] criteria for compassionate release. Thank you for your willingness to consider the matter.

Docket No. 885-15 at 1.

November 1, 2016 hearing the government stated that it is "fair" to conclude from the chronology that the communication from Ms. Ortiz to the General Counsel of the Bureau of Prisons "essentially got this [matter of a possible motion for compassionate release] reopened or reviewed." Nov. 1, 2016 Tr. at 26. DiMasi's counsel similarly stated that Ms. Ortiz's involvement "was very important in leading the Bureau of Prisons to take a second look at [the matter]." Id. at 28.

In the July 18, 2016 letter written to Ms. Kenney at the United States Attorney's suggestion, see supra n.10, DiMasi's counsel again argued that a motion for DiMasi's compassionate release by the Bureau of Prisons was justified. See Docket No. 885 at 4; Docket No. 885-15 at 1. DiMasi's counsel met with Ms. Kenney in late July 2016 to advocate for further medical review of DiMasi's condition and for the filing of a §3582(c)(1)(A)(i) motion on his behalf. See Docket No. 885 at 5.

On August 3, 2016, a second barium study of DiMasi's throat was done. See Docket No. 907-3 at 2-3. It was performed at the Granville Medical Center in North Carolina. Id. at 1. The 2014 barium study was not available for comparison. The doctor who conducted the study found that DiMasi's "swallowing mechanism was abnormal." Id. DiMasi "aspirate[d] thick liquid barium during [the] procedure." Id. The doctor also reported that "the esophagus looks within normal limits for course and caliber during active

drinking phase." Id. However, during the "resting phase," when DiMasi was not actively swallowing, the doctor noted "delayed transit through the esophagus." Id. In addition, there was a "narrowing" of the esophagus consisting of "a benign looking stricture." Id. at 2. DiMasi was found to be unable to swallow a 7 millimeter pill, "probably [because he] lack[ed] a little bit of confidence" given his aspiration problem. Id. at 1-2.

Another test conducted the same day confirmed that DiMasi was aspirating food when he swallowed. The doctor noted that "with small volumes of food given intermittently under controlled environment the patient might be able to avoid significant aspiration." Id. at 4.

On August 5, 2016, DiMasi met with a Bureau of Prisons dietician. Id. at 7-8. DiMasi "expressed interest in learning about new recommendations for diet and fluid consistency" following the modified barium study. Id. at 7. He expressed concern about his "long term weight loss," and trouble swallowing and gastrointestinal problems, caused by the radiation therapy, though his weight at the time, 180 pounds, was described as "normal" and "appropriate." Id. The dietician noted that DiMasi "has learned to avoid choking by chewing and swallowing slowly, but usually never has adequate time to finish a meal and relies on a snack bag and commissary shopping." Id. He reported feeling residual food in his throat "long after stopping eating." Id. He required a downgrade

in the consistency of his diet to "puree" and his liquids to "honey-thick." Id. The dietician recommended "[a]lternative feedings methods . . . if dysphagia and aspiration continues." Id. The parties agree that "alternative feeding methods" refers to the use of a feeding tube, which DiMasi required for a year during and following the radiation and chemotherapy for his tongue and neck cancer. See Docket No. 882 at 3; 885-4 at 6; Nov. 1 Tr. at 20.

A Bureau of Prisons' Inmate Skills Development Plan, dated August 9, 2016, stated that DiMasi was then "medical care level II (Chronic care - stable)."[11] Docket No. 907-1, Ex. H at 1. It also stated that DiMasi then had no medical restrictions on regular duty, id. at 2, and that "no non-routine services/assistance devices [were] needed" for him, id. at 1.

On August 11, 2016, DiMasi's Bureau of Prisons physician, Dr. Nwude, submitted a medical summary in connection with DiMasi's request for reduction in sentence. See Docket No. 907-1, Ex. B. Dr. Nwude reviewed the results of the second, August 3, 2016 barium

---

[11] Medical Care Level 2 inmates are "stable outpatients with chronic illnesses requiring at least quarterly clinician evaluations. These inmates independently perform daily living activities. The care level includes inmates with mental health conditions that can be managed through chronic care clinics or individual psychology or health services contacts no more frequently than monthly to quarterly." Inmate Health Care, supra n.7, at 16.

swallow study. He stated that DiMasi was Care Level 3[12] and his condition was "unstable." Id. at 1.

Dr. Nwude noted that DiMasi was free of tongue cancer. However, the repeated radiation for it had narrowed DiMasi's throat, creating difficulty in swallowing and requiring about nine dilations of his esophagus. Dr. Nwude stated that the difficulty swallowing persisted nevertheless and DiMasi reported increasing choking episodes despite taking extra time to eat. Dr. Nwude stated that the second, August 3, 2016 barium study "demonstrated worsening of his [difficulty swallowing] . . . aspiration of thin liquid . . . [and] esophageal stricture." Id. at 1. He noted that on August 5, 2016, the dietician had recommended that DiMasi eat only a "pureed diet with honey thick liquids and [take] aspiration precautions." He also noted that the dietician said "in the future [DiMasi] may need to consider alternative feeding methods"-- meaning using a feeding tube again--if his difficulty in swallowing continued. Id. at 1-2.

Dr. Nwude concluded his summary by writing:

---

[12] Medical Care Level 3 inmates are "fragile outpatients with medical conditions that require daily to monthly clinical contact. These inmates may have chronic or recurrent mental illnesses or ongoing cognitive impairments that require daily to monthly psychiatric health services or psychology contacts to maintain outpatient status. These inmates may also require assistance in performing some activities of daily living, but do not require daily nursing care." Inmate Health Care, supra n.7, at 16.

Mr. Dimasi is housed on an outpatient unit where he is
independent in his activities of daily living.
Specifically, his score is excellent under Instrumental
Activities of Daily Living (IADL). However, his
swallowing difficulty from his esophageal stenosis and
stricture is chronic, serious, deteriorating, and the
conventional treatment for it has offered no
substantial improvement to it. In addition, he takes
extra time for his feeding and on that basis he has a
diminished ability to function in a correctional
setting. Based on the foregoing Mr. Salvatore Dimasi is
now probably appropriate for Reduction in Sentence for
Elderly with Medical Conditions.

Id. at 2 (emphasis added).

The summary prepared by Dr. Nwude is the medical record on

which the Bureau of Prisons primarily relied in deciding to file

the instant Motion for compassionate release. See Docket No. 889

at 7.

A few days later, on August 15, 2016, the Bureau of Prisons

Medical Director, Dr. Jeffery Allen, responded to the Bureau's

Associate General Counsel, Darrin Howard's, "request for a review

of [DiMasi's] reduction in sentence (RIS) submission . . . ."

Docket No. 907-1, Ex. G. Dr. Allen stated, in part:

[DiMasi's] medical record and correspondence from
healthcare staff reveals that due to his head and neck
cancer he experiences choking while eating and
drinking. In addition, a barium swallow study indicates
aspiration. It's medically indicated that someone be
present to assist him with choking prevention while
eating or drinking.

Based on our review of the medical record, Mr. Dimasi
does meet BOP elderly with medical [Reduction In
Sentence] criteria. He requires assistance with his
Instrumental Activities of Daily Living and is
experiencing deteriorating mental and physical health

43

that substantially diminishes his ability to function
in a correctional environment.

Id. (emphasis added).

The Bureau of Prisons has at FCC Butner an Inmate Companion
Program. See Inmates Helping Inmates, Federal Bureau of Prisons
Website (April 21, 2016), https://www.bop.gov/resources/news/
20160421_helpinghands.jsp; Nov. 1, 2016 Tr. at 41-42. In that
program, "[a] carefully selected and trained group of inmates help
their peers do things like brush teeth, shave . . . [and] assist[]
with bed-side feeding." See id.; see also Nov. 1, 2016 Tr. at 42
("[The Bureau of Prisons has] programs whereby some inmates have
inmate companions . . . for instance, if someone's wheelchair-
bound and they have difficulty cleaning themselves or other things,
self-care, there are inmate companions to assist those people.").
The Bureau of Prisons could assign an inmate companion to monitor
DiMasi while he is eating and assist in keeping him from choking.
To date, it has not chosen to do so.

Nevertheless, on August 26, 2016, the Warden of FCI Butner
Low, Ms. Hollembaek, who had previously denied DiMasi's requests
for a compassionate release motion, sent a letter to Ms. Kenney
recommending that the Bureau of Prisons move for DiMasi's release.
See Docket No. 907-1, Ex. D. That recommendation was subsequently
approved by the Acting Director of the Bureau of Prisons. See
Docket No. 881-1 at ¶11. On October 13, 2016, the government filed

on behalf of the Director of the Bureau of Prisons the instant Motion requesting DiMasi's release pursuant to §3852(c)(1)(A).

The Bureau of Prisons has previously moved for the compassionate release of 11 other inmates in the "Elderly with Medical Conditions" category of its policy. Two were in Medical Care Level 2, four were in Level 3, and five were in Level 4. Nov. 1, 2016 Tr. at 11. All of them had multiple medical problems which required assistance with activities of daily living. See Docket No. 907-1, Ex. A. Based on the summary submitted to the court, all of the other inmates appear to be more debilitated than DiMasi, who now resides in the low security facility at FCI Butner rather than the Medical Center. See Docket No. 885-15 at 1.

VI.   DISCUSSION

   A.   Extraordinary and Compelling Reasons Warrant a Reduction
        of DiMasi's Sentence to Time-Served

The court finds that there are extraordinary and compelling reasons that warrant a reduction of DiMasi's sentence to the approximately five years that he has served if his conditions of Supervised Release are appropriately modified. In essence, the court concludes that such a sentence is now sufficient and no more than necessary to serve the statutory purposes of sentencing. See §3553(a). Therefore, the Motion is being allowed and modifications to the conditions of DiMasi's Supervised Release are being ordered.

As explained earlier, when the court sentenced DiMasi to serve eight years in prison for the serious crimes of corruption of which he was convicted it was not foreseen that he would develop throat cancer, and later prostate cancer, while incarcerated. After treatment, both forms of cancer are now in remission. DiMasi is not terminally ill. Indeed, he is now serving his sentence in a Bureau of Prisons facility with a low level of security rather than in a medical facility.

However, the throat and prostate cancer DiMasi has experienced are now part of his history and characteristics that the court must consider. See §3582(a)(1)(A)(i) and §3553(a)(1). If DiMasi had been suffering from throat and/or prostate cancer when he was sentenced in 2011, the court would have considered imposing a sentence of less than eight years. The cancers that DiMasi developed while serving his sentence, and the fact that they could recur, weigh in favor of reducing his sentence.

Although now free of cancer, DiMasi is suffering from a serious physical or medical condition, which is an issue the court must consider in deciding whether extraordinary and compelling reasons exist under the relevant advisory Sentencing Guideline.[13]

---

[13] All provisions of the Sentencing Guidelines have been advisory since 2005, when the Supreme Court decided United States v. Booker, 543 U.S. 220 (2005). Policy Statements such as §1B1.13 that do not interpret a specific Guideline were advisory even before Booker.

See U.S.S.G. §1B1.13, A.N. 1(A)(ii)(I). The treatment for DiMasi's throat cancer has caused a narrowing of his esophagus. This has required many esophageal dilations and DiMasi may need more. Despite these procedures, DiMasi has great difficulty swallowing, needs to eat slowly, is on a diet of pureed food, and is at risk of choking and aspirating his food, which has at times resulted in pneumonia and could again. The Medical Director of the Bureau of Prisons recently found that DiMasi's condition is sufficiently severe that it is "medically indicated that someone be present to assist [DiMasi] with choking prevention while eating or drinking." Docket No. 907-1, Ex. G.

Application Note 1 to advisory Guideline §1B1.13 also directs the court to consider whether DiMasi's serious swallowing problem "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." U.S.S.G. §1B1.13, A.N. 1(A). In August 2016, Dr. Nwude wrote that: "Mr. DiMasi is housed on an outpatient unit where he is independent

---

See United States v. O'Neil, 11 F.3d 292, 302 n.11 (1st Cir. 1993). Moreover, the language in Application Note 1 that the court is addressing is not in §1B1.13 itself. For these reasons, while §1B1.13 and Application Note 1 provide a framework for determining the merit of the Motion, it is not required that each of the Application Note criteria be satisfied to find that a motion for compassionate release should be granted. Rather, 18 U.S.C. §3582(c)(1)(A) requires only that the court determine whether a reduction in sentence is "consistent with" the §1B1.13 Policy Statement. The court has reached this conclusion.

in his Activities of Daily Living." Docket No. 907-1, Ex. B at 2.
Dr. Nwude added that because of DiMasi's difficulty swallowing,
"he takes extra time for his feeding and on that basis he has a
diminished ability to function in a correctional setting." Id. Dr.
Nwude did not, however, characterize that diminution of DiMasi's
ability to function while in custody as "substantial." Id. In
denying DiMasi's request for a motion for compassionate release in
June 2016, the General Counsel of the Bureau of Prisons noted that
he had no "work restrictions or physical limitations" and
explicitly found his ability to function in prison was not
substantially impaired. Docket No. 885-13. Rather, she wrote, "Mr.
DiMasi does not meet the criteria for [a Reduction In Sentence] at
this time as he is not experiencing deteriorating mental or
physical health that substantially diminishes his ability to
function in a correctional setting." Id.

However, as explained earlier, the Guidelines, Policy
Statements, and Application Notes are only advisory. See supra
n.13. Therefore, the court is not required to find that all of the
criteria in Application Note 1 are met in order to grant the
Motion. The fact that the limitation on DiMasi's ability to
function in prison may not be "substantial" does not mean that it
is impermissible or inappropriate to grant the request to reduce
his sentence.

In addition, the Guidelines also now advise the court to consider whether DiMasi is "experiencing deteriorating physical . . . health because of the aging process" and whether he is "not expected to recover" from his condition. §1B1.13 A.N. 1(A)(ii). The evidence indicates that DiMasi's swallowing problem is permanent. It has not improved as a result of the esophageal dilations he has had in prison and is not likely to improve in the future. This is, among other things, the opinion of DiMasi's primary doctor at Butner, Dr. Nwude. See Docket No. 907-1, Ex. B at 2.

Dr. Nwude characterizes DiMasi's condition as "chronic, serious," and "deteriorating." Id. In some respects, however, DiMasi's health has improved. For example, his cancers are in remission and he is no longer medical care level 4. It is not evident to the court that the medical record, including the second barium swallow study, demonstrates that DiMasi's ability to swallow is deteriorating. However, Dr. Nwude is trained and expert in interpreting the medical records. The court is not. There is, in any event, no reason to question Dr. Nwude's characterization of DiMasi's condition as "serious" and not likely to improve substantially. These facts weigh in favor of granting the Motion.

As explained earlier, the court must also consider all of the relevant §3553(a) factors in deciding whether to reduce DiMasi's sentence. See §3582(c)(1)(A). In addition to DiMasi's current

history, which includes throat and prostate cancer as discussed earlier, these factors include the need to provide DiMasi with needed medical care in the most effective manner. See §3553(a)(2)(D). The Bureau of Prisons could, if necessary, adequately meet DiMasi's medical needs if he is not released. The record indicates DiMasi is now eating pureed food and could continue to do so. It has not been shown that the Bureau of Prisons could not give him extra time to eat if medically necessary. The Bureau of Prisons could also assign DiMasi an inmate companion to provide the recommended monitoring while he is eating. However, the court finds that a reduction of DiMasi's sentence with the additional conditions of supervised release being ordered would better serve the interest of providing DiMasi with needed medical care in the form of monitoring while he is eating. See §3553(a)(2)(D).

Releasing DiMasi now will also serve the interest of providing him with needed medical care most effectively in another way. The Eighth Amendment guarantees inmates in Bureau of Prisons custody adequate medical care for a serious medical need. See Farmer v. Brennan, 511 U.S. 825, 832 (1994); Estelle v. Gamble, 429 U.S. 97, 103-05 (1976). It does not require that the Bureau provide optimal medical care or care of an inmate's choosing. See United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004); DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991); United States v. DeCologero, 821

F.2d 39, 42-43 (1st Cir. 1987). A reduction of DiMasi's sentence will give him the ability to seek, from the doctors and hospitals of his choice, what may be better medical care than the Bureau of Prisons is obligated or able to provide.

The court must also consider the nature and seriousness of DiMasi's crimes and the need to provide just punishment for them. See §3553(a)(1) and (2)(A). For the reasons described in detail when DiMasi was sentenced in 2011, his crimes were very serious. See Sept. 9, 2016 Tr. at 19-23 (Docket No. 674 at 29-30). By accepting payments in return for the exercise of his official powers, DiMasi caused the Commonwealth of Massachusetts to purchase more than $17,000,000 of unneeded computer software. As the court said in sentencing DiMasi, those funds could have been much better used instead for other, important purposes, such as programs for the elderly and scholarships for students. Id. at 10-11. The court has no doubt that, as the First Circuit affirmed in 2011, an eight-year sentence was in 2011 appropriate to recognize the seriousness of DiMasi's crimes.

However, there is always a range of reasonable sentences in a particular case. Unforeseen developments may render a sentence that was at an appropriate point on the reasonable range when imposed longer than necessary. The five-year sentence DiMasi will serve as a result of the reduction in his sentence now being ordered is a significant sentence. The court finds that it will,

in the current circumstances, still be sufficient to recognize the very serious nature of DiMasi's crimes.

In deciding the Motion, the court is also required to consider "the need [for the sentence] to afford adequate deterrence to criminal conduct." §3553(a)(2)(B). This was an important consideration in the court's finding that an eight-year sentence was warranted in 2011. See Sept. 9, 2011 Tr. at 27-28 (Docket No. 674 at 37-38). DiMasi was the third consecutive Speaker of the Massachusetts House of Representatives to be convicted of a federal crime. DiMasi's predecessors, however, were not sentenced to serve time in custody. DiMasi knew when he conspired to extort payments in return for the exercise of his official powers in this case that the Mayor of the City of Providence, Rhode Island had recently been sentenced to serve five-years for his corrupt conduct. Id. at 27. However, knowing that did not deter DiMasi or his convicted co-defendant McDonough. The court concluded, therefore, that "a materially higher sentence than five years [was] essential to serve the important goals of specific and general deterrence..." Id. at 27-28.

DiMasi's medical problems while in prison, and his inability to get the medical care of his choice, have been highly publicized. See, e.g., A. Estes and Scott Allen, "Salvatore DiMasi Has Rare Form of Cancer: Ex-Speaker's Illness Likely to be Treated at Prison Medical Center," The Boston Globe (May 19, 2012); M. Valencia,

"Imprisoned DiMasi Weak with Cancer, Wife Says," The Boston Globe (Mar. 7, 2013); A. Metager, "Wife of Former Massachusetts Speaker of the House Fears He Will Die in Prison," State House News Service (July 14, 2015); J. Vennochi, "An Ill Sal DiMasi Deserves Better Treatment," The Boston Globe (Nov. 23, 2015). Knowledge of DiMasi's experience in prison should strongly discourage public officials, and those who might conspire with them, from acting corruptly. Therefore, the court finds that reducing DiMasi's sentence to the five years he has served will not undermine the need to assure that his sentence is sufficient to deter future criminal conduct by him and, particularly, others.

A five-year sentence will also be sufficient to protect the public from any further crimes by DiMasi. See §3553(2)(C). In addressing DiMasi's 2011 motion for release pending appeal, the court found that he was not likely to be a danger to the community if released. See United States v. DiMasi, 817 F. Supp. 2d 9, 12 (D. Mass 2011). DiMasi's difficulties while in custody should give him added incentive to obey the law in the future.

Finally, the court must consider whether reducing DiMasi's sentence will be consistent with the important statutory interest of avoiding unwarranted sentence disparity among similarly situated individuals. See §3553(a)(6). This raises the issue of whether the Bureau of Prisons treated DiMasi as it would other

inmates with comparable conditions in filing the Motion seeking DiMasi's release pursuant to §3582(c)(1)(A)(i).

As discussed earlier, motions for compassionate release have been very rare. Until 2013, they were generally filed for only about 24 terminally ill inmates a year. The Bureau of Prisons' reluctance to file motions for compassionate release more often was criticized by Human Rights Watch and the Department of Justice Inspector General, among others. In 2013, the Bureau of Prisons revised its policy to expand the definition of inmates eligible for motions for compassionate release to include inmates over 65, who had served more than half of their sentence, and whose deteriorating health substantially diminished their ability to function in a correctional facility. See Program Statement 5050.49 at 4 (Aug. 12, 2013).

Changes in stated policies, however, do not necessarily result in changes in practices."[14] As explained earlier, in 2016,

---

[14] For example, as this court said in 2001 with regard to the crimes, including murder, that members of the Federal Bureau of Investigation permitted, and in some cases abetted, by its Top Echelon Organized Crime informants James "Whitey" Bulger and Stephen Flemmi:

> [T]he Attorney General for whom I worked, Edward Levi, issued his informant Guidelines in December 1976, one month before he left office. [The United States Attorney has] acknowledged that, if obeyed, those Guidelines would have prevented the abuses revealed in this case. However, as I found, there was overwhelming evidence that they were routinely disregarded

the Department of Justice Inspector General reported that "[a]lthough the [Bureau of Prisons] has revised its compassionate release policy to expand consideration for early release to aging inmates . . . few aging inmates have been released under it." Office of Inspector General, U.S. Department of Justice, The Impact of an Aging Inmate Population, E-15-05, at 51 (February 2016), https://oig.justice.gov/reports/2015/e1505.pdf.  Indeed, the Bureau has since 2013 moved for the compassionate release of only 11 inmates in the "Elderly with Medical Conditions" category and each of them appears to have been more debilitated than DiMasi. See Docket No. 907-1, Ex. A.

Until July 2016, the Bureau of Prisons was not receptive to DiMasi's requests for a §3582(a)(1)(A)(i) motion. It repeatedly denied those requests and made it difficult for DiMasi to seek a reversal of those decisions. As described earlier, in one instance the Bureau told DiMasi that it would not consider an appeal that had been filed by his attorneys and that, because of the passage of time while their appeal was pending, any appeal by DiMasi himself would be time-barred. See supra n.8.

---

with respect to Flemmi, Bulger, and other Top Echelon informants.

United States v. Flemmi, 195 F. Supp. 2d 243, 252 (D. Mass. 2001)(citations omitted); see also United States v. Salemme, 91 F. Supp. 2d 141, 174, 194 (D. Mass. 1999).

The Bureau of Prisons addressed the merits of DiMasi's request for a compassionate release in June 2016. In denying that request, the General Counsel of the Bureau, Ms. Kenney, then wrote that DiMasi did "not meet the criteria for [a Reduction In Sentence motion] at [that] time as he [was] not experiencing deteriorating mental or physical health that substantially diminishe[d] his ability to function in a correctional setting." Docket No. 885-13.

The Bureau of Prisons' attitude and actions concerning Mr. DiMasi changed beginning in July 2016. The record does not demonstrate that the Bureau was influenced by the fact that DiMasi had been a powerful public official. Nor does it demonstrate that the two public officials who wrote to the Bureau on behalf of DiMasi had any effect. The record also does not suggest that the Bureau was influenced by the letters submitted by DiMasi's former constituents.

By July 2016, the Bureau knew that the Sentencing Commission had proposed an amendment to §1B1.13 of the Guidelines that encouraged the Bureau to be more liberal in filing §3582(c)(1)(A)(i) motions for compassionate release and, therefore, provide courts more opportunities to decide if a reduction in sentence is justified. However, that amendment was submitted to Congress by the Sentencing Commission before the

Bureau's denial of DiMasi's request in June 2016. See 81 Fed. Reg. at 27,261-63.

As explained earlier, the Bureau of Prisons conduct and decisions concerning DiMasi changed after his lawyers, including a former federal judge, met with United States Attorney Ortiz, and Ms. Ortiz spoke to Ms. Kenney to express her support for DiMasi's request for a compassionate release motion. The parties have not provided the court with any evidence or information concerning whether Ms. Ortiz communicated with any public officials who advocated for DiMasi's release.

In any event, Ms. Ortiz's discussion with Ms. Kenney quickly led to: a meeting between at least one of DiMasi's lawyers and the General Counsel; a second barium swallow test; a report by DiMasi's Bureau of Prisons doctor that DiMasi was "probably appropriate for Reduction in Sentence for Elderly with Medical Conditions," Docket No. 907-1, Ex. B; and the Bureau's Medical Director's conclusion that, although the Bureau had consulted him and found two months earlier that DiMasi did not qualify, the criteria for a compassionate release motion were met, see Docket No. 907-1 Ex. G.

In essence, as the parties agreed on November 1, 2016, the intervention of the United States Attorney was important to getting the Bureau to reconsider and reverse its denial of DiMasi's request for a motion seeking a reduction of his sentence. See Nov. 1, 2016 Tr. at 26, 28. As described earlier, the Bureau of Prisons

regulations contemplate that the United States Attorney will become involved only if and after the General Counsel determines that an inmate's request for a compassionate release warrants approval and consults the United States Attorney to determine whether he or she objects. See 28 C.F.R. §571.62(a)(2). In this case, the usual process was reversed.

However, the government has represented that DiMasi and his lawyers did not receive preferential treatment from the United States Attorney. Rather, the government has stated that the United States Attorney frequently meets with defense counsel who assert their clients are not receiving proper treatment and takes actions on their behalf if persuaded it is appropriate. See Nov. 1, 2016 Tr. at 26-27.

Similarly, the Bureau of Prisons represents that DiMasi did not receive preferential treatment after the United States Attorney's interest prompted the Bureau to consider his application for compassionate release again. The Bureau's Associate General Counsel has stated that DiMasi's request for compassionate release was:

> approved mainly because he has chronic, serious, and
> worsening [difficulty swallowing resulting from
> narrowing of the esophagus] . . . that is unlikely to
> improve with conventional treatment. This condition
> causes him to choke and aspirate food into his airway
> when he eats. To eat safely, he must take extra time
> with meals, and he should be attended by someone who
> can assist him with choking prevention while eating and

drinking. These needs interfere with his ability to function in a correctional setting.

Docket No. 881-1 at 5. The Bureau of Prisons asserts that it would file a motion for reduction in sentence for any inmate in a comparable condition.

The Bureau did not follow its established procedure when it discussed the matter with the United States Attorney before determining that a motion to reduce DiMasi's sentence was medically justified. However, there is substantial evidence to support the Bureau's conclusion that a reduction in DiMasi's sentence is warranted. Therefore, its judgment deserves some deference from the court. However, the degree of that deference is diminished in this case by the deviation from the usual process, which raises a question concerning whether the decision to seek DiMasi's release was made primarily by lawyers rather than by correctional and medical officials.

The future conduct of the United States Attorney and, particularly, the Bureau of Prisons will determine whether releasing DiMasi now will be consistent with the court's obligation to seek to avoid unwarranted disparities in sentences for similarly situated inmates. See §3553(a)(6). If in the future the Bureau evaluates the requests of elderly inmates with serious medical conditions more generously, and files §3582(c)(1)(A)(i) motions

more frequently, allowing the Motion will not contribute to an unjustified disparity in sentences.

The future, of course, cannot be foretold. The Sentencing Commission, the Department of Justice Inspector General, and organizations including Human Rights Watch have encouraged the Bureau of Prisons to file motions for compassionate release more often when an inmate's health seriously deteriorates while he is in custody. This would allow courts to perform their traditional role in weighing all of the competing considerations and deciding what sentence is sufficient and no more than necessary for that inmate. See §3553(a). The court hopes that the decision in this case will contribute to the humane administration of §3582(c)(1)(A)(i) by the Bureau of Prisons in the future.

In view of the foregoing, the court concludes that extraordinary and compelling reasons exist to reduce DiMasi's sentence to time-served if his conditions of supervised release are appropriately modified.

B.  Supervised Release

As explained earlier, where, as here, the court orders a reduction in sentence pursuant to §3582(c)(1), it "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." §3582(c)(1)(A). Therefore, the court now has the authority to add an additional two years of Supervised Release or

60

probation to the two years of Supervised Release ordered in 2011. The court does not, however, find that doing so is necessary or appropriate.

The court does find, however, that the reduction of DiMasi's sentence is justified only if certain additional conditions of Supervised Release are imposed. As required by 18 U.S.C. §3583, the court has considered the factors set forth in §3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), and (a)(6) in reaching this decision. See 18 U.S.C. §3583. Section 3553(a)(2)(D) includes the interest of providing the defendant with needed medical care most effectively. Section 3553(a)(6) addresses the need to avoid unwarranted sentence disparities.[15] In general, special conditions of Supervised Release must cause no greater deprivation of liberty than reasonably necessary to achieve the goals of Supervised Release, including the need to provide effective medical treatment. See United States v. Pabon, 819 F.3d 26, 30 (1st Cir. 2016).

---

[15] The court recognizes that §3583 does not authorize the court to consider in fashioning conditions of Supervised Release the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, which are the interests addressed in §3553(a)(2)(A). The court could instead order that DiMasi serve a term of probation, rather than or in addition to a term of Supervised Release, and order conditions of probation intended to serve the purposes of §3553(a)(2)(A). See U.S.C. §3563(b). The court, however, is not doing so.

In view of these principles, the court is modifying the conditions of DiMasi's Supervised Release to include at least six months home confinement, in the custody of his wife Deborah DiMasi, who is being ordered to assure that a family member or professional health aide is with DiMasi whenever he eats or drinks to minimize the risk of choking or other harm to DiMasi. DiMasi will be allowed to leave his home for any medical emergency and, with the prior approval of the Probation Office, for medical appointments, and religious observances. The court is not ordering electronic monitoring of DiMasi's home confinement.

The home confinement condition of DiMasi's Supervised Release is intended to assure that DiMasi receives needed health and medical care in the most effective manner. See 3553(a)(2)(D). As explained earlier, the Bureau of Prisons based its request for a reduction of DiMasi's sentence largely on its Medical Director's opinion that it is "medically indicated that someone be present to assist [DiMasi] with choking prevention while eating or drinking." Docket No. 907-1, Ex. G. The court has relied on this opinion in granting the Motion. While the Bureau of Prisons could provide DiMasi an inmate companion while DiMasi is eating or drinking, the court finds that his family, and professionals it may engage, will better provide the required monitoring. Therefore, the court has adopted DiMasi's original suggestion that his wife "act as a third party custodian, responsible for assuring that Mr. DiMasi eats and

drinks only in the presence of a monitor." Docket No. 896 at 3; Nov. 1, 2016 Tr. at 39-40.

The court is not persuaded, however, by DiMasi's later argument that the court should neither require any period of home confinement nor order that he be monitored while eating and drinking. See Docket No. 896 at 2-3. DiMasi asserts that such conditions are not reasonably necessary to serve any of the cognizable §3553(a) interests. However, it is difficult to reconcile DiMasi's claim that his early release is justified because it is medically indicated that he be monitored while eating with his argument that no time in home confinement is appropriate to assure such monitoring is properly provided. These contradictory positions caused, and to some extent continue to cause, the court to question whether DiMasi's medical condition warrants his early release.

Viewed most favorably to DiMasi, his argument is that he and his family understand the medical need for monitoring while he eats and that they will voluntarily assure he receives it when he returns home. However, the court is not persuaded that the necessary monitoring would be consistently provided if not required as a condition of DiMasi's Supervised Release.

Therefore, the court finds that, at least for a transitional period, it is reasonably necessary to assure the most effective care for DiMasi that it order that he be monitored at home, while

63

eating and drinking, by a member of his family or a healthcare professional hired to do so. [16]

The conditions of DiMasi's home confinement will also allow him to get needed medical care from doctors and hospitals of his choice. As explained earlier, DiMasi's sentence is being reduced, in part, to permit him to seek medical care from the doctors he prefers--a liberty all inmates lose while in Bureau of Prisons custody. The terms of his home confinement will allow him to leave his residence immediately for any medical emergency and to schedule appointments with the doctors of his choice. Because the court is not ordering electronic monitoring, the Probation Office will be able to approve DiMasi for doctor's appointments on short notice if necessary.

A six-month period of home confinement will also serve the interest of avoiding unwarranted disparities in sentencing, particularly as compared to other inmates transitioning from Bureau of Prisons custody to the community. See §3553(a)(6). 18 U.S.C. §3624(c) states that the Bureau of Prisons "shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a portion of the final months of that term

---

[16] DiMasi argued that if home confinement is ordered, it should be for no more than six months. See Docket No. 887 at 6. His counsel has stated that DiMasi will, in any event, "respect" any order of home confinement. Nov. 1, 2016 Tr. at 33.

(not to exceed 12 months) under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for [his] re-entry...into the community." 18 U.S.C. §3624(c). The statute further states that "the authority under this subsection may be used to place a prisoner on home confinement for the shorter of 10 percent of [his] term of imprisonment...or six months." Id. Pursuant to this statute, it is Bureau of Prisons policy to place eligible prisoners in community confinement and/or home confinement for the last six months of their sentence to prepare the inmate for re-entry into the community. See Federal Bureau of Prisons, Program Statements 7320.01, Home Confinement, at §1 (Sept. 6, 1995), and 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedures, at §1 (Dec. 16, 1998).

Ordinarily, DiMasi would, like other eligible inmates, be subject to such a six-month transition toward the end of his sentence. The court finds that the usually required placement in a Residential Re-entry Center is not appropriate. However, in view of his medical needs, it is particularly important that DiMasi serve a six-month period of home confinement to facilitate his transition to the community, and to develop a record concerning his current needs and capacity to function in the community, which will inform the court's decision concerning what conditions of Supervised Release are appropriate after the usual transitional period.

After the first three months of his home confinement, DiMasi may move for a modification of this condition of his Supervised Release if there is medical evidence to support such a request. The court may consider replacing the remaining period of 24-hour home confinement with a curfew. The court may also consider whether DiMasi's period of home confinement should be extended beyond six months.

In addition, the court is modifying DiMasi's conditions of Supervised Release to address issues concerning his co-defendants, Richard McDonough and Richard Vitale. Generally, the court may prohibit a defendant on Supervised Release from associating with certain individuals if the condition is reasonably related to interests addressed by §3553(a)(1) and (a)(2)(B)-(D), and involves no greater a deprivation of liberty than reasonably necessary to serve the goals of Supervised Release. See 18 U.S.C. §§3583(d) and 3563(b)(6). Such a condition may prohibit activity that would otherwise be legal. See United States v. Smith, 436 F. 3d 307, 312 (1st Cir. 2006); United States v. Napulou, 593 F. 3d 1041, 1045 (9th Cir. 2010).

McDonough is a convicted felon. Pursuant to a standard condition of Supervised Release imposed in 2011, DiMasi is prohibited from associating with him. See Docket No. 674 at 4. Vitale, an accused co-conspirator, was acquitted at trial of the charges against him. However, the court considered in sentencing

DiMasi that his corrupt conduct involved causing hundreds of thousands of dollars to be paid to Vitale for DiMasi's benefit. See Sept. 9, 2011 Tr. at 23 (Docket No. 674 at 33). Some of that money was used to fund a letter of credit for DiMasi. Id. Some of it was to be held for DiMasi at Vitale's company, W.N. Id.

If the court did not reduce DiMasi's sentence and he remained in custody, DiMasi would not be able to work with Vitale for two more years. In United States v. Smith, the Third Circuit upheld a condition of Supervised Release that barred the defendant from working for three years with any attorney or law firm where his prior work at a law firm enabled him to commit the crime for which he was sentenced. See 445 F. 3d 713, 719 (3rd Cir. 2006). A condition of Supervised Release barring DiMasi from working with Vitale is similarly justified and appropriate.

The court is also ordering that DiMasi and members of his family shall not receive money or anything of value, directly or indirectly, from Vitale or any individual or entity with which Vitale is associated, while DiMasi is on Supervised Release. This condition is necessary to minimize the risk that DiMasi will profit from his crimes while serving his sentence.

67

The court understands, however, that DiMasi and Vitale have long been close friends. Therefore, the court is not barring DiMasi from seeing Vitale when DiMasi returns home.[17]

VII. CONCLUSION

For the reasons explained in this Memorandum, the Motion seeking a reduction of DiMasi's sentence to time-served is being allowed. An amended judgment, with modified conditions of Supervised Release, will enter. It will allow the Bureau of Prisons to release DiMasi in North Carolina, to the custody of his wife Deborah DiMasi, at 10:00 a.m. on November 22, 2016, if the Probation Office has previously approved an itinerary for DiMasi's immediate return to Massachusetts.

This approach will expedite DiMasi's return home. It will also assure that he is not transported to Massachusetts in the usual manner by the Bureau of Prisons, which would involve a lengthy bus trip with stops at Bureau of Prisons facilities that may not be familiar with, or able to meet, the medical needs which justify DiMasi's early release. DiMasi shall return directly to

---

[17] The condition of Supervised Release concerning Vitale was not raised by the court in its Orders or at the November, 2016 hearing. The court has considered giving DiMasi notice of this proposed condition and an opportunity to be heard concerning it. See F. R. Civ. P. 32.1(c)(1). However, doing so would delay DiMasi's release from custody. In these circumstances, DiMasi may, by December 7, 2016, move for reconsideration of the condition of Supervised Release concerning Vitale that is now being imposed.

his residence and promptly inform the Probation Office of his arrival. The Probation Office will meet with Mr. and Mrs. DiMasi at their residence to review the documents relating to DiMasi's Supervised Release and have them executed.

VIII. ORDER

In view of the foregoing, is hereby ORDERED that:

1.   The Director of the Bureau of Prisons' Motion to Reduce Term of Imprisonment to Time Served (Docket No. 872) is ALLOWED.

2.   An Amended Judgment consistent with this Memorandum shall enter.

3.   If notified by the Probation Office for the District of Massachusetts that it has approved DiMasi's travel itinerary, the Bureau of Prisons shall release DiMasi, in North Carolina, to the custody of Deborah DiMasi on November 22, 2016, at 10:00 a.m.

4.   Mr. and Mrs. DiMasi shall return to Massachusetts forthwith, proceed directly to their residence, and inform the Probation Office when they have arrived home.

UNITED STATES DISTRICT JUDGE